Sophia M. Rios (Bar No. 305801)
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
srios@bm.net

Micheal Dell'Angelo
Andrew Abramowitz
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL PETERS, individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LPL FINANCIAL LLC<br><br>Defendant. | Case No. **'24 CV 1228 TWR AHG**<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

COMPLAINT

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION .............................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................ 3

III.  PARTIES ........................................................................................................... 3

    A.   Plaintiff............................................................................................... 3

    B.   Defendant ........................................................................................... 3

IV.   FACTS ............................................................................................................... 4

    A.   Defendant Establishes Cash Sweep Programs for the Uninvested
       Cash in Its Customer Accounts, Intended to Benefit Itself .............................. 4

    B.   Defendant's ICA and DCA Programs ................................................. 6

    C.   Defendant *Always* Retains the Vast Majority of Interest
       Payable to Its Customers..................................................................... 7

    D.   Defendant Misrepresented and Omitted Material
       Facts Regarding the Programs ............................................................. 8

V.    CLASS ACTION ALLEGATIONS ................................................................ 12

FIRST CAUSE OF ACTION
   Breach Of Fiduciary Duty ......................................................................... 16

SECOND CAUSE OF ACTION
   Unjust Enrichment (In The Alternative) ..................................................... 17

THIRD CAUSE OF ACTION
   Unfair, Or Fraudulent Business Practices In Violation Of The California
   Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq............... 18

FOURTH CAUSE OF ACTION
   For Breach Of Contract (In The Alternative)............................................... 20

PRAYER FOR RELIEF ............................................................................................ 21

DEMAND FOR JURY TRIAL ................................................................................. 21

i
COMPLAINT

Plaintiff Daniel Peters ("Plaintiff"), on behalf of himself and all others similarly situated who held cash positions in accounts custodied by LPL Financial LLC ("LPL" or "Defendant"), and whose cash was subject to Defendant's cash sweep program (the "Program") alleges as follows against Defendant, based on personal knowledge as to Plaintiff and his own acts, and otherwise on information and belief; based on the investigations of his counsel, which included a review of documents created and distributed by Defendant, SEC filings, and other publicly available commentary, analysis, and information. Upon information and belief, Plaintiff believes that discovery will further support the allegations in this Class Action Complaint.

## I.   **INTRODUCTION**

1.    The breach of fiduciary duty, unjust enrichment, breach of contract, and California Unfair Competition Law ("UCL") claims asserted herein are brought by Plaintiff on behalf of himself and other customers of LPL whose cash positions held in LPL accounts were subject to Defendant's cash sweep programs. Defendant's cash sweep programs automatically "swept" investors' cash out of their accounts, on a daily basis, and deposited it into one of LPL's cash sweep programs (the "Programs") defined below as the ICA Program and the DCA Program.[1] The ICA Program and DCA Program are collectively referred to herein as the "Programs."

2.    During the Class Period, LPL operated two cash sweep programs (i.e., the Programs) that dictated how its customers' cash in LPL accounts was managed. The first program, the ICA Program (the "ICA" or "ICA Program"), was LPL's default program for the treatment of uninvested cash in non-IRA customer accounts. Under the ICA Program, LPL channeled customers' uninvested cash in non-IRA accounts into a series of bank accounts that paid out substantial returns to Defendant, while paying minimal interest to Plaintiff and members of the proposed Class.

---

[1] This case is focused solely on Defendant's ICA and DCA Programs and not on any other cash management programs such as money market fund programs.

3.     The second program, the DCA Program (the "DCA" or "DCA Program") was LPL's default program for the treatment of uninvested cash in LPL customers' IRA accounts – similarly to the ICA Program – into a series of bank accounts that paid out substantial returns to Defendant, while paying minimal interest to Plaintiff and members of the proposed Class.

4.     Defendant's customers did not have a choice whether or not to participate in a Program and were required to do so in order to open an account with LPL. Also, Defendant's customers did not have a choice to select in which Program their accounts would be enrolled. Defendant, acting as its customers' investment as to the Programs, exercised that choice based on the type of account, and the cash in the various types of customer accounts was automatically and by default swept into the Program designated by LPL for the applicable account type.

5.     Defendant is an independent, dually registered broker-dealer and Registered Investment Adviser (RIA) that offers investment advisory services to its nationwide client base. LPL offers brokerage and advisory investment accounts to Plaintiff and members of the proposed Class accounts, with LPL acting as its customers' agent and investment adviser while managing their account cash positions in the Programs, regardless of whether those accounts were non-managed brokerage accounts or managed brokerage accounts where LPL acted both as a broker and as an investment adviser.

6.     Despite its affirmative and ongoing duties to (i) manage the accounts, including the cash in those accounts, in the best interest of Plaintiff and the proposed Class; (ii) discharge its agency as to the management and allocation of its customers' cash positions in the Programs; (iii) avoid conflicts of interests; (iv) act with loyalty toward its customers; and (v) properly disclose material information and its conflicts, Defendant continuously acted in its own interest and sought to maximize its own profits at the expense of Plaintiff and the Class.

## II.   JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2). Plaintiff is diverse from Defendant and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because among other things, the Defendant is headquartered in this District at 4707 Executive Drive, San Diego, CA 92121, and a substantial part of the events, omissions, and/or relevant conduct by Defendant giving rise to Plaintiff's claims occurred in this District.

## III.   PARTIES

### A.   Plaintiff

9.     **Daniel Peters** ("Plaintiff). Plaintiff is a customer of LPL and a resident of Michigan. Plaintiff opened managed and simple accounts, respectively, with LPL in which cash was held in varying amounts over the course of the life of the account. All cash held in Plaintiff's account was automatically funneled into low-interest bearing bank accounts pursuant to the ICA and DCA Programs – accounts for which Defendant ultimately received fees and returns on investments far higher than what was paid out to Plaintiff.

### B.   Defendant

10.    Defendant LPL is an independent, dually registered broker-dealer and RIA that offers brokerage and investment advisory services to its nationwide client base. According to Defendant's most recent Annual Report, filed with the SEC on Form 10-K on February 21, 2024 (the "2023 Annual Report"), "LPL serves the advisor-mediated marketplace as the nation's largest independent broker-dealer, a leading investment advisory firm, and a top custodian." According to the 2023 Annual Report, LPL serves "more than 22,000 financial advisors, including advisors at approximately 1,100 enterprises and at approximately 570 registered investment advisor firms nationwide, providing the front, middle and back office support our advisors need." Defendant is headquartered in this District at 4707 Executive Drive, San Diego, California.

IV.  **FACTS**

    A.  **Defendant Establishes Cash Sweep Programs for the Uninvested Cash in Its Customer Accounts, Intended to Benefit Itself**

    11.  Beginning in approximately 2016, Defendant has been engaged in a multi-year process to reposition the cash holdings in its customers' brokerage accounts into cash "investment" vehicles that generate substantial revenue for LPL while at the same time providing little to no benefit to Defendant's customers.[2] Defendant refers to such cash investment vehicles – which include the ICA Program and DCA Program as its "cash sweep programs."[3]

    12.  Initially, the Programs, which impact the account composition and performance of millions of Defendant's customer accounts,[4] began as a series of adjustments to Defendant's management of its customers' cash. However, in more recent years, it has transformed into an aggressive and unlawful effort to maximize Defendant's profits at the expense of its customers, as more fully alleged below. The Programs are so indifferent to the needs of Defendant's customer cash holdings that in most managed customer accounts, Defendant's customers *lose* money on their cash positions while LPL reaps substantial profits from that cash. This is because, notwithstanding Defendant's representations regarding the management of these accounts, the Programs are specifically designed and intended to ensure two results: (i) Defendant LPL will ***always*** receive the vast majority of the interest earned by its customers' cash holdings, and (ii) LPL's customers will ***always*** receive as interest on their cash holdings only a small fraction of the

---

[2] Ex. A – LPL 2016 From 10-K Report (Pg. 43): "Asset-based revenues for the year ended December 31, 2016, increased to $556.5 million, or 12.7%, from $493.7 million compared with the same period in 2015. The increase is due primarily to increased revenues from our cash sweep programs."

[3] Ex. B – ICA Disclosure Booklet (2024).

[4] Ex. C – LPL 2022 Q3 Earnings Release (Pg. 13 – LPL reported 7.8 million customer accounts).

interest that their money would generate if placed in any other bank savings account or a typical money market fund.

13.   The scale and magnitude of Defendant's improper use of customer cash for its own benefit through the Programs is evidenced by Defendant's publicly reported Return on Assets ("ROA") over the course of the Relevant Period. For example, in the fourth quarter of 2015, LPL reported ROA profits from its "Cash Sweep" of 2.3%, constituting approximately 8.5% of Defendant's total return on assets.[5] However, in the first quarter of 2024, after the Programs were fully ratcheted up, Defendant reported that "Client Cash" was now producing ROA profits of 11.8%, ***constituting an astounding 37.3% of Defendant's total return on assets.***[6] Indeed, as of Defendant's most recent investor presentations, the ***profits generated from clients' cash custodied at the firm now exceed the total ROA from advisory fees, commissions, and interest income combined***.[7] In effect, Defendant's brokerage operation has effectively become a lawful conduit for its unlawful Programs – costing Plaintiff and members of the Class a substantial amount of money.

14.   Consequently, while Defendant might still hold itself out as a brokerage and investment advisory firm, its current business model reflects a different commercial enterprise entirely. Rather than primarily generating revenue from the advisory services it provides to its customers, it instead now profits in large part from placing its customers' cash into banking and investment vehicles that are selected ***primarily*** for the benefit of Defendant, not the customer.

15.   Notably, this business model has not only improved Defendant's bottom line, but it has also resulted in a meteoric rise in the share price of LPL common stock. Since 2016, the share price of LPL stock has increased over 560%, far exceeding the returns of

---

[5] Ex. D – 2017 Q4 LPL Financial Key Metrics Presentation (pg. 12).
[6] Ex. E – Q1 2024 LPL Financial Key Metrics Presentation (pg. 11).
[7] *Id.*

the S&P 500 (GSPC – up approximately 186%) and the iShares U.S. Broker-Dealers & Securities Exchanges ETF (IAI – up approximately 225%) over the same period.[8]

### B.   Defendant's ICA and DCA Programs

16.    Daily, LPL automatically "sweeps" any cash in most customer accounts into (i) the ICA Program or (ii) the DCA Program. Each option substantially benefits LPL at the expense of its customers.

17.    Defendant's ICA and DCA Programs are a mechanism through which Defendant, while acting as its customers' investment adviser as to the Programs, siphons off most of the interest earned on the cash held by its customers in their LPL accounts.

18.    Daily, any uninvested cash in customer accounts is "swept" into a series of pre-selected bank accounts at institutions chosen by LPL primarily for its own benefit.

19.    Daily, interest is generated on the customers' cash held at the banks selected by LPL. However, the interest earned on the customers' cash is sent to LPL, not paid out directly to those customers. LPL then allocates to itself most of that interest, allocating only a small percentage of it to its customers, whose cash generated that interest. LPL does not disclose to its customers how much of the interest generated by their funds is withheld by LPL.

20.    Regardless of which banks into which LPL directs its customers' cash, or the interest rates any of those banks offer to the general public and/or to LPL specifically, the percentage payable to LPL's customers remains the same, as alleged in more detail below.

21.    The monthly account statements that LPL provides to its customers disclose the identity of the bank where the customer's cash was held during the relevant period and the interest rate paid *to the customer* on their cash; however, the statements do not disclose what percentage of the total interest paid was retained by LPL and/or what fees LPL received for placing its customer's cash through the ICA or DCA Programs. LPL also does not disclose the amount of interest that would be paid to its customers if those customers

---

[8] Ex. F - LPL Stock Performance since January 1, 2016.

were to directly deposit their funds into accounts at the same banks chosen by LPL for the ICA or DCA Programs. Those undisclosed rates – as well as the portion withheld by LPL for itself – are substantially higher than what LPL's customers receive.

22.    Overall, the ICA and DCA Programs enabled Defendant to generate substantial revenue for itself using its customers' money.

## C.    Defendant *Always* Retains the Vast Majority of Interest Payable to Its Customers

23.    LPL does not disclose the exact portion of the interest and/or fees that it keeps for itself from the total interest earned on the customers' cash subject to the Programs. While Defendant discloses that it ***may*** retain up to 600 basis points in fees drawn from the total interest payable on the aggregate customer cash it places for all its customers in the Program, it only provides customers with a retrospective lookback on the percentage that it takes in the aggregate, for the entirety of the cash in all of its customer accounts combined in each fiscal quarter, without identifying specific percentages or amounts charged to any specific customer thereby making it impossible for any individual customer to parse how their account was impacted relative to LPL.

24.    Accordingly, customers are unable to determine exactly what percentage of the total interest they receive on their own cash holdings relative to that kept by Defendant.

25.    For example, in the first quarter of 2024, LPL generated 3.23% in interest returns *for itself* from its customers' cash holdings. Conversely, Defendant paid out the following percentages to its customers based on their total household balances:

(1) Customers who held between $0 and $150,000 in assets with Defendant received just 0.35% in interest on their cash holdings.

(2) Customers who held between $150,000 and $750,000 in assets with Defendant received just 0.40% to 0.50% in interest on their cash holdings.

(3) Customers who held between $750,000 and $1.5m in assets with Defendant received just 0.80% in interest on their cash holdings.

(4) Customers who held between $1.5m and $10m in assets with Defendant received just 1.15% to 1.25% in interest on their cash holdings.

(5) Customers who held in excess of $10m in assets with Defendant received just 2.20% in interest on their cash holdings.

26.    In 2023, the fees charged by LPL ranged from 3.17% to 3.22%, while Defendant paid out similarly paltry returns to its customers on their own cash holdings.

27.    Notably, for customers who pay Defendant a management fee on their accounts, that fee also applies to the cash portion that is placed in the ICA or DCA Programs, in addition to the management fees charged by Defendant specifically for the ICA or DCA Programs, respectively. Thus, the returns on most of those customers' cash holdings are generally less than the expense of having that cash "managed" by LPL – meaning that most of Defendant's customers see *negative returns* on their cash holdings because they are automatically included in Defendant's Programs.

### D.    Defendant Misrepresented and Omitted Material Facts Regarding the Programs

28.    Defendant makes contradictory disclosures, material misrepresentations, and substantive omissions to Plaintiff and members of the Class to obfuscate how its Programs operate. Specifically, Defendant's disclosures conceal the fact that the ICA and DCA improperly divert the vast majority of the returns on customers' uninvested cash holdings back to Defendant – to the detriment of Plaintiff and members of the proposed Class.

29.    First, Defendant employs a false and inaccurate description of its fiduciary duties to its customers in this context in its Relationship Summary document – which it provides to all clients at the time of account opening, including Plaintiff and members of the proposed Class.

30.     Specifically, in the Relationship Summary[9], Defendant states that "[w]hen we provide you with a recommendation as your broker-dealer or act as your investment adviser, *we have to act in your best interest and not put our interest ahead of yours.*" (Emphasis added.) Defendant later states that, as to the cash sweep Programs, "[t]he fees we receive are *typically* higher than the interest you earn on the cash held in the bank accounts and are *in addition* to any fees you pay to us." (Emphasis added.) However, Defendant's statements omit that, regarding the ICA and DCA Programs, LPL is acting as an investment adviser because it is making the decision about how and where invested uninvested cash balances and the terms on which that case will be invested which. Those decisions, made by LPL in its capacity as an investment advisor, violate LPL's fiduciary duties to Plaintiff and members of the proposed Class because they *always* place LPL's interests ahead of Plaintiff and members of the proposed Class, and the fees LPL receives are *always* – not just "typically" –higher than the customer's portion of the interest generated by the customer's own money.

31.     The ICA and DCA are specifically designed to ensure two results: (i) Defendant will *always* receive most of the interest received from its customers' cash holdings, and (ii) that its customers will *always* receive substantially less interest on their cash holdings than if that money were placed in a typical bank savings account or money market fund. Defendant thus fails to disclose that it will *always* receive a larger portion than its customers, of the interest generated by the customers' cash and how much higher that portion is: not just the majority, but nearly the entirety of that interest goes to Defendant, rather than to its customers.

32.     Other documents provided by LPL to its customers, such as Plaintiff and members of the Class, at the time of account opening, similarly fail to disclose material relevant information. Most notably, Defendant's Master – Account Agreement, a 23-page

---

[9] The relevant portions of the Relationship Summary disclosures are uniform for LPL customer accounts at issue.

document applicable to Defendant's brokerage accounts, states that the customer will receive "the same interest rates" on the account cash regardless of the bank in which Defendant deposits the customer's money, and that the interest rates paid to the customer "are determined by the amount the Banks are willing to pay on the [ICA account] minus the fees paid to LPL and other parties," and that "[i]n the ICA program, LPL receives a fee equal to a percentage of the average daily deposit balance in each ICA Deposit Account. The fee paid to LPL will be at an annual rate of up to an average of 600 basis points as applied across all ICA Deposit Accounts taken in the aggregate." However, Defendant does not disclose who made the determination regarding the interest rates paid to the customer, or specifically that it is Defendant – not the banks – that makes that determination, and that it does so while acting as the customer's agent. When read in the context of that section, LPL fails to disclose that it – not the banks in which LPL customers' money is invested – make the determination regarding the interest payable to each customer. Defendant also fails to disclose the actual fees or percentage that it keeps from each particular customer's interest payment, beyond referencing the "up to" "average" of 600 basis points which applies to all ICA accounts in the aggregate, not to any one specific account. LPL also fails to disclose the fees paid to "other parties," who those "other parties" are, what such fees are for, and how they were determined.

33.    The account agreements governing Defendant's advisory accounts – which are fiduciary accounts – contain substantially similar incomplete disclosures and omissions regarding Defendant's fees, and in addition require its fiduciary customers to agree that they had "independently chosen the ICA or DCA" Program for their account, despite the fact that they had no such choice and those Programs are assigned by Defendant based on the type of account; also, to agree that Defendant's ICA and DCA Program fees are "reasonable and appropriate for the services being provided under the [Programs]," even though Defendant does not disclose the actual fees it charges or that they represent the vast majority of the interest generated by the customer's cash; and to agree that they had not

relied on the advice or recommendation of [Defendant or its advisor] in making [the DCA or ICA Program] selection," even though in reality the opposite is true and the customer makes no such selection. Defendant's account agreements governing its RIA platform customers contain substantially identical language.

34.     All of the account agreements discussed above instruct LPL customers to review the ICA and DCA Disclosure Booklets ("Disclosure Booklets"), which LPL does not provide but rather instructs customers to either access online at a separate link or affirmatively request from the customer's LPL representative. However, even those Booklets fail to provide a full disclosure as to how Defendant allocates the interest payments on the customer's cash between itself and the customers, including (i) the actual amount of Defendant's portion of those interest payments and (ii) that Defendant keeps nearly all the interest for itself and only pays a small percentage to the customer. Additionally, the Disclosure Booklets contain additional misrepresentations and omissions regarding Defendant's fees and the features of the ICA and DCA programs, as more fully explained below.

35.     Consistent with the Relationship Summary, the Disclosure Booklets acknowledge that under the ICA and DCA programs, Defendant is acting as its customers' agent, thus a fiduciary.

36.     Notwithstanding that Plaintiff and members of the proposed Class are fiduciary customers of LPL, LPL's Disclosure Booklets contain a series of inaccurate representations and omissions regarding the operation of the ICA and DCA Programs, as well as how they benefit Defendant over the interests of LPL's customers.

37.     For example, while the Disclosure Booklets state that "[t]he interest rates paid are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties...," Defendant omits to disclose what those fees actually are and how substantial a proportion of the interest on the customer's cash Defendant keeps to itself, fails to identify the other parties – if any –that receive a portion of those fees, and fails to

disclose that Defendant itself, rather than the banks, determine the portion of the interest allocated to customers.

38.     Later in the Disclosure Booklets, Defendant falsely states, "[t]he interest rates paid by a Bank *may* be higher or lower than the interest rates available to depositors making deposits directly with the Bank or other depository institutions. (Emphasis added.) In fact, Defendant omits the fact that the interest rates paid to LPL's customers are ***always*** lower than the interest rates available to depositors making deposits directly with those banks or other depository institutions. This is the direct result of the exorbitant portion that the Defendant keeps for itself from the interest paid on its customers' money in the ICA and DCA Programs despite its fiduciary status.

39.     Moreover, Defendant glosses over the fact that higher yield alternatives for cash management exist for its customers outside of the Programs, such as money market mutual funds, which typically provide better returns than bank deposits while offering similar levels of liquidity and principal protection.

40.     LPL also falsely discloses that "LPL ***generally*** receives as its fee the majority of the amount paid by the Banks with respect to such deposits." (Emphasis added.) In fact, LPL ***always*** receives most of the interest paid by the banks on the customers' cash.

## V.   CLASS ACTION ALLEGATIONS

41.     Plaintiff re-alleges and incorporates by reference the allegations set forth above.

42.     Plaintiffs bring this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of: All persons who held cash positions in accounts custodied by LPL Financial LLC, and whose cash was subject to Defendant's Program from July 17, 2018, until Defendant's unlawful conduct alleged herein ceases.

43.     Excluded from the Class are governmental entities, institutional and other non-retail investors; Defendant and any of its affiliates, legal representatives, employs, or

officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiff and the proposed Class, including other attorneys and staff at each respective firm.

44.     Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

45.     This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**Numerosity**
**Rule 23(a)(1)**

46.     Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time. However, Defendant's wealth management services provide financial planning and advisory services to over 4.5 million client accounts through the work of over 22,000 financial advisors, and Plaintiff believes that the members of the proposed Class number in the thousands. Accordingly, Plaintiff and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

***Existence and Predominance of Common Questions of Law and Fact***
***Rule 23(a)(2), 23(b)(3)***

47.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

48.     Whether Defendant has breached its duties to manage Plaintiff's cash in the best interest of Plaintiff;

13
COMPLAINT

49.     The existence of Defendant's fiduciary duties to the Class, and whether Defendant violated those duties;

50.     Whether Defendant's disclosures regarding the ICA and/or the DCA Programs were false;

51.     Whether Defendant breached its contract with Plaintiff and members of the proposed Class by failing to charge reasonable fees on the management of cash in the ICA and DCA Programs;

52.     Whether Defendant violated the California Unfair Competition Law;

53.     Whether Defendant was unjustly enriched by its wrongful conduct;

54.     Whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

55.     Whether and to what extent Class members are entitled to damages and other monetary relief; and

56.     Whether and to what extent Class members are entitled to attorneys' fees and costs.

**Typicality**
**Rule 23(a)(3)**

57.     Plaintiff's claims are typical of the claims of the Class because he was a customer of Defendant that had his cash balances improperly managed by Defendant through its administration of the ICA and DCA Programs. Thus, Plaintiff's claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendant, and the relief sought within the Class is common to the members of each.

**Adequacy of Representation**
**Rule 23(a)(4)**

58.     Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation,

and Plaintiff will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

### Superiority
### Rule 23(b)(3)

59.     A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

60.     Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

61.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

62.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

63.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

64.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

### FIRST CAUSE OF ACTION
**Breach Of Fiduciary Duty**

65.     Plaintiff repeats and incorporates by reference the preceding allegations as if fully set forth herein.

66.     At all relevant times, Defendant owed fiduciary and quasi-fiduciary duties to Plaintiff and the members of the Class. Such duties independently arose out of (1) the agency relationship between Defendant, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Programs; (2) the investment advisory relationship between Defendant, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Programs; (3) Defendant's duties arising out of Regulation Best Interest[10] (hereafter, "Regulation BI").; and (4) as to Defendant's advisory customers, the investment advisory relationship between Defendant and those customers pertaining to the entirety of those customers' accounts.  As a fiduciary to Plaintiff and the Class, Defendant owed them the highest duties of loyalty, candor, due care, and prudence in as to the services it provided to them in connection with the Programs. Moreover, as a fiduciary, Defendant had a continuing duty to act exclusively for the benefit of Plaintiff and the Class in connection with the Programs.

67.     Defendant further owed Plaintiff and the Class the fiduciary duty to act in good faith in connection with the Programs.

68.     Plaintiff and the Class were fully dependent upon Defendant's ability, skill, knowledge, and goodwill with respect to Defendant's Programs.

69.     Defendant breached its fiduciary duties by the conduct alleged herein, including by making material misrepresentations, failing to disclose material information,

---

[10] 2022 SEC LEXIS 1384, *5-8.

violating its duty of care, and acting in its own best interest at the expense of Plaintiff and the Class vis-à-vis the Programs.

70. Defendant violated its duty of loyalty by, among other things, not properly disclosing its own conflicts of interest arising out of the Programs.

71. As a direct and proximate consequence of Defendant's conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial, and also seek disgorgement of any undue and unjust gains of Defendant, punitive damages, as well as all other equitable relief deemed just and proper.

72. Defendant's conduct warrants a punitive damage award because Defendant has been guilty of oppression, fraud, and/or malice, engaged in conduct that is outrageous, and exhibited reckless indifference to the rights of its customers. Defendant engaged in intentional misrepresentation and/or concealed a material fact known to the Defendant with the intention on its part of thereby depriving its customers, including Plaintiff and the putative Class, of property and/or legal rights or otherwise causing injury, as more fully stated above.

## SECOND CAUSE OF ACTION
### Unjust Enrichment (In The Alternative)

73. Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

74. In the alternative, Defendant has received and retained a benefit from Plaintiff and the Class members, and inequity has resulted.

75. Defendant benefited through its unjust conduct by sweeping available cash balances from its customers' accounts in the Program into bank accounts selected for the benefits they offered to Defendant, not its customers, and retained most of the interest generated by those cash balances.

76. Plaintiff alleges that it is inequitable for Defendant to retain these benefits.

77.    Plaintiff alleges that because of Defendant's conduct, the amount of its unjust enrichment should be disgorged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**Unfair, Or Fraudulent Business Practices In Violation Of The California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.**

78.    Plaintiff realleges and incorporates by reference the preceding allegations as if fully set forth herein.

79.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unfair or fraudulent business act or practice."

80.    The acts and practices of Defendant as alleged herein constitute "unfair" business acts and practices under the UCL in that Defendant's conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous.

81.    Plaintiff alleges that Defendant has, in the course of its business and the course of trade or commerce, undertaken and engaged in unfair business acts and practices under the UCL by, among other things, using its Programs to generate significant revenue for itself with its customers' money, while paying its customers only a small fraction of those returns and concealing from such customers the amounts of those customers' interest that it retained for itself and the fact that those amounts represented the vast majority of such interest.

82.    These acts also constitute "fraudulent" business acts and practices under the UCL in that Defendant's conduct is false and has a tendency to deceive the general public.

83.    The unfair business acts or practices described herein presented a threat and likelihood of harm and deception to Plaintiff and the Class in that Defendant has systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

84.    Because of their reliance on Defendant's misrepresentations and omissions of material facts concerning the Programs, Plaintiff and the Class have suffered an

ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

85.   Defendant owed Plaintiff and the Class a duty to disclose the true information concerning the Programs and to not withhold material facts from Plaintiff and the Class that contradicted its representations.

86.   Had Plaintiff and the Class been aware of the Defendant's conduct with respect to its customer cash in the Programs, Plaintiff and the Class would not have participated in those investment products or would have done so on different terms.

87.   The gravity of harm resulting from Defendant's unfair conduct outweighs any potential utility.

88.   The harm from Defendant's conduct was not reasonably avoidable by Plaintiff and the Class because only Defendant was aware of the true facts concerning the Programs, and Defendant did not disclose these facts, or did not sufficiently disclose them.

89.   Plaintiff and the Class have suffered injury in fact and have lost money as a direct and proximate result of Defendant's business acts or practices. Monies lost by Plaintiff include, without limitation, the returns on cash positions from the Programs that Defendant improperly earned from Plaintiff's money as set forth above.

90.   Through its unfair conduct, Defendant acquired money that Plaintiff and the Class was entitled to.

91.   Under the UCL, Plaintiff may enjoin these acts and practices and obtain restitution of all funds retained by Defendant by reason of and through the use of these acts and practices.

92.   Plaintiff and the Class accordingly seek appropriate relief under the UCL, including (a) in the alternative, restitution in full and disgorgement of all profits relating to the above-described unfair business acts or practices, and (b) such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair practices.

93.     Plaintiff and the Class also seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

### FOURTH CAUSE OF ACTION
### For Breach Of Contract (In The Alternative)

94.     Plaintiff repeats and realleges each of the allegations in the forgoing paragraphs as if fully set forth herein.

95.     Plaintiff asserts this cause of action for breach of contract in the alternative.

96.     Defendant's relationship with its customers is governed by a written contract, the terms of which are contained in, and incorporated into various standardized documents drafted by Defendant.

97.     One such document is the "Account Application." In order to become a customer of Defendant, each member of the proposed Class must sign and submit an Account Application to Defendant.

98.     The Account Application is related to and incorporated by reference into an "Account Agreement" for each type of investment account offered by Defendant.[11]

99.     Pursuant to the Account Agreements, Defendant was and continues to be contractually obligated to charge Plaintiff and members of the proposed Class fees and changes for services provided, including the administration of the ICA and DCA Programs, in amounts that are reasonable.

100.    As set forth herein, the fees charged by Defendant for the administration of the ICA and DCA Programs were clearly excessive and not reasonable. Accordingly, Defendant breached its contracts with Plaintiff and the members of the proposed Class.

101.    Plaintiff and the members of the proposed Class were harmed by Defendant's breach.

---

[11] Each type of LPL account is governed by an Account Agreement. For example, brokerage accounts are governed by the LPL Master – Account Agreement, advisory accounts are subject to agreements such as the Manager Select Account Agreement, and RIA accounts are subject to agreements such as the Manager Access Select Account Agreement.

## **PRAYER FOR RELIEF**

Plaintiff requests relief as follows:

A.    Actual damages;

B.    Punitive damages;

C.    Injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein;

D.    Attorneys' fees and costs of suit;

E.    Prejudgment interest; and

F.    Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

DATED: July 17, 2024                     Respectfully submitted,

*/s/ Sophia M. Rios*
Sophia M. Rios (Bar No. 305801)
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
srios@bm.net

   -and-

Micheal Dell'Angelo
Andrew Abramowitz
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net

Alan L. Rosca, Esq.
ROSCA SCARLATO LLC
2000 Auburn Dr. Suite 200
Beachwood, OH 44122

Telephone: (216) 946-7070
E-mail: arosca@rscounsel.law

   -and-

Paul J. Scarlato, Esq.
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
E-mail: pscarlato@rscounsel.law

*Counsel for Plaintiff*

COMPLAINT