Matthew L. Dameron (admitted *pro hac vice*)
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Tel: (816) 945-7110
matt@williamsdirks.com

*Additional Counsel on Signature Page*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re LPL Financial Cash Sweep Litigation*<br><br>This Document Relates To All Actions | Case No. 24-CV-01228 TWR (AHG)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

1.    This class action arises out of LPL's drastic under-payment of interest to its clients through its cash sweep programs.  While expressly acting as its clients' agent with respect to those programs, LPL violated its fiduciary, contractual and implied duties by underpaying its clients to enrich itself at its clients' expense.  Rather than pay its clients a fair and reasonable interest rate on their cash balances and put its clients' interests above

1

its own, LPL instead paid *de minimis* rates to its clients, unjustly obtaining for itself billions of dollars on that cash during periods of rising interest rates.

2.    In a typical cash sweep program, a brokerage firm automatically moves uninvested cash from a client's brokerage or advisory account into an interest-bearing bank account that generates returns for the client.  When LPL sweeps its clients' cash through its cash sweep programs, however, LPL uses that cash to generate returns primarily for itself, rather than its clients, through the fees it receives from banks participating in the programs that it charges to clients for managing their sweep accounts.  These fees account for most, and **all** or **more** in some cases, of the interest income spread generated by those cash deposits.

3.    As a financial advisor, and as an agent of its clients with respect to its cash sweep programs, as it financial advisor contractually agreed to be, LPL is required to act as a fiduciary in the best interests of its clients in connection with those programs.  That includes a duty to put its clients' interests ahead of its own when recommending and/or conducting transactions for them, including transactions within the scope of its cash sweep programs.  Additionally, implied in the agreements between LPL and its clients is a promise to act fairly and in good faith, especially in the context of the relationship between LPL and its clients and their reliance on LPL's abilities, skill, and knowledge as an investment advisor and broker-dealer.

4.    Rather than act as a fiduciary in the best interests of its clients with respect to its cash sweep programs or fulfill its contractual and implied obligations to its clients, LPL

2

created cash sweep programs that used its clients' funds to enrich itself at its clients' expense.  Over the past several years, LPL used these programs as a ***profit center for itself*** (with revenue from cash sweep rising by ***four times*** in just the past two years).  At relevant times during the Class Period, analysts estimated that LPL's cash sweep programs generated ***30-40% of the company's total gross profit***.  This has made LPL "uniquely dependent" on its practice of paying its clients, in 2024 for example, ***only 0.20% interest*** on their cash sweep balances while collecting for itself a "fee" of ***3.32%*** on those balances.  For the supposed "service" of paying its clients only 0.20% interest, LPL thus charges its clients ***more than 16 times*** that amount.

5.      Periods of rising interest rates presented an opportunity for LPL clients to earn more on its clients' cash sweep account balances.  But, by improperly keeping the interest rates paid on cash sweep accounts artificially low, LPL usurped that opportunity for itself, leveraging its clients' cash for its own benefit and securing massive profits for itself.  At times, LPL generated fees on its clients' cash balances through its cash sweep programs between 10 to 100 times higher than the interest rates it set and paid to its clients on their cash balances.

6.      While citing market factors, including the Federal Funds Effective and Target Rates, as a basis for setting the fees it supposedly "earns" for administering the cash sweep programs, LPL ignores those same market factors in setting its sweep interest rates ultimately paid to clients.  For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and was above 5.25% for most of 2024.  By

3

contrast, the average LPL brokerage client has only received interest rates of only 0.20% to 0.34% on their cash sweep account balances over that same period of time.

7.     There is nothing fair or reasonable about leveraging market conditions to reap windfall profits, while at the same time setting rates paid to clients arbitrarily low, passing none of those profits on to its clients in whose best interests LPL is obligated to act. Other brokerages that sweep client cash to unaffiliated banks (as LPL does) pay far higher interest rates than LPL.

8.     In fact, LPL's practices have drawn the attention of the Massachusetts Secretary of the Commonwealth and the U.S. Securities and Exchange Commission ("SEC"). Specifically, in March 2022, the Massachusetts Secretary of the Commonwealth sent LPL a letter asking if it intended to increase its cash sweep rates. It was also disclosed in August 2024 that the SEC had requested information from LPL regarding its cash management program for advisory accounts.

9.     LPL's misconduct constituted, and continues to constitute, an ongoing series of breaches of its fiduciary duties and its contractual obligations, and an ongoing breach of the implied covenant of good faith and fair dealing. Indeed, LPL's behavior has been particularly harmful to its clients who have suffered through record inflation over the past few years. Plaintiffs, individually and on behalf of the proposed Class defined herein, bring this class action to remedy the significant financial harm caused by LPL's misuse of its cash sweep program to enrich itself at its clients' expense.

4

## PARTIES

### A.    Plaintiffs

10.    Plaintiff Daniel Peters is a resident of Michigan who held an advisory Individual Retirement Accounts ("IRA"), a non-advisory IRA account, along with a standard brokerage account with LPL.  Mr. Peters' cash balances held in his LPL accounts were swept into LPL's Bank Sweep Programs during the period when his accounts were open, and he received unreasonably low interest on those deposits.

11.    Plaintiff Douglas Nevitt is a resident of Illinois who held an advisory IRA with LPL. Mr. Nevitt's cash balances held in his LPL IRA account were swept into LPL's Bank Sweep Programs during the period when his account was open, and he received unreasonably low interest on those deposits.

12.    Plaintiff Carol White is a resident of Colorado who maintained an advisory IRA account with LPL.  Ms. White's cash balances held in her LPL account were swept into LPL's Bank Sweep Programs during the period when her account was open, and she received unreasonably low interest on those deposits.

### B.    Defendants

13.    LPL Financial Holdings Inc. is a Delaware corporation with its principal place of business in San Diego, California.  As a holding company, together with its subsidiaries, LPL Financial Holdings Inc. provides financial consulting, wealth management, brokerage, and investment advisory services.  LPL Financial Holdings Inc. substantially assisted,

5

encouraged, directed, participated in, and received the benefits of the wrongful conduct alleged herein that was conducted primarily by LPL Financial LLC.

14.    LPL Financial LLC is a Delaware limited liability company with its principal place of business in San Diego, California.  LPL Financial LLC ("LPL-LLC") is LPL Financial Holding Inc.'s primary subsidiary and a registered broker-dealer and investment advisor with the SEC and a FINRA member.

15.    As used in this Complaint, the term "LPL" collectively refers to LPL Financial Holdings Inc. and LPL Financial LLC.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and other class members are citizens of States different from Defendants.

17.    This Court has personal jurisdiction over Defendants because they conduct substantial business in this District and they have their principal places of business here.

18.    Venue is proper in this District under 28 U.S.C. § 1391 because, among other things, Defendants maintain their principal places of business in this District and a substantial part of the events and/or relevant conduct by them giving rise to Plaintiffs' claims occurred in this District.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 24-CV-01228 TWR (AHG)

## LPL'S CASH SWEEP ACCOUNT MISCONDUCT

19.    LPL serves the "advisor-mediated" marketplace as an independent broker-dealer, investment advisory firm, and custodian.

20.    Offering no investment banking or underwriting services or proprietary products of its own, LPL claims that its advisor-focused business model reduces conflicts of interest.

21.    To the contrary, a staggering source of LPL's revenue is derived from fees paid to LPL based on the net interest income on its clients' cash sweep accounts.  Net Interest Income (or "NII") in this context is the difference between the interest that banks pay LPL on LPL's client cash balances and the amount LPL pays back to its clients on those balances, generated from its cash sweep programs.  As a result, LPL's revenue is exposed to interest rate risk primarily from changes in fees payable to LPL from banks participating in LPL's client cash programs, and even small increases in the Federal Funds Rate translate directly into tens of millions of dollars of annual gross profits for LPL.

22.    This plays out directly in LPL's earnings.  With rising interest rates in recent years, LPL's revenue generated from its clients' cash holdings increased ***over 300%***, from $361 million in 2021 to $1.5 billion in 2024.

### A.    LPL's Express Duties to, and Agreements With, Its Clients

23.    At the same time that LPL has reaped billions of dollars using its clients' uninvested cash for its own benefit, LPL expressly and repeatedly acknowledged its

7

fiduciary and contractual duties to its clients as an investment advisor, broker-dealer and, with respect to LPL's cash sweep programs, an agent on behalf of its clients.

24.    For example, LPL incorporated its Relationship Summary into all of its brokerage and advisory account agreements that expressly acknowledged its legal duties and agreement to act in its clients' best interests, explaining under the heading "What are your legal obligations to me when providing recommendations as my broker-dealer or when acting as my investment adviser?" that:

> *When we provide you with a recommendation as your broker-dealer or act as your investment adviser,* **we have to act in your best interest and not put our interest ahead of yours**.[1]

25.    The Relationship Summary goes on to confirm under the heading "How do your professionals make money?" that:

> ***Your professional is legally required to act in your best interest and not put his or her interests ahead of your own***.  We have systems in place ***to mitigate the conflicts of interests that arise*** from the way he or she makes money, including systems to review whether a recommendation is in your best interest.

26.    LPL's various account agreements and disclosures also cite a client's best interests as a primary duty, obligation and agreement in approving and recommending programs or services.  Examples of those statements include:

---

[1] Emphasis added in bold.  Unless otherwise noted, all emphasis is added.

8

- "LPL *only approves investment products that it determines are suitable and in the best interests of clients* using the Program, depending on clients' investment objective and risk tolerance."

- "[A]n [Investment Advisor Representative] may *only recommend a program or service that he or she believes is suitable and in the best interests of a client* in accordance with the applicable standards under the Advisers Act.

- LPL has policies and procedures in place for customized [Unit Investment Trusts] that *are designed to prevent conflicts of interest and to ensure that financial professionals act in clients' best interest*."

27.     LPL thereby admits that when it has a conflict of interest it must take steps to mitigate it.  The disclosures above refer to LPL's actions in connection with recommending "services" to clients.    LPL describes its work (and the work of an unidentified "administrator") in connection with the Cash Sweep Programs as a "service."  This includes in LPL's "Miscellaneous Account and Services Fees Schedule," where LPL identifies the "Deposit Cash Account sweep fee" as a fee for "Cash Management Services."  Rather than having proper processes and procedures in place to mitigate the conflicts arising from such activities and "services," as LPL agreed it would, LPL profits off of, and has not mitigated the harm from, the conflicted Cash Sweep Programs.  The Cash Sweep Program "services" that LPL and the administrator provide to its clients are also in fact not in its clients' best interests.

28.     LPL's account agreements, disclosures, and related documents consistently acknowledge LPL's duties and agreement to mitigate conflicts of interest.  LPL's account brochures, agreements, and other documents contain sections that are dedicated to conflict

disclosures.   In reality, LPL has created, structured and implements its Cash Sweep Programs to profit from the conflict of interest between LPL and its clients with cash sweep accounts.

29.    For example, in disclosing the conflict of interest that it created in the design of its Insured Cash Account program ("ICA Program")—one of LPL's two automatic cash sweep programs (described further below)—LPL explains:

> The fees that LPL receives from the Banks are an important revenue stream and present a conflict of interest for LPL because ***LPL benefits financially if cash is swept into the ICA program***. Because this compensation is retained by LPL and is not shared with your financial professional, ***it does not cause your financial professional to have a direct financial incentive*** to recommend that cash be held in a Deposit Account instead of holding securities.

30.    Although completely within its control to do so, LPL makes no efforts to mitigate its conflict of interest.  In other words, discussing how LPL's advisors may or may not be incentivized with respect to the cash sweep programs does not mitigate ***LPL's*** conflict of interest—one that it created through the Cash Sweep Programs' design—including, the automatic enrollment feature and LPL's control over the interest rates paid to its clients and the fees paid to LPL and an unidentified "administrator" in connection with the Cash Sweep Programs.

31.    LPL also admits that it has a conflict of interest with respect to its Deposit Cash Account program ("DCA Program")—LPL's second, automatic cash sweep program available only for advisory retirement accounts (collectively with the ICA, the "Cash Sweep Programs").  As the LPL Relation Summary stated: "The compensation that LPL

10

receives related to ICA, DCA (including from any ICA and DCA overflow mechanisms) and the Sweep Funds is in addition to the Account Fee received with respect to the assets in the sweep investment. This compensation related to ICA, DCA and Sweep Funds is an important revenue stream and ***presents a conflict of interest*** to LPL because LPL has a financial benefit if cash balances are maintained in the ICA, DCA or Sweep Fund." Rather than taking adequate steps to mitigate this conflict of interest consistent with its agreements and fiduciary duties, LPL has structured and implemented the Cash Sweep Programs to profit from such conflict of interest.

32.    LPL also states in its disclosures that "In addition to LPL, other service providers of the ICA program will receive fees. Other than ***these stated fees***, there will be no charges, fees, or commissions imposed on your account with respect to the ICA program." LPL thus promises to clients in its ICA program that it will only charge them "stated fees." A "stated fee" refers to a fee that is clearly and explicitly disclosed upfront, meaning the exact amount of the charge is readily visible to the customer before they agree to a service or purchase, with no hidden or unexpected additional costs added later. Contrary to LPL's agreements with its clients, fees are paid from clients' cash sweep account balances to at least one "other service provider"—the unnamed administrator referenced above—but those fees are never stated to LPL clients.

33.    Further, specifically with respect to its cash sweep programs, LPL expressly acts as its clients' agent, and thus fiduciary, as explained throughout its program disclosures:

11

- "*Under the ICA program, LPL Financial ("LPL"), acting as your agent, will automatically transfer* (or "sweep") available cash balances in your eligible accounts . . . into interest-bearing deposit accounts ("Deposit Accounts") insured by the [FDIC]."

- "*As your agent*, *LPL will sweep cash out of your eligible account* and into Deposit Accounts held by the participating Banks."

- "*LPL acts as your agent when sweeping cash* to Deposit Accounts at each Bank on the DCA program [Available Bank List]."

- "*LPL (as your agent) will maintain your Deposit Accounts* such that cash balances will not exceed the FDIC Ownership Category limits of $250,000 per individual and $500,000 for joint accounts."

- "If it is possible to rebalance your cash so it is in the Banks in the appropriate priority sequence, *LPL will, as your agent, withdraw your cash and re-deposit* the cash in that sequence."

- "*As your agent, LPL will deposit* available cash balances in the [money market deposit account] at each Bank as set forth above. *All withdrawals will be made* from the [transaction account] at a Bank *by LPL as your agent.*"

34.    Additional provisions in LPL's advisory account agreements, and modifications to those provisions over time, further provide that LPL had a duty to charge and collect only reasonable fees through its Cash Sweep Programs.  For example, prior to March 2024, LPL's advisory account agreements included the following provision:

> In selecting the DCA program for your eligible Account, you agree that: you have independently chosen the DCA program for your Account, fees of LPL and the program administrator, as discussed below, are *reasonable and appropriate* for the services being provided under the program, you have reviewed the DCA Disclosure Booklet (as applicable) and you have not relied on the advice or recommendation of LPL in making this selection.

35.    This serves as an acknowledgement that LPL and the program administrator agreed to be paid only "reasonable and appropriate" fees in connection with the Cash

12

Sweep Programs. However, it was not an adequate agreement between LPL and its clients about the specific amount of fees that LPL or the "program administrator" in fact charged to LPL clients going forward. The account agreements do not identify the actual interest rates that LPL clients would receive, nor the actual fees that LPL would charge, on clients' cash sweep account balances. Instead, LPL sets clients' interest rates and the fees that LPL charges, on an ongoing basis, and LPL clients could not have agreed, or consented, to them ahead of time. The account agreements also do not include the identity of, or the amount of fees to be paid to, the administrator.

36.     Recognizing its duty to charge only "reasonable and appropriate" fees for its ICA Program, LPL belatedly added the "ICA" Program to that same provision in its March 2024 version of its advisory account agreements:

> In selecting the **ICA** or DCA program for your eligible Account, you agree that: you have independently chosen the **ICA** or DCA program for your Account, fees of LPL and the program administrator, as discussed below, are ***reasonable and appropriate*** for the services being provided under the program, you have reviewed the **ICA Disclosure Booklet** or the DCA Disclosure Booklet (as applicable) and you have not relied on the advice or recommendation of LPL or [investment advisor representatives ("IAR")] in making this selection.

37.     This post-March 2024 disclosure was similarly not an adequate agreement between LPL and its clients about the specific fees that LPL or the "program administrator" in fact charged to LPL clients going forward. The account agreements do not identify the actual interest rates that LPL clients would receive, and the fees that LPL or the administrator would charge, on clients' cash sweep account balances. Instead, LPL sets

clients' interest rates and the fees that LPL charges, on an ongoing basis, and LPL clients could not have agreed, or consented, to them ahead of time. The reasonableness of fees in practice depends on the ***operation*** of the programs, not only in their design described in account agreements and disclosures.

38.    In developing, offering, automatically enrolling, and maintaining cash sweep accounts as its clients' broker-dealer, advisor, and/or agent, LPL failed to fulfill its duties and obligations and agreements to act in the best interests of its clients. Instead, LPL developed and operates its cash sweep programs in a manner that puts its own interests and profits not only ahead of its clients, and also directly at its clients' expense.

**B.    LPL's Cash Sweep Programs**

39.    A cash sweep program is a program provided by a brokerage or investment advisory firm where the firm automatically transfers uninvested cash balances (known as "free credit balances") in its clients' accounts to an interest-bearing bank account.

40.    LPL includes its Cash Sweep Programs as a default feature of all of its brokerage and advisory accounts.

41.    Per LPL's account agreements under the heading "Automatic Cash Sweep Program," all LPL clients and account holders, "By signing the Account Application, [] ***are selecting and agreeing***, with respect to assets held at LPL, to have cash balances in [their] account ***transferred automatically*** into a sweep program, depending on the type of account [they] hold."

14

42.    If a client's account is eligible for one of LPL's Cash Sweep Programs but the client does not wish to have their cash swept through the program, the client must contact their financial advisor for assistance to "turn off" the automatic sweep.

43.    LPL offers two primary[2] automatic cash sweep programs: (i) the Insured Cash Account program ("ICA Program"); and (ii) the Deposit Cash Account program ("DCA Program", and collectively the "Cash Sweep Programs").  The ICA Program is the default sweep program for most LPL account types, and the DCA Program is the default sweep program specifically for qualified advisory IRA accounts.

44.    LPL designed, controls, and exercises complete discretion over: (i) which accounts are eligible for which Cash Sweep Program or alternative sweep vehicle; (ii) the operation and management of each Cash Sweep Program; (iii) the banks into which clients' cash can be swept, including any cash that exceeds FDIC limits; (iv) the interest rates paid to clients on their cash deposits ("client rates"); and (v) fees received from the banks for clients' participation in the Cash Sweep Programs.

### 1.    Eligibility

45.    The ICA Program Disclosure Booklet lists the account types eligible for the program, specifically excluding "[c]ertain advisory retirement accounts," and further

---

[2] Two additional sweep programs—Single Banks Insured Cash Account Program ("SBICA") and Money Market Mutual Fund Sweep Program—are described in LPL's account agreements.  They are available in limited circumstances and only to clients who are not otherwise eligible for the ICA or DCA Programs.

CONSOLIDATED CLASS ACTION COMPLAINT
NO. 24-CV-01228 TWR (AHG)

expressly states that "LPL may, *at its sole discretion*, make additional account types eligible for the ICA program or may choose to treat an otherwise eligible person as *ineligible* if LPL becomes aware that the person is prohibited as a matter of law from holding balances at any Bank."

46.     Similarly, the DCA Program Disclosure Booklet explains that "The DCA program is available only to individual retirement accounts (IRAs) subject to Section 4975 of the Internal Revenue Code in certain LPL advisory programs" and that "LPL may *at its discretion* deem an eligible person or account to be an ineligible account or person if LPL becomes aware that the person or account is prohibited as a matter of law from holding cash at any Bank."

### 2.     Operation and Management

47.     As the ICA Program Disclosure Booklet explains:

Under the ICA program, [LPL], *acting as your agent*, will automatically transfer (or "sweep") available cash balances in your eligible accounts . . . into interest-bearing deposit accounts ("Deposit Accounts") insured by the Federal Deposit Insurance Corporation ("FDIC"). . . . The Deposit Accounts will be held at one or more banks or other depository institutions ("Banks") identified on one of two Priority Bank Lists ("PBLs") maintained by LPL.

48.     The DCA Program Disclosure Booklet describes a similar design:

Under the DCA program, available cash balances . . . in your eligible accounts will automatically be deposited (which we refer to as sweeping) into interest-bearing [FDIC] insured deposit accounts (Deposit Accounts) at one or more of the banks or other depository institutions set forth on the DCA program Available Bank List (ABL) (referred to through the rest of this document simply as Banks/Bank), subject to Bank deposit capacity as discussed below.

49.    Both Cash Sweep Programs operate similarly in terms of how cash is swept into participating banks.  The Disclosure Booklets describe that "*As your agent*, LPL will sweep your cash out" of your LPL client accounts and into Deposit Accounts at participating Banks.  Once deposits at a participating Bank reach or approach maximum amounts covered by FDIC deposit insurance or other capacity limits of the bank, LPL will continue to sweep cash into other participating Banks in a manner intended to maximize FDIC insurance available across multiple banks, which is $2.5 million per individual offered through each Program.  If a client's cash balances reach the Programs' maximum for FDIC insurance coverage, subject to certain other limitations, additional cash is swept into an Excess Bank and would not be eligible for FDIC insurance.

50.    When sweeping cash to participating Banks in both Cash Sweep Programs, LPL states that it establishes Deposit Accounts as an agent for and on behalf of its clients. "Deposit Account ownership will be evidenced by a book entry on the account records of each Bank showing the Deposit Account *as an agency account held by LPL for the benefit of [LPL clients]*, and by records maintained by LPL *as your agent*. . . . The Banks will not provide [LPL clients] with information or accept instructions from [them] with respect to [their] cash in the Deposit Account that has been *established by LPL on your behalf* through the [Programs]."

51.    Further, with respect to the DCA Program and although Deposit Accounts are established by LPL as agent for and on behalf of its clients, the DCA Disclosure Booklet states:

17

***You will have no rights to the amounts paid by the Banks, except for interest actually credited to your account, as described above.***

52.    If participating Banks, including so-called Excess Banks that carry fund overflow, have insufficient capacity to accept additional deposits, the two Cash Sweep Programs treat those "overflow balances" differently.

53.    Under the DCA Program, the "overflow balances" "will automatically be invested in shares of a money market mutual fund (MMF) that LPL makes available" and "will be held in the MMF, as opposed to Deposit Accounts, until Bank deposit capacity becomes available. At such time, . . . amounts invested in the MMF will be converted to cash at the then-current market price, and then allocated to the Banks on the ABL."

54.    In the ICA Program, the ICA Program Disclosure Booklet describes LPL's elimination of the use of Goldman Sachs Asset Management Government Square Fund ("GSAM"), an MMF, for "overflow balances" in 2022.  Instead, overflow balances are now allocated by LPL to a "Client Cash Account" ("CCA").  While LPL promises that CCA balances will "earn" the same interest rate available under the ICA (which is, and has consistently been, substantially lower than GSAM returns), this change allows LPL to "deploy" its clients' cash balances "at a lower funding cost than would otherwise be the case" resulting "in an increase in its revenues from the ICA program relative to the revenues derived from the prior GSAM model."

55.    As reported by *Financial Planning*'s Tobias Salinger, this change was made "to generate an even higher yield for the company and much lower one for its customers.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 24-CV-01228 TWR (AHG)

As interest rates boost the company's profit, LPL is slashing the amount clients can earn on certain cash holdings."

### 3. Participating Banks

56. For both Cash Sweep Programs, LPL selects and provides a list of participating Banks (via its "Priority Bank List" or "Available Bank List," depending on the Cash Sweep Program) into which clients' cash may be deposited. In LPL's discretion, "Banks may be added or removed. In addition, the Banks identified as Excess Banks may change."

57. LPL expressly describes its discretion and control over the selection of participating Banks in its Cash Sweep Program Disclosure Booklets, which contain substantially similar language. Specifically, the DCA Program Disclosure Booklet provides:

> You may not designate or direct LPL as to which Banks . . . receive your cash. However, you may, at any time, designate a Bank as ineligible to receive your cash; i.e., "opt-out" of such Bank. . . . To designate Banks that are ineligible to receive your cash (i.e., to "opt-out" of specific Banks), you need to inform your financial advisor.

### 4. Interest Rates

58. LPL sets the interest rates paid to clients on their cash sweep deposit accounts. For example, the ICA Disclosure Booklet states that while "[t]he interest rates paid are determined by *the amounts the Banks are willing to pay* minus the fees paid to LPL and other parties" (both of which vary by Bank), "[y]ou will receive the *same interest rates* on all Deposit Account assets *regardless of the Bank* in which such assets are held." The

19

DCA Disclosure Booklet contains nearly identical language.  In other words, LPL establishes and sets the **same interest rates** actually paid to clients on their Deposit Accounts **across all banks**, <u>**then**</u> determines the fees it will take from that amount based on rates the Banks are "willing to pay."

59.    In doing so, however, LPL's account agreements and disclosure booklets implicitly require that the rates LPL ultimately sets for its clients and the fees it receives from the Banks are fair and reasonable based on market factors.  First, for example, by stating that rates are influenced by what "Banks are willing to pay," LPL provides that interest rates paid on client cash deposits will be determined by a reasonable arm's-length negotiation between LPL and the participating Banks based on the prevailing interest rate environment and competitive market factors.  The context further implies that, to mitigate the conflict of interest present in this arrangement with its own clients, LPL will reduce that amount by only a reasonable "fee" for itself and the administrator, and not significantly depress the amount of interest ultimately paid to LPL clients by extracting reasonably high payments for itself and "other parties," including the administrator.

60.    The disclosure booklets further express that "interest rates **you receive** from a Bank **may be higher** or lower than the interest rates available to depositors making deposits directly with the Bank or other depository institutions in comparable accounts and for investments in money market mutual funds and other cash equivalent investments available through LPL."  This statement implies that the interest rate paid on Deposit Accounts would be directly associated with what a participating Bank is paying on a Deposit Account and

20

reasonably comparable to rates paid on comparable accounts and investments. It also means that there are likely to be situations when LPL puts its clients' best interests ahead of its own interests when negotiating its fee (because LPL's fee reduces the amount of interest paid to its own clients). In other words, the situation where the interest rate that LPL clients receive from the Banks on their cash balances is higher than the interest rates available to other depositors of the same Bank will only occur if LPL either foregoes its fee or accepts a miniscule fee. This has never occurred; in fact, just the opposite. LPL's "fees" on the cash sweep balances have always been higher than (and, often, many multiples higher than) the actual interest rates paid to LPL clients.

### 5. Fees

61. LPL has breached its agreements and fiduciary duties to set reasonable interest rates for its clients and to set a reasonable fee for itself by unilaterally attempting to set an upper bound for its ***aggregate*** fees that it progressively doubled, and then tripled. However, that aggregate fee number does not speak to the specific amount of interest LPL could pay to specific accounts, or how LPL would divide the amount of fee to be paid to itself versus the amount of interest to be paid to specific clients.

62. In LPL advisory account agreements from 2017, LPL stated that "The fee paid to LPL may be at an annual rate of ***up to an average of 200 basis points*** as applied across all ICA Deposit Accounts taken ***in the aggregate***." That was an acknowledgement at the time that an aggregate fee of up to an average of 200 basis points was the maximum fee LPL should take. That was objectively an unreasonably large amount when compared to

21

the amount of interest that LPL paid clients.  But, again, that aggregate fee number does not speak to the specific amount of interest LPL could pay to specific accounts, or how LPL would divide the amount of fee to be paid to itself versus the amount of interest to be paid to specific clients.

63.     LPL subsequently doubled the 200 basis point amount to 400 basis points in the aggregate.  That was an objectively even more unreasonably large amount when compared to the amount of interest that LPL paid clients.  Indeed, there is little to no marginal cost to LPL to increase cash sweep deposits.  As BofA Global Research wrote on August 5, 2024, "***we believe the incremental operating margins on cash sweep revenues are 100% or very close*** …"

64.     Now, LPL's ICA Program Disclosure Booklet explains that LPL has tripled the 200 basis point aggregate fee to 600 basis points:

> Each Bank will pay LPL a fee equal to a percentage of the average daily deposit balance in each Deposit Account. Such ***fees differ among the participating Banks depending on the interest rate environment*** and/or fee waivers made by LPL. The fee paid to LPL will be ***an annual rate of up to an average of 600 basis points*** as applied across all Deposit Accounts taken in the aggregate. The ***fee paid to LPL reduces the interest rate paid on your cash,*** and ***depending on the interest rate and other market factors,*** LPL generally receives as its fee the majority of the amount paid by the Banks with respect to such deposits.

65.     Again, this disclosure speaks to the fees that the Banks pay to LPL, "as applied across all Deposit Accounts ***taken in the aggregate***."  It does not speak to the specific amount of interest to which any specific client is entitled, nor does it operate as an

agreement that LPL can derive up to 600 basis points in fees with respect to any specific account.

66.    LPL's attempts to unilaterally authorize its ability to charge such an unreasonably high fee—while paying to its clients a mere fraction of that amount—was itself a breach of its fiduciary duties to its clients.

67.    Similarly, although a significantly different structure, LPL's monthly, per account flat fee under the DCA Program is "indexed to the current Federal Funds Target (FFT) Rate" and set forth in the fee schedule provided in the DCA Program Booklet. When judged against the miniscule amounts of interest that LPL pays its customers (who have an average cash balance of approximately $5,000-$7,000), those flat fees are unreasonably high.

68.    Even less transparent than LPL's fees under the ICA Program, however, are the fees paid to the third-party administrator. Although LPL's disclosure booklets provide a lengthy (yet unclear) explanation that the fees vary month to month and are expressed in basis points on the average daily cash balances at the Banks, LPL provides no tangible explanation or reference to other sources of information that would identify for clients what those actual third-party administrator fees are and/or their proportion of "the amounts the Banks pay in respect of the aggregate DCA program deposits."

69.    The administrator has a set "annual targeted fee" whose amount is not provided to clients. LPL also structures the Cash Sweep Programs such that if the administrator does not obtain fees in an amount equal to its "annual targeted fee," LPL will

23

"adjust" the interest rates of clients' accounts "for the purpose of bringing the amounts actually received by the Administrator back in line with the Administrator Target Fee." Again, despite LPL's agreement to charge clients only "stated fees," LPL pays the administrator's fee to the administrator without identifying the amount of the fee or the amount by which specific accounts' interest payments are reduced in order to cover it.

70.     Contrary to LPL's express promises to act in its clients' best interests and as their agent, and implied promises to establish reasonable rates and fees based on the current interest rate environment and other market factors, LPL ***always*** receives the majority of the amounts paid by Banks on LPL clients' Deposit Accounts and sometimes charges clients ***more*** in fees than it pays to clients in interest which can result in LPL clients experiencing a "***negative overall investment return*** with respect to cash reserves" in the Programs.

71.     Accordingly, the interest rates that LPL sets and actually pays clients on their cash balances were and are unreasonably and unfairly low, and LPL improperly and unreasonably retained profits derived from its clients' cash balances that it should have passed on to those clients.

**C.     LPL Established Unreasonably Low Interest Rates and Unreasonably High Fees on the Billions of Dollars Its Clients Held in Cash Sweep Accounts to Unjustly Enrich Itself**

72.     In exercising complete control over the design and operation of its Cash Sweep Programs, LPL guaranteed tremendous profits for itself at the expense and against the best interest of its clients.

CONSOLIDATED CLASS ACTION COMPLAINT
NO. 24-CV-01228 TWR (AHG)

73.    On March 15, 2023, it was reported that, in March 2022, Massachusetts Secretary of the Commonwealth William Galvin directed the state's securities division to investigate brokerage firms' sweep account rates.  A letter sent to LPL asked whether it intended to increase its sweep rates.

74.    In June 2023, Tobias Salinger published an article in *Financial Planning* called "Wealth management's $1T conflict of interest; Cash sweeps are lucrative to the industry, but not to clients."  In it, he emphasized that:

> In [LPL's] earnings for the fourth quarter [of 2022], [LPL] reported that, unlike the firm's clients, it received an average of 2.54% [254 basis points] on the DCA sweeps and 2.91% [291 basis points] from the ICA Program.  As part of its February [2023] earnings statement, the company noted that ***the Fed's interest rate hikes have added more than $1.29 billion to its annual gross profits***, with an extra $55 million expected from each subsequent increase.

> In an "issuer in-depth" report from February [2023] on Schwab, Raymond James, LPL and Oppenheimer & Co., Moody's Investor Services analyst Gabriel Hack wrote that the firms' profits tied to interest rates will keep growing for at least the first half of the year.

> Rate hikes generated "significant additional revenue for the four firms over the last two quarters," from a business line that "***typically has no associated operating expense, meaning that the bulk of benefits will boost bottom-line profitability and expand profit margins***," Hack wrote.

75.    Salinger's article added that:

> When Bill Hamm of Tampa, Florida-based Independent Financial Partners left LPL Financial to launch the firm's own brokerage in 2019, ***his team capped the firm's yield on cash sweeps at no more than 30 basis points***, with the rest going to its clients.

> Hamm had ***always "had an issue" with brokerages taking most of the yield for themselves***, he said in an interview.

25

76.    By contrast, LPL's "fees" charged on its clients' cash sweep deposits are many multiples of even Hamm's internal limits on cash sweep fees.

77.    Even though the average client balance in LPL's Cash Sweep Programs is approximately $5,000, the aggregate total of LPL cash sweep balances through these Cash Sweep Programs is staggering. As of September 30, 2024, LPL client cash sweep balances were **$45.8 billion** which generated ***over $1 billion*** in revenue for LPL during the previous nine months. In 2023, revenues generated from client cash sweep balances were **$1.5 billion**, up from **$954 million** in 2022 and **$361 million** in 2021.

78.    Market analysts and news reports have emphasized the enormous profits that LPL has generated from its cash sweep programs, without passing those benefits on to its clients. For example:

- On October 28, 2022, JP Morgan reported that, at LPL, "***Cash sweep fees surged to $304mn in 3Q22 from $156mn in 2Q22***. . . . Looking ahead, LPL's underlying fundamentals are clearly positioned to benefit from the higher interest rate environment, and the company is taking the opportunity to increase certain investments. . . As expected, ***3Q22's client cash revenues jumped notably to $304mn given the ongoing interest rate hikes and uplift to LPL's cash yields***";

- William Blair reported on April 28, 2023, that, at LPL, "Spread income continues to expand as interest rates rise at their fastest pace in decades. Client cash revenue increased to ***$439 million in the quarter*** from $85 million in the prior-year period. . . . Assuming two more [interest] rate hikes, this should result in client cash revenue of $1.7 billion in 2023 versus $984 million in 2022";

- On September 7, 2023, Barclays reported that, at LPL, "Interest generated from client cash ***generates the largest portion of gross profit***. . . Cash in all three [LPL cash sweep program] accounts earns interest

26

income from bank deposit interest and investments in short-term US Treasury bills";

- On July 17, 2024, *CityWire* reported that LPL is "***uniquely dependent***" on the spread between the interest it pays clients in its cash sweep program and the interest that LPL earns on such deposits because, as analysts estimated, "cash sweep revenues will generate ***30% of LP's gross profits*** for both 2024 and 2025";

- On August 5, 2024, BofA Global Research wrote that "In 2024, we estimate cash sweep revenues will contribute ***33% to LPLA's gross profit*** . . . and ***69% to pre-tax profits***. This rose significantly from the 2021 trough, before the Fed started raising rates, when it only contributed 15% / 39% to gross profits/pre-tax profits";

- On August 5, 2024, UBS wrote that "While LPLA has said that they don't intend to reprice [their clients' cash sweep interest], it's our view that ***this threat to their business model (client cash represents roughly 40% of Gross Profit)*** should constrain the stock's valuation in the near term";

- JP Morgan reported on August 13, 2024, that "LPL generates ~12% of its total revenues from its client's operational cash through a third-party bank network, ***which equates to nearly 70% of EBITDA***";

- Wells Fargo reported on September 11, 2024, that, "Higher interest rates have been ***a boon [for] LPL***, with revenue from cash sweep ***rising by 4x in just two years*** . . . . At LPL, cash sweep generates ***30-40% of gross profit***, and pressure there could directly impair earnings power"; and

- JP Morgan reported on October 31, 2024 that, "[W]e are focused on the cash sweep trend within LPL as ***it can affect the performance of the business greatly***. The company's cash sweep revenues increased 4% QoQ [quarter over quarter] driven by their cash sweep balance increasing $1.8bn QoQ to $45.8bn with ***the yield increasing 9bp to 3.35%***. The increase in yield was driven by ***a 14bp increase in their ICA yield, to 3.32%***."

79.    Examining LPL's interest rates paid to clients against the backdrop of the Federal Funds Rate illustrates the unjust windfall LPL captures through its Cash Sweep

27

Programs. For example, and without limitation, since 2022, the Federal Funds Rate – the interest rate at which banks lend to one another – increased significantly from a low of 0.08% to a high of 5.33% in 2024.  However, LPL failed to pay proportional interest rates on its clients' swept cash.

80.    In fact, LPL maintained nearly flat Cash Sweep Program rates for years, at a fraction of a percent, continuing to collect high fees for itself on the cash but paying far less than a fair and reasonable rate to clients—thereby retaining the sharply increased spread for itself. This is reflected in the graph below comparing the Federal Funds Rate to LPL's ICA Program interest rate on deposits up to $149,999, its lowest three tiers:



81.    As this graph illustrates, LPL derives significant profits from having its clients' funds invested through its "default" Cash Sweep Program because LPL established

28

drastically low client rates that are neither fair nor reasonable, and in violation of its legal, contractual and implied duties.

82.    LPL's account agreements and disclosure booklets do not specify the applicable interest rates paid on cash balances or the fees charged by LPL. Instead, LPL directs clients to its website to obtain current interest rate information and, for the ICA Program, historical fee information. However, as mentioned above, LPL does not provide any information (in its Disclosure Booklet or elsewhere) about actual fees charged by its third-party administrator.

83.    Accordingly, clients are unable to determine exactly what percentage of the total interest Banks will pay to LPL in fees for maintaining its clients' Deposit Account balances relative to the interest LPL pays to its clients in any given month.  However, comparing client rates and just the fees to LPL that LPL retrospectively reports, LPL has and continues to capture more than ten times what it ultimately pays its clients.

84.    The table below provides examples of the artificially low rates paid through LPL's ICA and DCA Programs and the ICA fees charged in each of the previous six years and to date in 2024:

29

CONSOLIDATED CLASS ACTION COMPLAINT
NO. 24-CV-01228 TWR (AHG)

| Deposit Balance | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024[3] |
|---|---|---|---|---|---|---|---|
| **ICA Program** | | | | | | | |
| $0 - $24,999 | 0.09% | 0.03% | 0.01% | 0.01% | 0.34% | 0.34% | 0.20% |
| $25,000 – $49,999 | 0.09% | 0.03% | 0.01% | 0.01% | 0.34% | 0.34% | 0.20% |
| $50,000 – $149,999 | 0.18% | 0.09% | 0.01% | 0.01% | 0.34% | 0.34% | 0.20% |
| $150,000 – $299,999 | 0.21% | 0.09% | 0.01% | 0.01% | 0.34% | 0.39% | 0.20% |
| $300,000 – $499,999 | 0.23% | 0.09% | 0.01% | 0.01% | 0.39% | 0.44% | 0.25% |
| $500,000 – $749,999 | 0.28% | 0.14% | 0.01% | 0.01% | 0.39% | 0.49% | 0.40% |
| $750,000 – $1.49 M | 0.30% | 0.14% | 0.01% | 0.01% | 0.49% | 0.79% | 0.70% |
| $1.5 M – $4.9 M | 0.35% | 0.14% | 0.01% | 0.01% | 0.74% | 1.14% | 1.00% |
| $5 M – $9.9 M | 0.45% | 0.14% | 0.01% | 0.01% | 0.89% | 1.24% | 1.10% |
| > $10 Million | 0.65% | 0.29% | 0.01% | 0.01% | 1.19% | 2.17% | 2.00% |
| **ICA Fees** | -- | 2.22% | 1.08% | 1.01% | 2.91% | 3.17% | 3.32% |
| **DCA Program** | | | | | | | |
| **>$0** | 0.59% | 0.05% | 0.01% | 0.01% | 0.49% | 0.34% | 0.35% |

---

[3] Rates for 2024 are as of November 14, 2024.  Rates and fees for each previous year reflect that last observed rate for each year.

CONSOLIDATED CLASS ACTION COMPLAINT
NO. 24-CV-01228 TWR (AHG)

85.    LPL's metrics provided to investors further demonstrate how it "generate[s] compelling economics on client cash balances" by generating significant profits with each increase in the Federal Funds rate:



86.    As the bar graph indicates, even as client cash balances declined, LPL continued to receive significant revenues on those cash balances because of deposit betas associated with the increases in Federal Funds Rates.

87.    A deposit beta measures the sensitivity of a bank's deposit costs to changes in the short-term interest rates.  For example, a deposit beta of ~20% means that a bank raises its average deposit rate by 20 basis points for every 100 basis point increase in the short-term interest rate. Or, in simpler terms, the bank passes on 20% of the rate increase from which it benefits to its depositors.

88.    The deposit betas in the above graphic, however, indicate the increase in rates (or fees) the Banks paid to LPL, not the increased rates passed on to LPL's clients.  For example, while LPL increased its average fees or yield on its clients' cash balances by 47

basis points between Q4 2022 and Q4 2023 as shown in the bar chart, it increased its interest rate paid to LPL clients by between only 0 and 5 basis points (i.e., between 0% and .05%) during the same time period for balances under $500,000 as shown in the table above.

89.    As designed, LPL makes an enormous amount of revenue from its clients' swept cash. In a Q2 2021 earnings call, LPL Chief Financial Officer Matthew Jon Audette stated, "Using our current sweep balances, a 100 basis point increase in the Fed Funds rate would translate to approximately $340 million of annual gross profit." Thereafter, the Federal Funds Rate saw a steep increase of more than 500 basis points from 2022 to its high in point in 2024. Per LPL's latest investor presentation, LPL's current cash balances would yield "$35 million in annual gross profit per subsequent 25 bps rate adjustment, at ~20% deposit beta."

90.    As illustrated above, LPL has derived significant financial benefits for itself from the payment of unreasonably low rates on its clients' Deposit Account balances by taking advantage of the nearly-cost-free cash entrusted to it by its clients pursuant to its Cash Sweep Programs and retaining for itself the vast majority (and sometimes *all*) of the profits generated by its clients' cash deposits.

91.    LPL has continued to take advantage of its clients and their cash balances through its Cash Sweep Programs, even as regulatory and industry scrutiny of case sweep programs increased, and competitors raised the interest rates paid on cash sweep balances in late 2023 and through 2024.

92.    In November 2023, Wells Fargo announced that its cash sweep program was under investigation by the SEC.  Then, in July 2024, both Wells Fargo and Morgan Stanley announced that they were raising interest rates on cash sweep accounts.  Morgan Stanley then announced on August 5, 2024, that the SEC was investigating its "advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940."

93.    Market analysts issued reports suggesting that an interest rate increase for LPL cash sweep clients was possible.  For example:

- On July 25, 2024, Barclays reported that "we sensitize the impact of increasing the cash payout . . . to *a range from 1.5% to 3%* on ICA balances in 2025-2026," and increasing the payout to 1.5% decreases EPS [earnings per share] by 10% in F26 [fiscal 2026] (vs our published estimates), while a more drastic increase in payout to 3% increases would decrease EPS by nearly 47%"; and

- On July 26, 2024, William Blair similarly reported on a potential client interest rates increase at LPL, writing that, "If the sweep rate were *increased to 2.5%* in early 2025, we estimate this would reduce spread income by $355 million."

94.    But on July 26, 2024, *Barrons* reported on LPL's refusal to increase cash sweep interest rates paid to clients, quoting former LPL CEO and President Dan Arnold[4]

---

[4]  On October 1, 2024, the LPL Board of Directors disclosed that it had terminated CEO Arnold for cause, for making statements to employees that violated the company's code of conduct.  James Putnam, chair of the Board of Directors, said that "LPL's Code of Conduct requires every employee, no matter their title, to foster a supportive and professional workplace and show respect to each other, our stakeholders and the broader community," and "Mr. Arnold failed to meet these obligations."

33

as saying during LPL's earnings call that, "*We do not have plans to change our pricing*." *Barrons* reported that Arnold issued this refusal despite that "[r]ates paid on client cash have become a hot topic in wealth management *after Wells Fargo and Morgan Stanley announced they would increase yields in their cash sweep programs* in response to a mix of competitive and regulatory pressures."

95.    In LPL's Form 10-Q for the quarter ending September 30, 2024 filed with the SEC on November 4, 2024, it disclosed that since August 2024 it had also received "a request for information from the SEC regarding certain elements of the Company's cash management program", but downplayed concern.  As competitors were raising rates in the Summer and Fall of 2024, LPL reduced the interest rates paid on its clients' cash sweep balances in September 2024, after receiving the SEC's inquiry.

96.    LPL continues to take advantage of its clients' cash balances at their expense, capturing most of their interest income.

**D.    LPL Has Independent Duties and Obligations to Its Clients**

97.    As a registered investment adviser and broker-dealer acting as an agent for its clients with respect to its Cash Sweep Programs, LPL owes fiduciary duties to its clients, as well as contractual obligations implied under the law.

98.    LPL-LLC is a registered investment adviser bound by the fiduciary duties imposed on it by the Investment Advisers Act of 1940, including duties of care and loyalty. This includes a duty for LPL to act in the best interests of its clients, and to place the best interests of its clients ahead of its own self-interest.  Similar duties are imposed on LPL

34

under principles of broker-dealer law and as an agent of its clients in connection with its Cash Sweep Programs.

99.    For all advisory (or managed) accounts (including advisory IRAs), LPL was required to act as a fiduciary to its clients with respect to all aspects of the accounts, including its Cash Sweep Programs, pursuant to the Investment Advisers Act of 1940.

100.    For all accounts with cash sweep accounts, LPL acknowledged that it was an "agent" for its clients with respect to the Cash Sweep Programs, and, as a result, LPL was required to act as a fiduciary for its clients as principals with respect to the Cash Sweep Programs.

101.    In addition, LPL is bound by the implied covenant of good faith and fair dealing to secure for, and pay, its clients a fair and reasonable rate of interest through its Cash Sweep Programs.

102.    LPL breached its fiduciary duties and express and implied contractual duties to its clients by, among other things: (i) failing to secure for them a reasonable rate of interest on their cash sweep balances; (ii) structuring and implementing the Cash Sweep Programs in a manner that benefited LPL and not its clients' best interests; (iii) promising to pay LPL and third parties such as the unidentified administrator only the stated fees but did not state the fees ahead of time and paid non-stated fees; (iv) contrary to its agreement to "have systems in place to mitigate the conflicts of interests that arise," not having adequate systems in place to mitigate conflicts of interest; (v) not acting in its clients' best interest or putting clients' interests ahead of LPL's; and (vi) providing the Cash Sweep

Programs, including LPL's and the Administrator's "services" in connection with them, that were not in the best interest of the LPL clients.

### E.    LPL Has Fiduciary Duties to Its Clients

103.    As an investment adviser for its clients, LPL must adhere to certain standards of care and conduct.

104.    Specifically, for its advisory clients (including its advisory retirement accountholders), LPL owes its clients a fiduciary duty under the Investment Advisers Act of 1940, which is based on equitable common law principles and fundamental to its relationship with its clients.  *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

105.    Under this fiduciary duty, LPL "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own.  In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.*

106.    If there is a conflict between its interests and its client's interests, then LPL is also required to "eliminate or make full and fair disclosure of all conflicts of interest which might incline an adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.*

107.    Where LPL "cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent," then LPL "should either ***eliminate*** the

conflict or adequately ***mitigate*** (*i.e.*, modify practices to reduce) the conflict[.]" *Id.* (emphasis in the original).

108.  LPL owes substantially similar duties to its brokerage clients under broker-dealer rules and regulations, *see* Reg. BI, 17 C.F.R. § 240.15l-1, 84 Fed. Reg. 33318-64, which LPL expressly acknowledges and incorporates in its Relationship Summary, including an obligation to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation." 84 Fed. Reg. 33318, 33321.

109.  Moreover, in creating and operating its Cash Sweep Programs, LPL also contractually agreed to act as an agent (and therefore a fiduciary) on behalf of its clients in establishing, maintaining, and operating their cash sweep accounts. For example, pursuant to its account agreements and disclosure documents as described above, LPL contractually agreed to act as its clients' agent and exercise control over the establishment and operation of the Cash Sweep Programs, including the establishment of the rates paid to the clients and the fees earned by LPL.

110.  Accordingly, in its capacity as an adviser, broker-dealer, and/or agent in exercising complete control in developing, offering, automatically enrolling, and establishing Deposit Accounts through its Cash Sweep Programs, LPL assumed fiduciary and other substantial duties of loyalty and care to its clients.

111.  Contrary to its duties and at the same time that LPL was supposed to be acting as its clients' agent in connection with the Cash Sweep Programs, it was actually acting to

advance its own interests at the expense of its clients. For example, strictly because of the fee structure and client rates that are entirely within LPL's control, "the ***yields … have been, and may continue in the future to be, lower than the aggregate fees and expenses received by LPL*** for [clients'] participation in the [Programs]" and, for advisory accounts with corresponding Cash Sweep Deposit Accounts, "***LPL earns two layers of fees on the same cash balances***" in a client's LPL account. This can and does result in negative returns for LPL clients—an outcome that is entirely caused by LPL's actions.

### F.    LPL Has a Legal Obligation to Make Reasonable Arrangements Regarding Its Clients' Cash Balances in Advisory Retirement Accounts

112.    For client cash balances maintained in qualified advisory retirement accounts, LPL may utilize those cash balances for investments or loans, but only if it pays to or secures for the client a "reasonable rate" of interest on those cash balances.

113.    LPL acknowledges this obligation by creating a separate and distinct Cash Sweep Program for these specific types of accounts—the DCA Program, available only to advisory IRAs subject to Section 4975 of the Internal Revenue Code ("IRC").

114.    IRC Section 4975 taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. § 4975(c).

115.    A "disqualified person" includes companies or individuals "providing services to the plan."[5] 26 U.S.C. § 4975(e)(2)(B).  This includes banks that receive deposits swept from LPL client accounts.

116.    The Internal Revenue Code provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."  26 U.S.C. § 4975(d)(4).

117.    LPL thus has both legal and contractual duties to act in the best interests of its clients vis-à-vis its DCA Program and to pay reasonable interest rates on its clients' cash balances.

**G.    LPL's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for LPL to Provide Clients with a Reasonable Rate of Interest**

118.    Under Massachusetts law, which governs LPL client agreements, all contracts contain an implied covenant of good faith and fair dealing.  This implied covenant reflects the implicit condition that neither party will act in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement based on the parties understanding of performance obligations, as reflected in the overall spirit of the bargain.

---

[5]  "Plan" is defined as including "an individual retirement account described in Internal Revenue Code § 408(a)."  26 U.S.C. § 4975(e)(1)(B).

119.    In this case, that implied covenant included an understanding and reliance that LPL would secure for its clients a reasonable rate of interest on their cash sweep balances and not usurp the benefits of favorable market conditions only for itself.

### H.    LPL Breaches Its Duties, Contracts, and the Implied Covenant, and Profited Thereby

120.    LPL breached, and continues to breach, its duties, its contractual obligations, and the implied covenant of good faith and fair dealing to, and with, its clients by creating and operating its Cash Sweep Programs for its own principal benefit, over which LPL exercises complete control, while failing to pay or secure fair and reasonable rates of interest on client cash balances.

121.    LPL was obligated, but failed, to: (i) set, secure or pay fair and reasonable interest rates on clients' cash balances deposited in the Cash Sweep Programs; and (ii) elevate its clients' interests above its own in creating, implementing, maintaining, recommending, and operating the Cash Sweep Programs.

122.    LPL's conduct of failing to pay to or secure for its clients a fair or reasonable rate of interest on their cash balances unjustly enriches LPL at the direct expense of its clients.

123.    LPL gained significant financial benefits from its clients' cash balances swept into its Cash Sweep Programs through the fees LPL received from the Banks.

124.    LPL's over 300% increase in revenue generated from client cash balances between 2021 and 2024 plainly shows that LPL was taking improper advantage of its

40

relationships with its clients, appropriating for itself the benefit of the rising interest rate environment, while failing to pass that benefit on to its clients.

125.   The relationships between LPL and its clients, the imbalance of negotiating power between LPL and its clients, and LPL's exercise of control over every aspect of its Cash Sweep Programs are circumstances that create an equitable obligation (in addition to any fiduciary, contractual, or implied duty) running from LPL to its clients.

126.   LPL's continual sweep of Plaintiffs' and the Class members' cash into the Cash Sweep Programs during the entire period in which they held accounts with LPL, while securing for them unreasonably low rates, constitutes a continuing wrong and is a continuing breach and series of breaches of LPL's duties to, and contracts with, Plaintiffs and the Class members.

## I.    LPL's Client Rates Were and Continue to Be Unreasonable

127.   LPL developed, implemented, and maintains its Cash Sweep Programs to maximize its profits by capturing increased net interest income by setting and paying unreasonably low client rates, appropriating nearly all of the interest that "Banks are willing to pay" to LPL through fees at significantly higher rates than LPL pays its clients on Deposit Accounts.

128.   The U.S. Department of Labor provides the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those

41

available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, at 34648 (June 10, 2003).

129.   IRS regulations similarly define an "arm's-length interest rate" as:

[A] rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

130.   Under these terms, and any other reasonable understanding of what a "reasonable" rate of interest is, LPL did not pay a reasonable rate of interest to its clients, including Plaintiffs and Class members, on their Deposit Accounts.  This is supported by reference to other leading indicators of interest rates being paid during the relevant time periods.

### 1.      Sweep Account Rates Paid by Other Institutions

131.   LPL has publicly claimed that its use of unaffiliated banks in its Cash Sweep Programs distinguishes it from its larger competitors and potentially insulates it from scrutiny.  But the interest rates paid by other brokerages that, like LPL, sweep cash into unaffiliated banks nonetheless demonstrate that the client rates LPL pays were not reasonable.

42

132.   As shown in the graph below, an index of interest rates paid by five brokerages that, like LPL, did not sweep client cash balances into banks affiliated with the brokerage generally tracks the movement of the Federal Funds Rate (set forth above).  By contrast, the *de minimis* interest rates that LPL paid its clients were much lower during much of the relevant time period:



133.   As shown in the above graph, from mid-2018 to 2024, LPL's sweep rates had minimal movement, even as the sweep rates paid by other brokerages using unaffiliated banks increased during 2018 and 2019 and remained much higher than LPL in the beginning of 2020. In addition, starting in mid-2022, LPL's sweep rates stayed consistently low with miniscule increases while the rates paid by comparable brokerages increased consistently with the market.

134.   The interest rates paid by those comparable brokerages more closely resembled arm's-length negotiations that clients could expect a fiduciary to secure for

43

them, and therefore at least partially reflected the then-current interest rate environment and other relevant market factors, compared to the rates paid by LPL.

135.   For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and they have consistently paid significantly higher rates of interest than LPL.  At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of asset tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). LPL, in contrast, paid 0.01% to 0.6% on all cash balances as of year-end 2022.  As mentioned above, cash balances in LPL's Cash Sweep Programs were allocated to participating Banks.  Several of these Banks are also currently utilized by Fidelity as program banks in Fidelity's sweep program, but Fidelity currently credits interest at 2.44% for its clients in these same program banks.  This is in stark contrast to the .20% that LPL pays *its own clients* out of the fees it receives from *the very same banks*.

136.   Additional examples of brokerage firms that sweep their clients' cash into accounts with banks that are not affiliated with the firm include Robinhood, which secures a rate of 4.9% for Robinhood Gold members as of July 27, 2023, and WeBull, which secures a rate of 5%.

137.   Fidelity and R.W. Baird have significantly increased the rates they paid on swept cash.  As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier, and R.W. Baird paid 2.03% interest (on cash balances up to $1 million).  In comparison, during the same time period, LPL secured only 0.34% to 0.49%

44

for cash balances under $750,000 and 0.79% to 1.24% for balances between $750,000 and $10 million.  Only for cash balances of $10 million or more, did LPL pay above 2%.

138.   In addition, the interest rate offered by Vanguard on its sweep program is currently 3.90% regardless of asset tier, and the interest rate offered by Dreyfus is 2.50% regardless of asset tier.

139.   As the data show, other brokerage and advisory firms that have cash sweep programs pay or secure significantly higher interest rates than LPL.

### 2.    The Federal Funds Rate Benchmark

140.   A number of interest rate benchmarks increased dramatically over the past several years, but LPL's rates have only minimally changed.

141.   LPL acknowledges throughout its account agreements, disclosures, and other statements, the importance of the Federal Funds Rate as a benchmark and index in conducting business, including setting the fees it received from Banks in the Cash Sweep Programs and estimating annual gross profit.

142.   Consequently, the Federal Funds Rate benchmark further demonstrates that client rates LPL set and paid were not reasonable. The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises.  In other words, it is the market of unsecured borrowing transactions, principally between banks.  The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

45

CONSOLIDATED CLASS ACTION COMPLAINT
NO. 24-CV-01228 TWR (AHG)

143.   The Federal Funds Rate increased dramatically in recent years.  For example, the effective Federal Funds Rate on August 28, 2024, was 5.33%.  The graph below (the same provided as above) shows the Federal Funds Rate over the past several years and the client rate paid through the ICA Program on deposits up to $150,000.  As the comparison shows, LPL's client interest rates have been drastically lower and have failed to reflect changes in the market:



144.   The  above  graph  demonstrates  that  LPL's  client  interest  rates  were unreasonably low.

### 3.    The Interest Rates on Sovereign Short-Term Debt Benchmark

145.   The yield on short-term U.S. Treasury Bills also demonstrates that the interest rate paid on client Deposit Accounts was not reasonable.  U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from

46

four to 52 weeks.  They are sold at a discount to their face value, and when they mature, the investor is paid the face value. Treasury Bills are considered extremely safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

146.   The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage.  As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased through mid-2019; (ii) dropped to close to zero throughout the COVID pandemic; and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



47

147.   During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, LPL's client rates remained a tiny fraction of that benchmark.

### 4.   The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements

148.   The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present were also significantly higher than LPL's client rates.  This further demonstrates that LPL's client rates were not reasonable and did not properly account for relevant market factors.

149.   A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price.  The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period.  The security serves as collateral for the lender.  A repo can be based on any security, but it usually involves government debt or other debt instruments with steady values.

150.   The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs.  From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023.  These rates are significantly higher than LPL's client rates.

### 5.    LPL's Cash Sweep Program Fees

151.    The unreasonableness of LPL's client rates is further reflected by considering the fees that LPL collects through its Cash Sweep Programs.

152.    As its disclosure booklets explain:

[D]epending on the interest rate and other market factors, LPL generally receives as its fee ***the majority of the amount paid by the Banks*** with respect to such deposits. Depending on interest rates and other market factors, the ***yields on the ICA program have been, and may continue in the future to be, lower than the aggregate fees and expenses received by LPL*** for your participation in the ICA program. This can result in you experiencing a ***negative overall investment return*** with respect to cash reserves in the ICA program.

153.    Moreover, for advisory accounts with corresponding Cash Sweep Deposit Accounts, "***LPL earns two layers of fees on the same cash balances***" in a client's LPL account.

154.    LPL has thus established a practice whereby LPL make significant profits on its client cash balances whereas the client, to whom a fiduciary duty is owed, **loses** money on his or her cash balances, because the interest the client earns in his cash sweep account is less than the fees LPL collects.

## CLASS ACTION ALLEGATIONS

155.    Plaintiffs re-allege and incorporate by reference the allegations set forth above.  Plaintiffs seek certification of the following Class:

**Clients of LPL who had cash deposits or balances in LPL's Cash Sweep Programs from July 18, 2018, until the unlawful conduct alleged herein ceases.**

49

156.   Plaintiffs reserve the right to amend the Class definition if further investigation and discovery indicates that such definition should be narrowed, expanded, or otherwise modified.

157.   Excluded from the Class are LPL and any of its affiliates, legal representatives, employees, or officers, as well as the Court and officers of the Court.

158.   This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

### Numerosity
### Rule 23(a)(1)

159.   Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time.   However, LPL, as an independent broker-dealer and investment advisory firm, supports approximately 7.9 million client accounts through a network of over 28,000 financial advisors and professionals.   Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23.   Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

### Existence and Predominance of Common Questions of Law and Fact
### Rule 23(a)(2), 23(b)(3)

160.   Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.   These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.      whether LPL's interest rates paid on its sweep accounts were fair and reasonable;

b.      whether LPL owed fiduciary duties and other duties of care to the Class, and whether LPL violated those duties;

c.      whether LPL breached the contractual terms of its account agreements and other written communications to Class members;

d.      whether LPL breached the implied covenant of good faith and fair dealing;

e.      whether LPL was unjustly enriched by its wrongful conduct;

f.      whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

g.      whether and to what extent Class members are entitled to damages and other monetary relief; and

h.      whether and to what extent Class members are entitled to attorneys' fees and costs.

161.    LPL client account agreements contain a choice of law provision that provides, in relevant part, that they shall be construed, governed, and enforced under the laws of the Commonwealth of Massachusetts.

162.    For advisory accounts, LPL client agreements further acknowledge that agreements should be construed "in a manner consistent with the Advisers Act and the rules and regulations of the Securities and Exchange Commission thereunder (and ERISA, where applicable)."

163.    For all brokerage accounts, LPL client agreements expressly state that all transactions "are subject to the rules, customs and usages of the exchanges, markets or

51

clearing houses where the transactions are executed and to all applicable federal and state laws and regulations."

## Typicality
### Rule 23(a)(3)

164.  Plaintiffs' claims are typical of the claims of the Class because they were account holders with LPL who were paid unreasonably low interest rates in their cash sweep accounts.  Thus, Plaintiffs' claims are typical of the claims of the Class members as they arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members.

## Adequacy of Representation
### Rule 23(a)(4)

165.  Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously.  Plaintiffs have no interests adverse or antagonistic to those of the Class.

## Superiority
### Rule 23(b)(3)

166.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

167.  Even if Class members could afford individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

168.  Superiority is particularly satisfied in a circumstance such as this where the law of a single state will apply.  Under the uniform contract terms with LPL, the law of Massachusetts will apply to each Class member's claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

169.  Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b.  The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their

53

ability to protect their interests; and/or

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## FIRST CLAIM FOR RELIEF

**Breach of Fiduciary Duty**
**Brought on Behalf of Plaintiffs and the Class Against All Defendants**

170.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against LPL.

171.    LPL owed fiduciary duties to Plaintiffs and Class members with respect to the Cash Sweep Programs.

172.    These duties include, but are not limited to:

a.    a duty of care;

b.    a duty of loyalty;

c.    a duty to act in the best interests of its clients; and

d.    a duty not to place LPL's interests above those of its clients.

173.    LPL breached the foregoing duties when it (i) failed to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest on their cash sweep account balances; (ii) failed to act in the best interests of Plaintiffs and the Class with respect to the Cash Sweep Programs; and (iii) recommended to Plaintiffs and the Class that they utilize and continue to utilize the Cash Sweep Programs.

174.   LPL's past, continuous, and ongoing breaches of duties damaged Plaintiffs and the Class.

175.   Defendant LPL Financial Holdings Inc. knowingly encouraged, directed, and participated in the breaches of fiduciary duty by LPL Financial LLC.

176.   LPL Financial Holdings Inc. is also liable for such breaches, including under the doctrine of respondeat superior, because LPL Financial LLC is a wholly owned subsidiary and agent of LPL Financial Holdings Inc. and committed breaches of fiduciary duties within the scope of its corporate relationship and employment.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment
### Brought on Behalf of Plaintiffs and the Class Against All Defendants

177.   Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim in the alternative to the preceding Claim to the extent it is duplicative of such Claim.

178.   As a result of LPL's wrongful conduct, Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits.

179.   As a result of LPL's wrongful conduct, LPL was unjustly enriched because, among other benefits, it received significantly greater "fees" or net interest income than it would have but for its wrongful conduct.

180.   LPL appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 24-CV-01228 TWR (AHG)

181.   It would be inequitable and unjust for LPL to retain these wrongfully obtained profits.

182.   LPL's retention of these unjustly-obtained benefits would violate the fundamental principles of justice, equity, and good conscience.

### THIRD CLAIM FOR RELIEF

**Breach of Contract**
**Brought on Behalf of Plaintiffs and the Class Against All Defendants**

183.   Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against LPL.

184.   LPL's governing documents related to the Cash Sweep Programs constitute a binding agreement between LPL and its accountholders.

185.   The governing documents require LPL to act in a client's "best interest and not put [LPL's] interest ahead of [the client's]."

186.   As set forth herein, LPL breached the terms of its agreements with Plaintiffs and the Class when it failed to pay to or secure a fair and reasonable interest rate on their cash sweep account balances by putting LPL's interests ahead of its clients.

187.   LPL's past, continuous, and ongoing breach damaged and continues to damage Plaintiffs and the Class.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 24-CV-01228 TWR (AHG)

# FOURTH CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Brought on Behalf of Plaintiffs and the Class Against All Defendants

188.   Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

189.   LPL's governing documents related to their accounts constitute binding agreements with accountholders.

190.   Implicit in these contracts (which incorporate LPL's Cash Sweep Programs, respectively), and under Massachusetts law which governs them, is a covenant of good faith and fair dealing, requiring LPL to deal fairly with its clients, to fulfill its obligations under the contract in good faith, and to not deprive Plaintiffs and Class members of the fruits of their bargain.

191.   Through the implied covenant of good faith and fair dealing, LPL was obligated to pay to or secure for Plaintiffs and Class members a fair and reasonable rate of interest on their cash balances.  By failing to do so, LPL breached the implied covenant of good faith and fair dealing.

192.   LPL's past, continuous, and ongoing breach of the implied covenant damaged and continue to damage Plaintiffs and the Class.

# DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, demand judgment and relief as follows:

    a.    certifying the proposed Class, and appointing Plaintiffs and their counsel to represent the proposed Class;

    b.    awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

    c.    awarding Plaintiffs and Class members restitution, disgorgement of profits, and forfeiture of compensation;

    d.    awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

    e.    awarding such other and further relief as the Court deems proper.

# JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

DATED: December 12, 2024        Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

_____*/s/ Matthew L. Dameron*_____
Matthew L. Dameron (admitted *pro hac vice*)
Clinton J. Mann (admitted *pro hac vice*)
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Tel: (816) 945-7110
matt@williamsdirks.com
cmann@williamsdirks.com

58

Sophia M. Rios (Bar No. 305801)
**BERGER MONTAGUE PC**
8241 La Mesa Blvd, Suite A
La Mesa CA 91942
Telephone: (619) 489-0300
srios@bm.net

-and-

Michael Dell'Angelo (*pro hac vice*)
Alex Heller (*pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
aheller@bm.net

Jonathan D. Uslaner (Bar No. 256898)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470
jonathanu@blbglaw.com

-and-

Salvatore J. Graziano (*pro hac vice*)
John J. Rizio-Hamilton (*pro hac vice*)
Avi Josefson
Michael D. Blatchley
Adam H. Wierzbowski
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com
adam@blbglaw.com

59

CONSOLIDATED CLASS ACTION COMPLAINT
NO. 24-CV-01228 TWR (AHG)

***Court-Appointed Interim Co-Lead Counsel for Plaintiffs and Proposed Class***

Alan L. Rosca (admitted *pro hac vice*)
Jonathan A. Korte (admitted *pro hac vice*)
**ROSCA SCARLATO LLC**
2000 Auburn Dr. Suite 200
Beachwood, OH 44122  Telephone: (216) 946-7070
arosca@rscounsel.law
jkorte@rscounsel.law

Paul J. Scarlato (admitted *pro hac vice*)
**ROSCA SCARLATO LLC**
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
E-mail: pscarlato@rscounsel.law

Michael J. Angelides
Thomas I. Sheridan, III
Sona R. Shah
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6404
mangelides@simmonsfirm.com
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

Bruce D. Oakes
Richard B. Fosher
**OAKES & FOSHER, LLC**
1401 Brentwood Boulevard, Suite 250
Saint Louis, Missouri 63144
Telephone: (314) 428-7600
Facsimile: (314) 428-7604
boakes@oakesfosher.com

60

rfosher@oakesfosher.com

***Additional Counsel for Plaintiffs***

61