1  JOSEPH E. FLOREN, SBN 168292
      joseph.floren@morganlewis.com
2  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
3  San Francisco, CA 94105
   Tel.: 415.442.1000 / Fax: 415.442.1001
4
   ARJUN P. RAO, SBN 265347
5     arjun.rao@morganlewis.com
   MORGAN, LEWIS & BOCKIUS LLP
6  300 South Grand Ave, 22nd Floor
   Los Angeles, CA 90071-3132
7  Tel.: 213.612.2500 / Fax: 213.612.2501

8  VANESSA M. BROWN, *pro hac vice*
      vanessa.brown@morganlewis.com
9  MORGAN, LEWIS & BOCKIUS LLP
   One Federal Street
10 Boston, MA 02110
   Tel.: 617.341.7700 / Fax: 617.341.7701
11
12 *Counsel for Defendants LPL Financial LLC*
   *and LPL Financial Holdings, Inc.*
13
                **UNITED STATES DISTRICT COURT**
14
              **SOUTHERN DISTRICT OF CALIFORNIA**
15
16 | *In re LPL Financial Cash Sweep* | No. 3:24-cv-01228-TWR-AHG |
17 | *Litigation* | **MEMORANDUM OF POINTS AND** |
18 | | **AUTHORITIES IN SUPPORT OF** |
   | | **DEFENDANTS' MOTION TO** |
   | | **DISMISS PLAINTIFFS'** |
19 | This Document Relates To: | **CONSOLIDATED COMPLAINT** |
   | | **UNDER RULE 12(b)(6)** |
20 | ALL ACTIONS | |
   | | Date:    April 17, 2025 |
21 | | Time:    1:30 p.m. |
   | | Place:   Courtroom 14A, 14th Floor |
22 | | Judge:   Hon. Todd W. Robinson |
23
24
25
26
27
28

I. INTRODUCTION ..................................................................................... 1

II. SUMMARY OF FACTUAL ALLEGATIONS ........................................ 2

    A.    Defendants and Their Business ............................................... 2

    B.    Plaintiffs and Their LPL Accounts ........................................ 3

    C.    LPL's Cash Sweep Programs ................................................. 3

    D.    Plaintiffs' Extraneous Allegations ........................................ 8

    E.    Plaintiffs' Claims ................................................................... 9

III. LEGAL STANDARD AND GOVERNING LAW ................................. 9

IV. ARGUMENT ...................................................................................... 10

    A.    Plaintiffs' Breach of Contract Claim Fails. ........................ 10

    B.    Plaintiffs Fail to Plead Any Breach of Fiduciary Duty ...... 15

        1.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty. ................................................................... 15

        2.    Plaintiffs' Claims for Breach of Fiduciary Duty Are Partially Barred by the Statute of Limitations. .......................... 21

    C.    Plaintiffs' Repackaged Claims for Breaches of Implied Covenants and Unjust Enrichment Necessarily Fail. ......................... 21

    D.    The Complaint Must Be Dismissed as to LPL Holdings. ................... 24

    E.    Dismissal Should Be with Prejudice. ................................... 25

V. CONCLUSION ................................................................................. 255

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen v. Fid. Brokerage Servs. LLC,*
    711 F. Supp. 3d 219 (S.D.N.Y. 2024) .................................................... 20

*Ashcroft v. Iqbal,*
    556 U.S. 663 (2009) .................................................................. 9, 25

*Baker v. Goldman, Sachs & Co.,*
    771 F.3d 37 (1st Cir. 2014) ............................................................ 17

*Barkhordar v. President & Fellows of Harvard Coll.,*
    544 F. Supp. 3d 203 (D. Mass. 2021) .................................................... 23

*Bowoto v. Chevron Texaco Corp.,*
    312 F. Supp. 2d 1229 (N.D. Cal. 2004) .................................................. 25

*Brand Grp. Int'l, LLC v. Established Brands Int'l, Inc.,*
    2011 WL 3236078 (D. Mass. July 26, 2011) ............................................... 23

*Chamber of Com. v. Dep't of Labor,*
    885 F.3d 360 (5th Cir. 2018) ........................................................... 14

*Chokel v. Genzyme Corp.,*
    449 Mass. 272 (2007) ............................................................... 17, 22

*Cohen v. Stevanovich,*
    722 F. Supp. 2d 416 (S.D.N.Y. 2010) .................................................... 24

*Crown Coal & Coke Co. v. Powhatan Mid-Vol Coal Sales, LLC,*
    929 F. Supp. 2d 460 (W.D. Pa. 2013) ................................................... 23

*DeBlasio v. Merrill Lynch & Co.,*
    2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........................................... passim

*Doyle v. Hasbro, Inc.,*
    103 F.3d 186 (1st Cir. 1996) ........................................................... 11

*Eigerman v. Putnam Invs., Inc.,*
    450 Mass. 281 (2007) ................................................................... 22

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

No. 24-cv-01228-TWR-AHG

*Europacific Asset Mgmt. Corp. v. Tradescape Corp.*,
    2005 WL 497787 (S.D.N.Y. Mar. 2, 2005)........................................................18

*Haglund v. Estee Lauder Companies, Inc.*,
    466 F. Supp. 3d 292 (D. Mass. 2020)...............................................................11

*I Am Athlete, LLC v. IM EnMotive, LLC*,
    2023 WL 8933592 (Del. Ch. Dec. 27, 2023)....................................................25

*Keros v. Massachusetts Mut. Life Ins. Co.*,
    958 F. Supp. 2d 306 (D. Mass. 2013)...............................................................15

*Kriegel v. Bank of Am., N.A.*,
    2010 WL 3169579 (D. Mass. Aug. 10, 2010)...................................................18

*Lattuca v. Robsham*,
    442 Mass. 205 (2004)........................................................................................21

*Levitin v. PaineWebber, Inc.*,
    159 F.3d 698 (2d Cir. 1998)........................................................................13, 21

*Lindner v. Occidental Coll.*,
    2020 WL 7350212 (C.D. Cal. Dec. 11, 2020) ..................................................24

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982) ..........................................................................................19

*Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
    412 F.3d 215 (1st Cir. 2005) .......................................................................22, 24

*Merriam v. Demoulas Super Markets, Inc.*,
    464 Mass. 721 (2013)........................................................................................17

*Metro. Life Ins. Co. v. Cotter*,
    464 Mass. 623 (2013)........................................................................................23

*Nedlloyd Lines B.V. v. Superior Court*,
    3 Cal. 4th 459 (1992)........................................................................................10

*Okwu v. McKim*,
    682 F.3d 841 (9th Cir. 2012)............................................................................25

*Olson v. Sovereign Bancorp, Inc.*,
    2012 WL 642543 (D. Mass. Feb. 28, 2012)......................................................20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

No. 24-cv-01228-TWR-AHG

*Patsos v. First Albany Corp.*,
    433 Mass. 323 (2001) ................................................................................ 16, 17

*Patton v. Cox*,
    276 F.3d 493 (9th Cir. 2002) ............................................................................ 10

*SEC v. W. Int'l Secs., Inc.*,
    2023 WL 2480732 (C.D. Cal. Mar. 13, 2023) .................................................. 20

*Shaulis v. Nordstrom, Inc.*,
    865 F.3d 1 (1st Cir. 2017) ................................................................................ 24

*In re Shields Health Care Grp., Inc. Data Breach Litig.*,
    2024 WL 939219 (D. Mass. Mar. 5, 2024) ...................................................... 23

*SiOnyx, LLC v. Hamamatsu Photonics K.K.*,
    332 F. Supp. 3d 446 (D. Mass. 2018) .............................................................. 23

*Souter v. Edgewell Pers. Care Co.*,
    542 F. Supp. 3d 1083 (S.D. Cal. 2021) ..................................................... 9, 10, 24

*Stanley v. Schmidt*,
    369 F. Supp. 3d 297 (D. Mass. 2019) .............................................................. 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .......................................................................................... 9

*Transam. Mortg. Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979) .......................................................................................... 19

*UBS Fin. Servs., Inc. v. Aliberti*,
    483 Mass. 396 (2019) ...................................................................................... 16

*United States v. Bestfoods*,
    524 U.S. 51 (1998) .......................................................................................... 24

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    2023 WL 4239073 (S.D.N.Y. Jun. 28, 2023) .................................................. 15

*Vieira v. First Am. Title Ins. Co.*,
    668 F. Supp. 2d 282 (D. Mass. 2009) .............................................................. 11

*Wehlage v. EmpRes Healthcare Inc.*,
    821 F. Supp. 2d 1122 (N.D. Cal. 2011) ............................................................ 25

*Weil v. Morgan Stanley DW Inc.*,
 877 A.2d 1024 (Del. Ch. 2005) .................................................. 18, 20

*Welch v. TD Ameritrade Holding Corp.*,
 2009 WL 2356131 (S.D.N.Y. 2009) .................................................. 16

*Wellman v. Dow Chem. Co.*,
 2007 WL 842084 (D. Del. Mar. 20, 2007) .................................................. 25

*Young v. Facebook, Inc.*,
 790 F. Supp. 2d 1110 (N.D. Cal. 2011) .................................................. 22

*Young v. Wells Fargo Bank, N.A.*,
 717 F.3d 224 (1st Cir. 2013) .................................................. 22

*Zotbelle, Inc. v. Kryolan Corp.*,
 416 F. Supp. 3d 33 (D. Mass. 2019) .................................................. 22

STATUTES

15 U.S.C. § 78c .................................................. 2, 20

15 U.S.C. § 80b-2 .................................................. 2, 19

6 Del. C. § 18-303(a) .................................................. 25

Employee Retirement Income Security Act of 1974 ("ERISA") .................................................. 14

Internal Revenue Code Section 4975, 26 U.S.C. § 4975 .................................................. 13, 14

Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.* .................................................. 14, 19

Mass. Gen. Laws 260, § 2A .................................................. 21

REGULATIONS

17 C.F.R. § 15*l*-1(a)(1) .................................................. 20

17 C.F.R. § 240.15c3-3(j)(2) .................................................. 20

17 C.F.R. § 240.15c3-2 .................................................. 13

*Financial Responsibility Rules for Broker-Dealers*, SEC Release No.
 34-70072, 78 Fed. Reg. 58124 (Aug. 21, 2013) .................................................. 20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

No. 24-cv-01228-TWR-AHG

*Regulation Best Interest*, SEC Release No. 34-86031,
    84 Fed. Reg. 33318, 33462 (July 12, 2019) ................................................ 19, 20

*Commission Interpretation Regarding Standard of Conduct for*
    *Investment Advisers*, SEC Release No. IA-5248,
    84 Fed. Reg. 33669, 33671 (July 12, 2019) ...................................................... 19

**OTHER AUTHORITIES**

Restatement (Second) of Agency §§ 376, 377 ....................................................... 21

SEC, *Investor Bulletin: Bank Sweep Programs* (June 5, 2014),
    available at https://www.investor.gov/introduction-
    investing/general-resources/news-alerts/alerts-bulletins/investor-
    bulletins-78 .......................................................................................................... 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii

No. 24-cv-01228-TWR-AHG

# TABLE OF ABBREVIATIONS

| Short Form | Full Meaning |
| --- | --- |
| Complaint | Plaintiffs' Consolidated Class Action Complaint (ECF No. 38), filed December 12, 2024 |
| Defendants | LPL and LPL Holdings |
| DCA Program | LPL's Deposit Cash Account Program, one of the two challenged cash sweep programs |
| ERISA | Employee Retirement Income Security Act of 1974 |
| Ex. __ | Numbered Exhibit to Defendants' Request for Consideration of Documents Incorporated into the Consolidated Complaint and for Judicial Notice, which is also attached to and authenticated in the Declarations of Tien Nguyen (for Exhibits 1 and 8), Scott Severino (for Exhibits 2-6), and Cedric Armstrong (for Exhibit 7), all served and filed herewith |
| FDIC | Federal Deposit Insurance Corporation |
| ICA Program | LPL's Insured Cash Account Program, the other challenged cash sweep program |
| IRA | Individual Retirement Account |
| LPL | Defendant LPL Financial LLC |
| LPL Holdings | Defendant LPL Financial Holdings Inc. |
| Plaintiffs | Plaintiffs Daniel Peters, Douglas Nevitt, and Carol White |
| RJN | Defendants' Request for Consideration of Documents Incorporated into the Consolidated Complaint and for Judicial Notice, served and filed herewith. |
| SEC | United States Securities and Exchange Commission |
| SIPC | Securities Investor Protection Corporation |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

No. 24-cv-01228-TWR-AHG

# I.  **INTRODUCTION**

This putative class action seeks to rewrite the terms of the parties' contracts to retroactively force LPL to increase the interest paid on Plaintiffs' *uninvested* cash that they chose to keep in LPL accounts, and to impose duties that Plaintiffs agreed LPL does not have.  Plaintiffs—investors who hold various types of investment accounts with LPL—seek to invoke duties regarding investment advice, but they are not suing about investments.  They complain solely about the purportedly insufficient interest received from a voluntary "sweep" program that moved their idle, uninvested cash to an FDIC-insured account with a third-party bank and then back when the cash was needed.  Plaintiffs were not required to participate in any sweep programs at all (as they admit), and their Complaint blithely proceeds to quote and incorporate LPL's disclosures and agreement terms that render their claims meritless as a matter of law.

Plaintiffs cannot conjure duties to pay a "reasonable rate of interest" on their idle cash because the facts alleged show that no such duty existed.  Plaintiffs admit that LPL *disclosed* the allegedly "unfair" interest rates at all times.  And they admit LPL *disclosed* that the interest they received was reduced by fees paid to LPL (not by Plaintiffs, but by the third-party banks)—fees that also were *disclosed*, that LPL explained were *more* than the amounts of interest paid, and that LPL told Plaintiffs comprised an "important revenue stream."  LPL also disclosed that the programs created "conflicts of interest" between LPL and its customers, which LPL detailed.  Moreover, LPL told Plaintiffs that it set its overall advisory fees with the expectation that this "important revenue stream" will continue, and that without it LPL's other fees "would be higher."  And LPL cautioned Plaintiffs to understand the features of the programs, compare them against alternatives—which LPL also described—and avoid using them as a long-term investment option.

Knowing all that, and having the right to remove themselves from the programs, Plaintiffs have no possible basis to complain.  Importantly, they do ***not*** claim to have been unknowingly hornswoggled or misled into consenting to the cash

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

sweep programs, or even that LPL recommended or advised that they participate. To the contrary, their Complaint affirms that, in selecting the cash sweep programs, they were acting "independently" and without any advice or recommendation from LPL. There can be no breach of contract on these facts, nor any fiduciary breach, unjust enrichment, or breach of the covenant of good faith and fair dealing. The claims are meritless and should be dismissed with prejudice.

## II. SUMMARY OF FACTUAL ALLEGATIONS[1]

### A. Defendants and Their Business

LPL is an independent broker-dealer and investment adviser, registered in both capacities with the SEC. ¶ 14. LPL provides an array of securities brokerage and investment advisory services through a network of over 28,000 individual financial advisors and professionals, servicing over 7.9 million client accounts. ¶ 159.

LPL's Relationship Summary (quoted in ¶¶ 24, 25, 108) provides an overview of its services and fees and explains how brokerage and investment advisory services differ. Ex. 1; *see* 15 U.S.C. § 78c(4)-(5) (definitions of "broker" and "dealer"); 15 U.S.C. § 80b-2(11) (definition of "investment adviser"). Brokerage services involve taking orders, executing securities transactions, and maintaining assets and accounts. In providing brokerage services, LPL may recommend investments, but clients make all investment decisions. Ex. 1, at 2. When LPL provides investment advisory services, it provides advice for a fee, and either LPL or another financial institution may be granted discretion to manage the client's investments (*i.e.*, to buy and sell investments without asking in advance); or the account may be non-discretionary, in which case the client retains total control and must approve any investment before it is made. *Id.* LPL's financial professionals offer brokerage or investment advisory services, or both. *Id.* Most of them are independent contractors of LPL, although some are employees of LPL or an affiliate. *Id.* at 5.

---

[1] The facts are drawn from the Complaint, cited by "¶ __" references, together with documents incorporated therein or subject to judicial notice pursuant to Defendants' RJN. For purposes of this motion only, the Complaint's well-pled factual allegations are presumed true, but not its contentions, conclusions, and implausible inferences.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Plaintiffs also sue LPL's ultimate corporate parent, LPL Holdings, a holding

2    company that is not alleged to have had any contact or dealings with them. ¶ 13.

3    **B.    Plaintiffs and Their LPL Accounts**

4    Plaintiffs allege they were LPL customers, but their Complaint says virtually

5    nothing about their relationships with LPL. Plaintiff Daniel Peters pleads that he

6    held an "advisory [IRA], a non-advisory IRA account, [and] a standard brokerage

7    account." ¶ 10. Plaintiffs Douglas Nevitt and Carol White each say they held

8    "advisory IRA" accounts. ¶¶ 11-12. All three complain that they received

9    "unreasonably low interest" on uninvested cash balances that "were swept into LPL's

10   Bank Sweep Programs during the period when [their] accounts were open." ¶¶ 10-

11   12. Plaintiffs omit basic allegations, such as when they maintained their LPL

12   accounts, what agreements they made with LPL, which cash sweep program they

13   participated in, how much (if any) uninvested cash is at issue, during what period,

14   and what interest rates they were paid. Nor do Plaintiffs say anything about their

15   accounts beyond whether they were IRAs, brokerage, or "advisory"—leaving out

16   whether the accounts were discretionary or non-discretionary and *who* provided any

17   advisory or discretionary management services (LPL or someone else). Plaintiffs

18   also include no facts plausibly showing that LPL advised or recommended that they

19   place uninvested cash in LPL's cash sweep programs.

20   **C.    LPL's Cash Sweep Programs**

21   In LPL's cash sweep programs, uninvested cash balances held in a

22   participating LPL account (called "free credit balances") are automatically

23   transferred, or "swept," into an interest-bearing, FDIC-insured deposit account with

24   an unaffiliated bank, and back when needed in the LPL account. ¶¶ 2, 39; Exs. 2-3.

25   LPL offers two primary cash sweep programs to its brokerage and advisory

26   clients: (i) the ICA Program, which is the default option for most individual account

27   types; and (ii) the DCA Program, which is "the default sweep program specifically

28   for qualified advisory IRA accounts." ¶ 43. In both programs, free credit balances

are swept into FDIC-insured deposit accounts opened and maintained for clients by a third-party administrator at a third-party bank. ¶ 49. Once the uninvested cash is swept, the bank pays interest on the cash deposited, which is credited to the client's LPL account, and the third-party bank pays LPL a fee, reducing the interest paid to clients. ¶¶ 64, 67. The rates of interest and LPL's fees are disclosed. *See* Exs. 4-6.[2]

As Plaintiffs admit, participation in the ICA or DCA Programs is entirely voluntary. LPL's account agreements provide: "By signing the Account Application" the client is "selecting and agreeing, with respect to assets held at LPL, to have cash balances in [their] account transferred automatically into a sweep program, depending on the type of account ...." ¶ 41 (emphasis omitted); Ex. 8, § 17, at 65-68. But this is only the "default" option: clients who do not wish to participate can "'turn off' the automatic sweep" and remove themselves from the program. ¶¶ 40, 42. In that case, the uninvested cash would remain in their LPL account. Ex. 2, at 17 (If clients "turn off the automatic cash sweep, ... any cash balances will be held with LPL as a free credit balance as described in your account agreement."); Ex. 3, at 28 (same). Plaintiffs elected not to avail themselves of this option.

LPL provides robust disclosures to its clients regarding all aspects of the ICA and DCA Programs, which are quoted and referenced throughout the Complaint as the basis for Plaintiffs' claims.[3] The key disclosures relevant here are those concerning the interest rates paid to participating clients, the fees LPL receives from the participating third-party banks, conflicts of interest, and Plaintiffs' alternatives.

<u>Interest Rates Paid to Clients</u>: Plaintiffs do not allege that LPL promises that program deposits pay any specific interest rate, because LPL makes no such promise. Instead, Plaintiffs allege that LPL's account agreements and Disclosure Booklets "direct[] clients to [LPL's] website to obtain current interest rate information[.]"

---

[2] LPL has other cash sweep programs, about which Plaintiffs do not complain. ¶ 43.

[3] The Complaint attempts to cobble together a basis for a claim based on partial and selective quotations from LPL's disclosure documents—two Disclosure Booklets, a "Relationship Summary," and "account agreements"—all of which the Court should take notice and/or deem incorporated as explained in the RJN.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

¶¶ 82, 84.  The disclosure Plaintiffs are referencing states in relevant part:

> "Interest will accrue daily on Deposit Account balances from the day cash is deposited into a Bank through the business day preceding the date of withdrawal from that Bank.  Interest will be compounded daily and credited monthly.  The interest rates paid are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties (described below).  The rate of interest accruing on your Deposit Account balances may change as frequently as daily without prior notice.  The most up-to-date interest rates may be found by visiting https://www.lpl.com/content/dam/lpl-www/documents/disclosures/insured-cash-account-current-interest-rate-tiers.pdf."  Ex. 2, at 13; *see also* Ex. 3, at 25; Ex. 8, § 17, at 66.

The rate paid remains the same regardless which bank holds the deposit account.  *Id.* The hyperlink directs the reader to LPL's website, which publishes the current interest rate.  *See* Exs. 4, 6.  The Complaint includes a table summarizing the interest rates in effect from 2018 through November 14, 2024.  ¶ 84.

Fees Paid to LPL by Third-Party Banks:  LPL fully discloses that it is paid a fee by third-party banks for enrollment in the cash sweep programs.  For the ICA Program, LPL's Disclosure Booklet and agreement specifies the maximum fee LPL might receive and "directs clients to its website to obtain … historical fee information."  ¶ 82.  Selectively quoting from LPL's disclosures, Plaintiffs point out that LPL explicitly states what fees it receives, and explains that this poses a conflict of interest—putting Plaintiffs and all clients on notice of this information:[4]

**"FEES AND RELATED CONFLICTS OF INTEREST**

Each Bank will pay LPL a fee equal to a percentage of the average daily deposit balance in each Deposit Account.  Such fees differ among the participating Banks depending on the interest rate environment and/or any fee waivers made by LPL.  The fee paid to LPL will be at an annual rate of up to an average of 600 basis points as applied across all Deposit Accounts taken in the aggregate.  The fee paid to LPL reduces the interest rate paid on your cash, and depending on the interest rate and other market factors, LPL generally receives as its fee the majority of the amount paid by the Banks with respect to such deposits.  Depending on interest rates and other market factors, the yields on the ICA program have been, and may continue in the future to be, lower than the aggregate fees and expenses received by LPL for your participation in the ICA program.  This can result in you experiencing a negative overall investment return with respect to cash reserves in the ICA program.  *For information about historical fees received by LPL from average daily*

---

[4] Unless otherwise noted, italicized text in this and other quotations from LPL disclosures indicates text that Plaintiffs omitted from the Complaint.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*balances in the ICA program, please visit https://www.lpl.com/content/dam/lpl-www/documents/disclosures/ account-fees.pdf or speak with your financial professional.*" Ex. 2, at 13-14; ¶¶ 64, 152; *see* ¶ 82, Ex. 8, § 17, at 66.[5]

The hyperlink directs the reader to LPL's website, which discloses the aggregate fees LPL received each quarter, expressed as a percentage of total cash in the ICA program. Ex. 5. LPL's fees from the ICA Program during the last five years have ranged from 0.98% to a high of 3.32%. *Id.*; ¶ 84 (table itemizing year-end fees).

For the DCA Program, the Disclosure Booklet explains that LPL receives a flat monthly fee from the third-party banks for each participating account, includes a table disclosing precisely what those fees are, and explains that LPL receives no other fees with respect to the program. Ex. 3, at 26-27; ¶ 67. The fee depends only on the applicable federal funds rate, *id.*, and was $18.50 per month as of November 14, 2024—the end of the period covered by Plaintiffs' allegations. Ex. 6; *see* ¶ 84.

Plaintiffs admit that advisory account clients affirm that they have reviewed LPL's sweep program disclosures, "independently chosen" the ICA or DCA program for their account, and agreed that LPL's fees "are reasonable and appropriate for the services being provided under the program[.]" ¶¶ 34, 36. Clients also agree that they "*have not relied on the advice or recommendation of LPL or [their professional] in making this selection.*"[6] *Id.* (emphasis added); Ex. 8, § 17, at 65-66.

<u>Conflicts of Interest</u>: LPL explicitly details how its interests conflict with those of clients with respect to the sweep programs. Plaintiffs acknowledge only some of these statements in their selective quotations from LPL's disclosures:

> "*If you are investing through an advisory account, the fees that LPL receives from the Banks is in addition to the advisory fee that you pay LPL and your financial professional.* This means that LPL earns two layers of fees on the same cash balances in your LPL account. . . . [W]e have an incentive for you to use (and invest your assets in) the sweep

---

[5] Plaintiffs allege that the 2017 version of this provision specified that LPL's aggregate fees would not exceed 200 basis points (*i.e.*, 2%), and allege further that the maximum was later increased to 400 basis points (4%). ¶¶ 62-63; *see* Ex. 8, § 17, at 66. They do not allege that LPL's fees exceeded these rates.

[6] Plaintiffs contend this provision referenced only the DCA program before March 2024. ¶ 36. They also complain that LPL disclosed the fact, but not the amount, of fees to a third-party administrator of the programs. ¶¶ 32, 68-69.

*products that increase our compensation…. LPL has a conflict of interest with respect to allocations of additional sweep capacity to programs and arrangements that will increase its compensation. We set our advisory program fees with the expectation that we will receive fees and benefits from the ICA program. Our advisory program fees would be higher if we did not receive fees and benefits from the ICA program….*

The fees that LPL receives from the Banks are an important revenue stream and present a conflict of interest for LPL because LPL benefits financially if cash is swept into the ICA program. Because this compensation is retained by LPL and is not shared with your financial professional, it does not cause your financial professional to have a direct financial incentive to recommend that cash be held in a Deposit Account instead of holding securities." Ex. 2, at 14; *see* Ex. 8, at 95; ¶¶ 29, 31.

In addition to these disclosures, LPL also provides a Relationship Summary to all clients that outlines fees it charges to clients and directs them to its further, more detailed disclosures of fees and conflicts of interest. Ex. 1; ¶¶ 24, 25, 108. As relevant to LPL's cash sweep programs, the Relationship Summary highlights how LPL's interest in the cash sweep program conflicts with its clients' interests:

"When we provide you with a recommendation as your broker-dealer or act as your investment adviser, we have to act in your best interest and not put our interest ahead of yours. *At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the recommendations and investment advice we provide you. Here are some examples to help you understand what this means. . . .*

*. . . In some accounts we offer, uninvested cash is automatically placed into interest-bearing federally insured bank accounts. We receive fees for your participation in these 'cash sweep' programs from the banks sponsoring the programs. The fees we receive are typically higher than the interest you earn on the cash held in the bank accounts and are in addition to any fees you pay to us. This creates an incentive for LPL if you maintain a cash balance in your account*." Ex. 1, at 5; *see* ¶ 24.

The Complaint includes no less than 27 references to "conflicts of interest," but nowhere do Plaintiffs identify a purportedly material conflict of interest with respect to its cash sweep programs that LPL failed to disclose.

<u>Alternatives to Cash Sweep</u>: Plaintiffs had many alternatives for any uninvested cash, and LPL's Disclosure Booklets explained those too. Initially, the cash sweep programs at issue only apply to uninvested cash; Plaintiffs could have purchased investments with their idle cash, withdrawn it, or closed their accounts. They did none of these things. In addition, LPL encouraged clients to shop around:

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"You should compare the terms, interest rates, required minimum amounts, and other features of the ICA program with other accounts and alternative investments.

The ICA program should not be viewed as a long-term investment option. If you desire to maintain cash balances for other than a short-term period or are seeking higher yields currently available in the market, please contact your financial professional to discuss investment options to maximize your potential return." Ex. 2, at 13; *see also* Ex. 3, at 25.[7]

If they did not wish to have their uninvested cash moved to an FDIC-insured bank account to receive what they now say is "unreasonably low interest," Plaintiffs could withdraw from the ICA or DCA Programs at any time. ¶ 42. In that case, their idle cash would remain in their LPL accounts as free credit balances, to which they may not be entitled *any* interest, and they would have no FDIC insurance.[8] Ex. 2, at 17 (option to "turn off" sweep); Ex. 3, at 28 (same). Plaintiffs did not do that, either.

As LPL also disclosed, Plaintiffs could have invested the cash in a money market mutual fund ("MMF") offering higher rates of return, in which case the funds would not be automatically swept to or withdrawn from an MMF. *Id*. Such MMF shares, unlike deposits in the sweep programs, would be ineligible for the government guarantee and would carry risk of loss. LPL disclosed that too. *Id*.

## D. Plaintiffs' Extraneous Allegations

The Complaint devotes page after page to detailing the supposedly excessive aggregate sums LPL receives in fees from all of its cash sweep programs (including programs Plaintiffs don't challenge). ¶¶ 74-78, 85-93. Given the scale of LPL's business, with nearly eight million client accounts and over $1.4 trillion in assets, the figures should be unremarkable. *See* ¶ 159; ECF No. 1-6, at 4, 13. If Plaintiffs' point is that the revenue stream is important to LPL, that too should be uncontroversial—

---

[7] The SEC provides the same advice to investors. SEC, *Investor Bulletin: Bank Sweep Programs* (June 5, 2014), available at https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-78 (noting "[m]ost" firms are paid fees by banks in sweep programs, which reduces interest, and advising investors seeking higher rates of return to check other options).

[8] Free credit balances are entitled to SIPC protection, which is substantially different from FDIC insurance. *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/securities-investor-protection-corporation-sipc

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

that is exactly what LPL disclosed to them.  ¶ 29 (quoting ICA Disclosure Booklet: "The fees that LPL receives from the Banks are an important revenue stream"); *see also* ¶ 31 (same for DCA).  And the significance of cash sweep in LPL's overall revenue picture only reflects LPL's strategic pricing decisions regarding its other fees, which it also disclosed.  Ex. 2, at 14 ("Our advisory program fees would be higher if we did not receive fees and benefits from the ICA program.").

### E.    Plaintiffs' Claims

Plaintiffs each filed separate complaints from July through September 2024, which they have now substantially amended after the Court granted the parties' joint motion to consolidate the three separate actions.  ECF No. 30.  Plaintiffs contend that, during a proposed six-year putative class period, clients participating in the ICA and DCA Programs received "unreasonably low" interest rates and that LPL was paid "unreasonably high" fees by the unaffiliated participating banks.  ¶ 71.  Based on those and the other allegations in the Complaint, Plaintiffs allege claims against Defendants for: (1) breach of fiduciary duty, (2) unjust enrichment, (3) breach of contract, and (4) breach of the implied covenant of good faith and fair dealing.

### III.    <u>LEGAL STANDARD AND GOVERNING LAW</u>

To survive dismissal, "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A "plausible" claim is one that is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  In making that determination, the Court must consider the complaint, documents incorporated therein, and "matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  While the Court must accept a complaint's well-pled allegations as true, "[t]his presumption does not extend to conclusory allegations, 'unwarranted deductions of fact, or unreasonable inferences.'"  *Souter v. Edgewell Pers. Care Co.*, 542 F. Supp. 3d 1083, 1089 (S.D.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Cal. 2021) (Robinson, J.) (quoting *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)).

Plaintiffs allege that Massachusetts law governs the parties' relationship. ¶ 161. Because this Court sits in diversity, ¶ 16, California's choice-of-law rules apply in the first instance. *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). Under those rules, a contractual choice-of-law clause "encompasses all causes of action arising from or related to that agreement, … including tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 470 (1992). Plaintiffs affirmatively allege that "the law of Massachusetts will apply to each Class member's claims," ¶ 168, and the Complaint provides no basis to conclude otherwise. For purposes of this Motion, therefore, all of Plaintiffs' claims should be deemed governed by Massachusetts law.

## IV.  ARGUMENT

The Complaint falls squarely within the category of "conclusory allegations," "unwarranted deductions of fact," and "unreasonable inferences." *Souter*, 542 F. Supp. 3d at 1089. Its pages consist of nothing more than a hodgepodge of contractual provisions governing LPL's cash sweep offerings slapped with the label of "unreasonable." Said differently, all Plaintiffs have alleged is that LPL followed its contracts with its clients and did what it disclosed it would do. Because the parties' agreement disposes of the claims, the proper analysis begins with the claim for breach of contract, the failure of which also dooms the derivative unjust enrichment and implied covenant claims. Even an alleged fiduciary that abides by the contract with its client has not breached any duty, contractual or otherwise (to the extent any fiduciary duty existed here and applied to the conduct at issue, which it did not). Because the allegations of the Complaint make plain that these defects cannot be cured, Plaintiffs' claims should be dismissed in their entirety with prejudice.

### A.  Plaintiffs' Breach of Contract Claim Fails.

"'To plead a viable breach of contract claim under Massachusetts law

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

'plaintiffs must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach.'" *Vieira v. First Am. Title Ins. Co.*, 668 F. Supp. 2d 282, 288 (D. Mass. 2009) (quoting *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007))). Plaintiffs have not satisfied these requirements. The Complaint neither identifies which contract term(s) were allegedly breached, nor plausibly alleges that LPL departed from the requirements of its account agreements and disclosures. It also puts forth no cognizable claim for damages caused by LPL's alleged actions, because it was Plaintiffs' choice to participate in the cash sweep programs.

To survive a motion to dismiss, Plaintiff must "'state with substantial certainty the facts showing the existence of the contract and the legal effect thereof.'" *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (quoting *Pollock v. New England Tel. & Tel. Co.*, 194 N.E. 133, 136 (Mass. 1935)); *Haglund v. Estee Lauder Companies, Inc.*, 466 F. Supp. 3d 292, 298 (D. Mass. 2020) (granting motion to dismiss breach of contract claim). Here, Plaintiffs do the opposite, effectively acknowledging that LPL complied with all of its stated contractual obligations. To overcome this, Plaintiffs try to piece together an argument that the cash sweep "governing documents" require LPL to act in a client's "'best interest and not put [LPL's] interest ahead of [the client's].'" ¶ 185. But that is ***not*** what the contract says. The purported contract term that Plaintiffs are quoting is contained in the Relationship Summary, which makes explicit that the "best interest" requirement applies when LPL provides "a recommendation as your broker-dealer or act[s] as your investment advisor." Ex. 1, at 4; ¶ 24. Other contract snippets quoted in the Complaint reinforce the conclusion that recommendations or advice concerning investment products are the touchstone of any "best interest" undertaking by LPL. ¶ 26. But nowhere do Plaintiffs allege facts plausibly suggesting that LPL recommended or advised them to participate in the cash sweep programs. Instead, the Complaint only alleges the opposite, confirming Plaintiffs' agreement that they

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

had "independently chosen" the cash sweep program and "have not relied on the advice or recommendation of LPL in making this selection." ¶¶ 34, 36.

Moreover, even if there were some question about a recommendation, the very next sentence in the Relationship Summary after the "best interest" quote by Plaintiffs in ¶¶ 24, 185 continues: "At the same time, the way we make money creates some conflicts with your interests." Ex. 1, at 4. The Relationship Summary goes on to highlight that the fees LPL receives from clients' participation in the cash sweep programs "*are typically higher than the interest you earn on the cash held in the bank accounts and are in addition to any fees you pay to us. This creates an incentive for LPL if you maintain a cash balance in your account*." *Id.* at 4 (emphasis added). Given these express disclosures, and the others quoted earlier, Plaintiffs could not possibly have understood that LPL was undertaking to act in their "best interest" with respect to the setting of interest rates and fees in the cash sweep programs. Nor could the purported contract possibly be read to impose such an obligation. If that were the case, then LPL could scarcely charge, let alone increase, any fees to its clients, because that would never be in a client's "best interest."

Plaintiffs manufacture another contract term out of nothing in alleging: "LPL breached the terms of its agreements with Plaintiffs and the Class when it failed to pay or secure a fair and reasonable interest rate on their cash sweep account balances by putting LPL's interests ahead of its clients." ¶ 186. Plaintiffs have not identified any contractual provision that required LPL to pay or secure a "fair and reasonable interest rate," and LPL never made such a promise. LPL merely disclosed the interest rate paid, for all to see, that it was determined after deducting fees paid to LPL, and could change daily. *See* Ex. 2, at 13; Ex. 3, at 25; Exs. 4-6; Ex. 8, § 17, at 66.

In fact, the only contract provision alleged by Plaintiffs using the word "reasonable" concerns not interest, but rather the fees that the third-party banks pay to LPL, and it says the opposite of what Plaintiffs contend. In that provision, LPL's *clients* agree that they have reviewed the disclosures that explain how third-party

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

banks pay fees to LPL, which reduces the interest clients receive, and **clients** expressly agree that the fees LPL will receive from the banks are "reasonable and appropriate[.]"[9] ¶¶ 34, 36; Ex. 8, § 17, at 65-68. On its face, this provision is merely an additional recitation of Plaintiffs' **consent** to LPL's and the administrator's fees, not any representation or undertaking by LPL about interest rates. The suggestion that LPL thereby promised to secure "reasonable" interest rates for clients, a subject which this provision does not mention, is absurd. The same is true of Plaintiffs' contentions that the "context" of the program somehow "implies" a duty to take only a "reasonable" fee, ¶ 59, or that such an obligation arises from LPL telling clients the interest they received after deduction of fees may be higher or lower than that available directly from banks or through other arrangements, ¶ 60. LPL not only disclosed the amounts of its fees in the programs, but also highlighted that they were more than the interest paid to clients, refuting Plaintiffs' notion. *See, e.g.*, *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *37 (S.D.N.Y. July 27, 2009) (rejecting claims that agreement limited firm's ability to profit on cash sweep program or obligated firm "to maximize Plaintiffs' earnings on uninvested funds").[10]

Since there is no contract language whereby LPL agreed to secure what Plaintiffs now claim is a "reasonable" rate of interest, Plaintiffs further try to manufacture a "legal obligation" to do so under Section 4975 of the Internal Revenue Code, 26 U.S.C. § 4975 ("Section 4975"). ¶¶ 113-17. Plaintiffs have badly misread

---

[9] As Plaintiffs also admit, LPL disclosed its fees. The black-and-white disclosures state that LPL collects fees from banks totaling from 0.98% to 3.32% on the ICA Program and a fixed monthly amount ($18.50 as of November 14, 2024) on the DCA Program, Exs. 5-6, and that these fees comprise an "important revenue stream" which directly reduces the interest paid to clients. Ex. 2, at 14; Ex. 8, at 93. As for the complaint that the amounts of administrators' fees are not explicitly disclosed, ¶¶ 68-69, Plaintiffs fail to articulate any obligation that breached, given the disclosures of the interest paid to the client and LPL's fees, let alone any purported recoverable damage therefrom. There is no claim that Plaintiffs' interest was reduced by fees other than those "stated" in LPL's disclosures, Exs. 2-3.

[10] More generally, LPL had no independent obligation to pay or secure *any* interest on Plaintiffs' uninvested cash. *See* Ex. 8, § 17, at 68 ("Interest will not be paid to the Account on free credit balances."); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 701 (2d Cir. 1998) (under Exchange Act Rule 15c3-2, a "broker may or may not, offer interest on [customers'] 'free balances' through money market accounts").

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Section 4975 and do not even allege that it applies here. Section 4975 is a tax provision that, in part, imposes an excise tax on certain "prohibited transactions" under ERISA and IRA accounts. Section 4975(c) defines the transactions subject to the tax, and Section 4975(d) lists out several exemptions. Plaintiffs focus on the exemption in Section 4975(d)(4) that purportedly requires the person relying on that exemption to pay a "reasonable interest rate[.]" ¶ 116. **But Plaintiffs never allege that LPL relies on this exemption for any aspect of its business**. Nor could they.[11] All that Plaintiffs allege is that Section 4975 exists, and that LPL offers the DCA Program for "advisory retirement accounts." ¶ 31. Plaintiffs fail to connect these allegations in any way to LPL's contractual duties. Even if Section 4975(d)(4) were relevant to LPL's business, courts have rejected the notion that any private right of action arises under these excise tax laws. *Chamber of Com. v. Dep't of Labor*, 885 F.3d 360, 384 (5th Cir. 2018) (holding violations addressed by "IRS audits and excise taxes" and there is no private right of action). Plaintiffs' massive leap in inferential logic fails to plausibly plead that LPL "acknowledges [any] obligation" to pay a reasonable interest rate for its cash sweep program.[12] ¶ 113.

Finally, although the Court need not reach the issue here, even if there were some contract provision requiring LPL to pay a "reasonable" rate of interest, Plaintiffs *still* have not alleged facts plausibly establishing a breach. Plaintiffs attempt to establish that the interest rates they receive were not "reasonable" by comparisons to several wildly inapplicable rate "benchmarks": "unsecured borrowings by depository institutions from other depository institutions[,]" the "yield on short-term U.S. Treasury Bills[,]" and the rate for "short-term lending instrument[s] that involve[] the sale and repurchase of securities[.]" ¶¶ 140-50.

---

[11] Section 4975(d)(4) might have been tangentially relevant to some other case, in which an IRA fiduciary causes the IRA to made deposits with an *affiliated* bank, such that the excise tax and exemption could become relevant. But that is not this case. *See, e.g.*, ¶ 7 (acknowledging that LPL "sweep[s] client cash to unaffiliated banks.").

[12] Plaintiffs' other federal law arguments, based on the Adviser's Act or Regulation Best Interest, fail both on their own terms and because those laws are not inconsistent with the parties' agreement, *see* ¶¶ 162-63 & discussion *infra* Part IV.B.1.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Plaintiffs cannot establish that LPL's interest rates were not "reasonable" by comparing them to completely inapt securities and lending arrangements that are in no way comparable to an FDIC-insured bank account offered by LPL for automatic sweep. *See, e.g.*, *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 4239073, at *4 (S.D.N.Y. Jun. 28, 2023) (rejecting comparisons of bank deposit accounts, on which defendant contracted to pay a "reasonable rate," to "entirely distinct investment products"). Plaintiffs also compare LPL's interest rates with rates purportedly paid by "five brokerages that, like LPL, did not sweep client cash balances into banks affiliated with the brokerage," ¶¶ 132-38, but this also fails to plausibly allege that LPL's interest rates were not reasonable. All that Plaintiffs have alleged is that some other firms offered higher interest rates in some years; no allegations suggest that the businesses of those firms are remotely comparable or even competitive with that of LPL in relevant respects. They say nothing more about the "reasonableness" of interest paid here than the price of a motorcycle does about that of a luxury car (both motorized vehicles). Alleging that a cherry-picked list of other firms paid higher rates in some years does not state a legally cognizable breach of contract claim. In short, Plaintiffs have not pled a breach of contract.

### B. Plaintiffs Fail to Plead Any Breach of Fiduciary Duty.

Under Massachusetts law, LPL did not owe Plaintiffs a fiduciary duty with respect to the matter at issue—interest rates paid in cash sweep programs. The terms of those programs were stated in the parties' agreements and LPL's conflicts of interest were fully disclosed. As a matter of law, LPL could not breach any fiduciary duty to Plaintiffs by complying with its agreements. What is more, no allegations suggest a fiduciary duty existed at all as to many of their vaguely described accounts.

#### 1. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty.

To establish a breach of fiduciary duty, Plaintiffs must allege: "that a fiduciary relationship existed that created a duty," and "that a defendant breached that duty." *Keros v. Massachusetts Mut. Life Ins. Co.*, 958 F. Supp. 2d 306, 310 (D. Mass. 2013).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Plaintiffs' allegations fail to establish the elements of this claim because they have not alleged that LPL owed fiduciary duties to Plaintiffs with respect to the relevant operation of its cash sweep programs.

Under Massachusetts law, "a simple broker-customer relationship is not fiduciary in nature[.]" *Patsos v. First Albany Corp.*, 433 Mass. 323, 330 (2001); *Stanley v. Schmidt*, 369 F. Supp. 3d 297, 315 (D. Mass. 2019) (same); *UBS Fin. Servs., Inc. v. Aliberti*, 483 Mass. 396, 405-09, 405 n.12 (2019) (same for IRA custodian; noting "no relevant difference" between Massachusetts and New York law). The mere fact that a broker-dealer offers a cash sweep program that pays allegedly low interest and yields allegedly high profits to the firm does not support a fiduciary duty, which requires facts be alleged to support such as "personal and context-specific" relationship. *DeBlasio*, 2009 WL 2242605, at *30, *27-34 (so holding under New York law); *Welch v. TD Ameritrade Holding Corp.*, 2009 WL 2356131, at *10 (S.D.N.Y. 2009) (same). Courts look to "the degree of discretion a customer entrusts to his broker" over the matter in question to determine whether the relationship gives rise to fiduciary duties. *Patsos*, 433 Mass. at 333.

> Where the account is "non-discretionary," meaning that the customer makes the investment decisions and the stockbroker merely receives and executes a customer's orders, the relationship generally does not give rise to general fiduciary duties…. Conversely, where the account is 'discretionary,' meaning that the customer entrusts the broker to select and execute most if not all of the transactions without necessarily obtaining prior approval for each transaction, the broker assumes broad fiduciary obligations that extend beyond individual transactions. *Id.*

Plaintiffs allege that they held "brokerage" and "advisory" accounts, without specifying any over which LPL had discretion. ¶¶ 10-12. Their only allegations about "discretion" concern the setting of interest rates and fees—matters on which LPL did ***not*** undertake to act in Plaintiffs' interests and instead disclosed LPL's conflicting interests—or matters about which Plaintiffs do not complain, such as the selection of banks or determination of account eligibility. ¶ 44. As to the non-discretionary accounts—the ordinary brokerage account and non-advisory IRA

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

account that Plaintiff Peters alleges he held—LPL owed no fiduciary duties at all as a matter of Massachusetts law, and the claim must fail. *See Patsos*, 433 Mass. at 333.

As to the "advisory" accounts that all Plaintiffs allege they held, the existence and extent of *any* fiduciary duty between the parties depends on facts Plaintiffs omit from their Complaint, including whether LPL had discretionary investment management authority, whether a third party had such authority, or whether these were non-discretionary accounts as to which LPL merely provided advice regarding investments in securities. For Peters' "advisory IRA," discretion was granted to a third party; LPL held the account, but the subjects on which it contracted to provide investment advice did not include cash sweep. Ex. 7, at 47; Ex. 8, § 1, at 53-54. Because Plaintiffs fail to include the necessary allegations establishing that LPL owed any fiduciary duty, the breach of fiduciary duty claim should be dismissed.

Regardless, the critical issue is not whether LPL owes Plaintiffs any fiduciary duty, but whether LPL owes Plaintiffs a fiduciary duty with respect to the setting of interest rates (and/or LPL's fees) in the cash sweep programs. The facts alleged establish that LPL had no such duty. Even if Plaintiffs had alleged a general fiduciary relationship with LPL, "where the parties have defined in a contract the scope of their rights and duties in a particular area, good faith action in compliance with that agreement will not implicate a fiduciary duty." *Merriam v. Demoulas Super Markets, Inc.*, 464 Mass. 721, 727 (2013). Because LPL's cash sweep program is governed by a comprehensive set of contractual terms that fully disclose the amounts of interest, fees, and LPL's conflicts of interest, LPL's actions in compliance with the terms of those agreements do not create or implicate any fiduciary duty owed to its clients generally or as to other matters. *See Chokel v. Genzyme Corp.*, 449 Mass. 272, 278 (2007). Likewise, "a fiduciary relationship exists only if the plaintiff justifiably reposed trust in the defendant and the defendant knew of and accepted that trust," *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 59 (1st Cir. 2014) (applying Massachusetts law), and there could be no such relationship of trust here with respect

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

to the setting of interest rates or fees on the cash sweep programs.

Consistent with these principles, courts have rejected breach of fiduciary duty claims in analogous circumstances. For instance, in *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024 (Del. Ch. 2005), decided under California law, the plaintiff alleged that defendant Morgan Stanley breached a fiduciary duty because of the way uninvested cash in plaintiff's brokerage accounts was handled. *Id*. at 1025-26. The court held that "[t]he scope of any fiduciary obligations Morgan Stanley owed to [plaintiff] must be determined by reference to the contract between them." *Id*. at 1033. After examining the relevant contractual provisions, the court dismissed plaintiff's breach of fiduciary duty claim, explaining:

> "To indulge this claim would be to use the fiduciary duty tool for an improper purpose, permitting the plaintiff to rework a voluntary contractual relationship and capture a windfall gain while depriving Morgan Stanley of its reasonable expectations. By so doing, this court would invent an 'equitable duty' of boundless scope when there is no inequity justifying that innovation and when this novelty would undermine both the economic fairness and the efficiency that result from the freedom to contract. I cannot fathom how Morgan Stanley breached any fiduciary duty to the plaintiff by doing what the plaintiff had contractually agreed that it could do." *Id*. at 1026.

Claims for breach of fiduciary duty and breach of the covenant of good faith and fair dealing involving five firms' cash sweep programs similarly met with dismissal under New York law where, as in this case, no facts were alleged creating a relevant fiduciary duty and the defendants had merely performed as permitted under their contracts. *DeBlasio*, 2009 WL 2242605, at *27-34, *37-38; *see also Europacific Asset Mgmt. Corp. v. Tradescape Corp.*, 2005 WL 497787, at *9 (S.D.N.Y. Mar. 2, 2005) (dismissing breach of fiduciary duty and implied covenant claims against broker that "was acting at all times in accordance" with its Customer Agreement). And likewise, courts applying Massachusetts law routinely grant motions to dismiss breach of fiduciary claims where no breach of duty has been pled. *See, e.g.*, *Kriegel v. Bank of Am., N.A.*, 2010 WL 3169579, at *14 (D. Mass. Aug. 10, 2010) (dismissing breach of fiduciary duty claim for failure to plead breach of duty).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Because Plaintiffs cannot plausibly plead a breach of fiduciary duty under Massachusetts law, they suggest LPL has violated alleged fiduciary duties created by federal law. ¶¶ 104-108. Federal law is not a basis for any claim here. Plaintiffs' reliance on the Investment Advisers Act ("IAA"), 15 U.S.C. § 80b-1 *et seq.*, is misplaced for at least three insurmountable reasons. First, the IAA provides only a limited private right of action that Plaintiffs do not invoke here. *Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979) (holding only a claim to void an investment adviser's contract is permitted); *DeBlasio*, 2009 WL 2242605, at *16-18 (rejecting IAA claim challenging cash sweep in brokerage accounts). Second, Plaintiffs never plausibly allege that LPL undertook duties as their investment adviser concerning the use of the cash sweep programs. Plaintiffs cannot make this allegation, both because their agreements provide otherwise, *see, e.g.*, Exs. 1-3, 8, §§ 1, 17, at 1-3 & 14-17, and because investment advice under the IAA pertains to "securities"—but depositing uninvested free credit balances in a FDIC-insured bank account does not concern a security. *See* 15 U.S.C. § 80b-2(a)(11), (a)(18) (defining securities under the IAA); *Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982). Third, even if a federal fiduciary duty applied here, such duty requires an adviser to "eliminate or make full and fair disclosure of all conflicts of interest"—and LPL did the latter. *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, SEC Release No. IA-5248, 84 Fed. Reg. 33669, 33671 (July 12, 2019). Such a duty cannot and does not override the parties' contracts defining the scope of the relationship and identifying matters, such as cash sweep, in which LPL's interests conflict with clients' interests. *See id.* ("duty follows the contours of the relationship between the adviser and its client, [which they] may shape … by agreement").

Nor does SEC Regulation Best Interest ("Reg BI") supply any relevant duty. ¶ 108. In promulgating Reg BI, the SEC expressly stated that it did ***not*** create fiduciary duties or a private cause of action. *See Regulation Best Interest*, 84 Fed. Reg. 33318, 33462 (July 12, 2019) ("[I]nstead of adopting our approach in [Reg BI],

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the Commission could have alternatively imposed a form of fiduciary standard on broker-dealers[.]"); *id.* at 33327 (Reg BI does not "create[] any new private right of action or right of rescission, nor do we intend such a result."); *SEC v. W. Int'l Secs., Inc.*, 2023 WL 2480732, *1 (C.D. Cal. Mar. 13, 2023) (Reg BI "is less stringent than the fiduciary standard"); *Allen v. Fid. Brokerage Servs. LLC*, 711 F. Supp. 3d 219, 224 & n.5 (S.D.N.Y. 2024) (rejecting private action under Reg BI). Moreover, Reg BI's obligations are triggered only when a broker-dealer "mak[es] a recommendation of any securities transaction or investment strategy involving securities," 17 C.F.R. § 15*l*-1(a)(1), which Plaintiffs have not alleged here—nor could they as to the sweep programs, which do not involve "securities."[13] *See* 15 U.S.C. § 78c(a)(10).

Finally, Plaintiffs contend that because LPL agreed to act as Plaintiffs' "agent" in opening deposit accounts with third-party banks and sweeping funds, it agreed to act as a fiduciary with respect to rates and fees. ¶ 109. That too is wrong, and as discussed in Part IV.A, Plaintiffs cannot point to any contractual provision where LPL agreed to such broad duties. Instead, Plaintiffs' agreements with LPL expressly confine LPL's agency to making "deposits to and withdrawals from deposit accounts" at program banks, making sure balances remained under FDIC maxima, keeping records of the bank accounts, and moving funds between banks as required. Ex. 2, at 9, 10, 16, 19-20; Ex. 3, at 23, 24, 27, 29. There is no allegation that LPL failed to perform any of those obligations, and that kind of limited agency (*i.e.*, to open deposit accounts for Plaintiffs and move funds) does not create broad generalized fiduciary duties. *See Olson v. Sovereign Bancorp, Inc.*, 2012 WL 642543, at *3 (D. Mass. Feb. 28, 2012) (bank-customer relationship "is generally one of debtor and creditor and does not itself, without more, establish a fiduciary duty."); *see also Weil*, 877 A.2d at 1035 (fiduciary duties limited by "the scope of the agency set forth in the agreement"); Restatement (Second) of Agency §§ 376, 377.

---

[13] Plaintiffs do ***not*** allege that LPL violated any of the SEC's express requirements around sweep programs. *See* 17 C.F.R. § 240.15c3-3(j)(2); *Financial Responsibility Rules for Broker-Dealers*, SEC Release No. 34-70072, 78 Fed. Reg. 58124, 51837-42 (Aug. 21, 2013) (detailing SEC requirements for sweep programs).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

No. 24-CV-01228-TWR-AHG

In sum, even if the Court assumes that LPL owed Plaintiffs fiduciary duties with respect to matters as to which an advisory relationship existed, such as the selection of investments in a discretionary account, those duties do not supersede contractually assented to matters between the parties—such as the amount of the advisory fees that LPL's clients pay, or the interests rates received by Plaintiffs and fees paid to LPL. As to those matters, all Plaintiffs allege is that LPL complied with the contractual terms, which are not in any way unusual or deceptive. *See Levitin*, 159 F.3d at 703 ("[T]he practice of a financial institution using money deposited with it to obtain earnings is neither unknown nor unexpected, much less nefarious."). Plaintiffs have incurably failed to state a claim for breach of fiduciary duty.

## 2. Plaintiffs' Claims for Breach of Fiduciary Duty Are Partially Barred by the Statute of Limitations.

Plaintiffs' claims for breach of fiduciary duty, which purportedly extend back to July 2018, ¶ 155, are also partially barred by the statute of limitations. Massachusetts provides a three-year statute of limitations on breach of fiduciary duty claims. Mass. Gen. Laws 260, § 2A; *Lattuca v. Robsham*, 442 Mass. 205, 213 (2004). This action was filed on July 17, 2024, and Plaintiffs do not allege any basis for tolling. All claims for breach of fiduciary duty before July 17, 2021 are barred by the statute of limitations.

## C. Plaintiffs' Repackaged Claims for Breaches of Implied Covenants and Unjust Enrichment Necessarily Fail.

Plaintiffs re-package their contract and fiduciary duty theories as claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment. These derivative claims also fail for same reasons as their other claims and more.

Implied Covenant of Good Faith and Fair Dealing: Under Massachusetts law, all contracts imply a covenant of good faith and fair dealing, but "'the scope of the [implied] covenant is only as broad as the contract that governs the particular relationship.'" *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 238 (1st Cir. 2013) (quoting *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005)). Because

"[a] breach [of the implied covenant] occurs when one party violates the reasonable expectations of the other," *Chokel.*, 449 Mass. at 275, "[a]ctions permitted by a contract that are consistent with the parties' reasonable understanding of performance obligations based on the plain terms of the contract cannot form the basis of a claim for breach of the implied covenant of good faith and fair dealing," *Zotbelle, Inc. v. Kryolan Corp.*, 416 F. Supp. 3d 33, 48 (D. Mass. 2019) (citation omitted). "The covenant may not, however, create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir. 2005) (quoting *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004)).

There is no allegation here that LPL did anything other than abide by the terms of the contracts governing its cash sweep products. Plaintiffs' only relevant "reasonable expectations" from the express terms of those agreements was that it would receive interest at the rates posted by LPL (which they did) and that LPL's fees would not exceed the contractually specified maximum (which they did not). Alleging that LPL followed the contract does not come close to pleading breach of any implied covenants. *See Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D. Cal. 2011) ("The implied covenant will not apply where no express term exists on which to hinge an implied duty ...." (cleaned up)); *Eigerman v. Putnam Invs., Inc.*, 450 Mass. 281, 289 (2007) (affirming dismissal of breach of implied covenant good faith and fair dealing, holding covenant "cannot create rights and duties that are not already in the contractual relationship. [it] concerns the manner in which existing contractual duties are performed."). From the express terms and disclosures, Plaintiffs could not have reasonably expected either the higher rates they now retroactively seek or that LPL's fees would be lower. *See DeBlasio*, 2009 WL 2242605, at *37 (rejecting claims that plaintiffs reasonably expected cash sweep

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

program to limit firms' profits or maximize their interest).

Finally, courts have long rejected attempts to repackage a defective breach of contract claim into a claim for breach of an implied covenant. *See Brand Grp. Int'l, LLC v. Established Brands Int'l, Inc.*, 2011 WL 3236078, at *3 (D. Mass. July 26, 2011) (dismissing implied covenant claim where "Plaintiff merely repeats its breach of contract allegations …. That is insufficient."). The Complaint does nothing more.

Unjust Enrichment:   Under Massachusetts law, an unjust enrichment claim cannot coexist with a breach of contract claim. *In re Shields Health Care Grp., Inc. Data Breach Litig.*, 2024 WL 939219, at *7 (D. Mass. Mar. 5, 2024). Where, as here, the parties agree that there was an explicit contract between them, the plaintiff cannot use an unjust enrichment claim to circumvent the terms of the contract or the disclosures to the plaintiff. *See Barkhordar v. President & Fellows of Harvard Coll.*, 544 F. Supp. 3d 203, 215 (D. Mass. 2021); *see also Crown Coal & Coke Co. v. Powhatan Mid-Vol Coal Sales, LLC*, 929 F. Supp. 2d 460, 474 (W.D. Pa. 2013) (a party cannot recover under an unjust enrichment theory when a written or express contract exists that would govern the conduct at issue).

Additionally, no claim for unjust enrichment lies where, as here, a contractual relationship "defines the obligations of the parties." *Metro. Life Ins. Co. v. Cotter*, 464 Mass. 623, 641 (2013) (quotation omitted). Unjust enrichment is a quasi-contract claim grounded in equity and thus is "displac[ed]" when a "contract"— express or implied—"defines the obligations of the parties" and provides an adequate remedy at law. *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 332 F. Supp. 3d 446, 472 (D. Mass. 2018) (quotation omitted). And fundamentally, the alleged conduct concerns ***disclosed*** interest and fees. No facts make LPL's conduct "unjust," as required to sustain such a claim, therefore it fails. *See Cotter*, 464 Mass. at 643-44.

Importantly, these principles apply irrespective of whether Plaintiffs can state a claim for breach of contract: "It is the *availability* of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment." *Shaulis v.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) (emphasis added); *see Lindner v. Occidental Coll.*, 2020 WL 7350212, at *9 (C.D. Cal. Dec. 11, 2020) (no unjust enrichment where contract governed relationship). Nor are the allegations sufficient to demonstrate that Plaintiffs' claim falls within this "equitable stopgap for occasional inadequacies in contractual remedies at law." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 234 (1st Cir. 2005).

### D. The Complaint Must Be Dismissed as to LPL Holdings.

Plaintiffs allege that LPL Holdings, a Delaware corporation, is a "holding company" and that its "primary subsidiary" is LPL, a Delaware limited liability company. ¶¶ 13-14. But the Complaint is devoid of any allegations that LPL Holdings itself engages in any of the challenged activities, or that Plaintiffs had any relationship with LPL Holdings. Plaintiffs do not contend that LPL Holdings itself provides brokerage services or investment advice (it does not), that they hold accounts with LPL Holdings (they do not), or that they have any contractual relationship with LPL Holdings (they do not). The bald allegation that LPL Holdings "knowingly encouraged, directed, and participated" in any alleged breaches, ¶ 175, is conclusory and disregarded on this Motion. *Souter*, 542 F. Supp. 3d at 1089. Therefore, the claims against LPL Holdings must be dismissed. *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 421 n.1 (S.D.N.Y. 2010) (rejecting claims against "parent corporations not engaged in the activities alleged in the Complaint. Because Plaintiffs allege no independent basis for liability against them, those companies do not belong as named parties in this action and are dismissed.").

LPL Holdings' ownership of LPL does not revive these claims, which run counter to the "general principle of corporate law … that a parent corporation … is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). As both entities organized in Delaware, that state's law governs the question whether derivative claims can be brought against LPL Holdings by virtue of its ownership of LPL. *See Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp. 2d 1122,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1128 (N.D. Cal. 2011) (holding law of state of incorporation governs liability of LLC's members). Under Delaware law, the owners of an LLC are not liable for claims against the LLC, just as the shareholders of a corporation are not liable for claims against the corporation. 6 Del. C. § 18-303(a); *Wellman v. Dow Chem. Co.*, 2007 WL 842084, at *2 (D. Del. Mar. 20, 2007). Plaintiffs also allege that LPL Holdings is liable for claims against LPL under the "doctrine of respondeat superior," ¶ 176, but that common-law rule does not apply at all to the relationship between a parent company and its subsidiaries. Claims against LPL Holdings should be dismissed because Plaintiffs have not even attempted to plead any basis to disregard their corporate separateness. *See I Am Athlete, LLC v. IM EnMotive, LLC*, 2023 WL 8933592, at *5 (Del. Ch. Dec. 27, 2023) (granting motion to dismiss, holding: "Because Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence.") (cleaned up); *accord Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1235 (N.D. Cal. 2004). Plaintiffs' claims against LPL Holdings offer only an archetypal set of "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" which "'will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### E. Dismissal Should Be with Prejudice.

Dismissal with prejudice is the appropriate result when the facts already alleged demonstrate the futility of further amendment. *See Okwu v. McKim*, 682 F.3d 841, 846 (9th Cir. 2012) (noting the futility of amending complaint). The Complaint, an amended and expanded version of three underlying pleadings, has already been subject to amendment, and its core defects detailed above are incurable. They are not a mere failure of pleading, but reflect that Plaintiffs have no cognizable claim.

## V. <u>CONCLUSION</u>

Plaintiffs' Complaint should be dismissed with prejudice.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Dated: January 13, 2025                        Respectfully submitted,

                                  By: */s/ Joseph E. Floren*
                                      Joseph E. Floren
                                      **MORGAN, LEWIS & BOCKIUS LLP**
                                      One Market Street
                                      Spear Street Tower
                                      San Francisco, CA 94105-1596
                                      Telephone: (415) 442-1391
                                      joseph.floren@morganlewis.com

                                      Arjun P. Rao
                                      **MORGAN, LEWIS & BOCKIUS LLP**
                                      300 South Grand Ave., 22nd Floor
                                      Los Angeles, CA 90071-3132
                                      Telephone: (213) 612-2500
                                      arjun.rao@morganlewis.com

                                      Vanessa M. Brown (*pro hac vice*)
                                      **MORGAN, LEWIS & BOCKIUS LLP**
                                      One Federal Street
                                      Boston, MA 02110-1726
                                      Telephone: (617) 341-7700
                                      vanessa.brown@morganlewis.com

                                      *Attorneys for Defendants LPL Financial LLC
                                      and LPL Financial Holdings, Inc.*