1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16

IN RE LPL FINANCIAL CASH SWEEP LITIGATION,

This Document Relates to:

ALL ACTIONS.

Case No.:  24-CV-1228 TWR (AHG)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

(ECF No. 40)

17
18
19
20
21
22
23
24
25
26
27
28

Presently before the Court is the Motion to Dismiss Plaintiffs' Consolidated Complaint ("Mot.," ECF No. 40[1]) filed by Defendants LPL Financial LLC ("LPL Financial") and LPL Financial Holdings Inc. ("LPL Holdings") (together, "LPL"), as well as Plaintiffs Daniel Peters, Douglas K. Nevitt, and Carol White's Opposition to ("Opp'n," ECF No. 43) and Defendants' Reply in Support of ("Reply," ECF No. 44) the Motion.  The Court held a hearing on May 7, 2025.  (*See* ECF No. 54; *see also* ECF No. 55 ("Tr.").)  Having carefully considered Plaintiffs' Consolidated Class Action Complaint ("CCAC," ECF No. 38), those documents properly incorporated by reference, the Parties' arguments, and the relevant law, the Court **GRANTS IN PART AND DENIES IN PART** the Motion.

---

[1]     Unless otherwise specified, all ECF citations are to documents filed in lead case number 24-CV-1228 TWR (AHG).

## REQUESTS FOR JUDICIAL NOTICE

Although generally limited to the allegations in a plaintiff's complaint when ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Because both Parties have filed requests for judicial notice, (*see* ECF No. 40-2 ("Defs.' RJN"), 43-1 ("Pls.' RJN")), the Court must first determine which materials may properly be considered for purposes of Defendants' Motion.

Defendants ask that the Court incorporate by reference and/or take judicial notice of the following eight documents:

- **Defendants' Exhibit 1**: LPL Relationship Summary (effective Mar. 31, 2022);
- **Defendants' Exhibit 2**: LPL Insured Cash Account – Disclosure Booklet (effective April 2024);
- **Defendants' Exhibit 3**: LPL Deposit Cash Account – Disclosure Booklet (effective April 2024);
- **Defendants' Exhibit 4**: LPL Insured Cash Account – Interest Rate Tiers (current as of Nov. 14, 2024, date used by the Complaint);
- **Defendants' Exhibit 5**: LPL Insured Cash Account Fees (current as of Nov. 14, 2024, date used by the Complaint);
- **Defendants' Exhibit 6**: LPL Deposit Cash Account – Interest Rate and Fee (current as of November 14, 2024);
- **Defendants' Exhibit 7**: Daniel R. Peters Account Application (executed August 8, 2022); and
- **Defendants' Exhibit 8**: Daniel R. Peters Account Agreement (effective August 8, 2022).

(*See* Defs.' RJN at 4–5.)  Plaintiffs do not object to Defendants' Request for Judicial Notice, (*see* Pls.' RJN at 2 n.1), and request that the Court take judicial notice of the following nine exhibits:

- **Plaintiffs' Exhibit 1**: Order Instituting Administrative Cease-and-Desist Proceedings, *In the Matter of Wells Fargo Clearing Services LLC and Wells Fargo Advisors Financial Network LLC*, File No. 3-22430, dated January 17, 2025;

- **Plaintiffs' Exhibit 2**: *LPL Financial Advisor Compliance Manual*, published December 20, 2023, available at: https://financialresourcesgroup.net/wp-content/uploads/2024/02/LPL-Advisor-Compliance-Manual-12.29.23.pdf;

- **Plaintiffs' Exhibit 3**: United States Securities and Exchange Commission ("SEC"), Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 33669 (July 12, 2019);

- **Plaintiffs' Exhibit 4**: Order Instituting Administrative Cease-and-Desist Proceedings, *In the Matter of Merrill Lynch, Pierce, Fenner & Smith, Inc.*, File No. 3-2243, dated January 17, 2025;

- **Plaintiffs' Exhibit 5**: 2023 Annual Report, LPL Financial Holdings Inc., available at: https://investor.lpl.com;

- **Plaintiffs' Exhibit 6**: LPL Financial LLC Firm Summary, FINRA BrokerCheck, available at: https://brokercheck.finra.org/firm/summary/6413;

- **Plaintiffs' Exhibit 7**: Investor Relations, LPL Financial, available at https://investor.lpl.com;

- **Plaintiffs' Exhibit 8**: LPL FINANCIAL, Registration No. 3662425, Status Summary, USPTO, TSDR Database, available at: https://tsdr.uspto.gov; and

- **Plaintiffs' Exhibit 9**: *Q3 2024 Investor Presentation (October 30, 2024)*, LPL Financial Holdings Inc., available at: https://investor.lpl.com/financials/quarterly-results.

/ / /

24-CV-1228 TWR (AHG)

(*See* Pls.' RJN at 2–3.)  Defendants oppose Plaintiffs' Request for Judicial Notice on the grounds that "Plaintiffs cannot fall back on a request for judicial notice as a supplement to an insufficient complaint, even if the document invoked by Plaintiffs is of a type generally subject to judicial notice," (*see* ECF No. 45 ("RJN Obj.") at 2), and Plaintiff have filed a reply in support of their Request for Judicial Notice, arguing that their "[e]xhibits do not introduce new allegations or otherwise go beyond the scope of the Complaint[,]" but "[r]ather . . . support the Complaint's existing allegations."  (*See* ECF No. 46 ("RJN Reply") at 1.)

## I.    Incorporation by Reference

The Court begins with Defendants' request that the Court incorporate by reference their eight exhibits.  (*See* Defs.' RJN at 5–8.)  "Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  *Id.* (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681–82 (9th Cir. 2006)).

"[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'"  *Id.* (quoting *Ritchie*, 342 F.3d at 907).  "'[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document' under *Ritchie*."  *Id.* (quoting *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)).  "[I]f the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint."  *Id.*  "Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims."  *Id.* (first citing *In re Immune Response Sec. Litig.*, / / /

375 F. Supp. 2d 983, 995–96 (S.D. Cal. 2005); then citing *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156–57 (2d Cir. 2006)).

As noted above, Plaintiffs do not object to Defendants' request that the Court treat Defendants' exhibits as incorporated by reference. (*See* Pls.' RJN at 2 n.1.) The Court agrees with Defendants that "Plaintiffs' claims all turn on whether the details of [the] challenged program were disclosed[,]" (*see* Defs.' RJN at 7), meaning the proffered exhibits form the basis for Plaintiffs' Consolidated Class Action Complaint. The Consolidated Class Action Complaint also refers extensively to the exhibits and quotes at length from several of them. (*See* Defs.' RJN at 4–5, 7.) The Court therefore **GRANTS IN PART** Defendants' Request for Judicial Notice and will treat Defendants' Exhibits 1 through 8 as incorporated by reference into the Consolidated Class Action Complaint.

## II. Judicial Notice

Because the Court has determined that it is appropriate to treat Defendants' Exhibits 1 through 8 as incorporated by reference into the Consolidated Class Action Complaint, *see supra* Section I, the Court **DENIES IN PART AS MOOT** Defendants' Request for Judicial Notice to the extent it asks the Court to take judicial notice of Exhibits 1 through 6 and 8. (*See* Defs.' RJN at 8–10.) The Court therefore will address only Plaintiffs' request that the Court take judicial notice of their nine exhibits. (*See generally* Pls.' RJN.)

"Judicial notice under [Federal] Rule [of Evidence] 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)). "Accordingly, '[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.'" *Id.* (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (alteration in original)). "But a court cannot take judicial notice of disputed facts contained in such public records." *Id.* (quoting *Lee*, 250 F.3d at 689).

Plaintiffs' Exhibits 1 and 4 are SEC cease-and-desist orders, which Plaintiffs offer to "support specific allegations concerning LPL's duties and obligations arising out of the Investment Advisers Act of 1940 [("IAA")]."  (*See* RJN Reply at 4–5.)  Even assuming that the cease-and-desist orders would be proper subjects of judicial notice, because they pertain to other brokerages' cash sweep programs, (*see generally* ECF No. 43-3 ("Pls.' Ex. 1") (Wells Fargo), ECF No. 43-6 ("Pls.' Ex. 4") (Merrill Lynch)), the Court concludes that they are not relevant to its analysis.  The Court therefore **DENIES IN PART** Plaintiffs' Request for Judicial Notice as to Plaintiffs' Exhibits 1 and 4.

Plaintiffs' Exhibit 2 is LPL's 404-page Compliance Manual, which Plaintiffs offer for its "statements and positions regarding its duties and obligations to its clients—issues that form the facts alleged in the Complaint [that] are obviously relevant to Plaintiffs' claims that LPL breached its fiduciary and contractual duties."  (*See* RJN Reply at 7–8.) Not only is Plaintiffs' request incredibly broad, but the "Manual sets forth the Compliance policies and procedures that LPL has established to assist *advisors* in complying with applicable federal and state regulations, including the Investment Advisers Act of 1940 and applicable SEC regulations, and the rules of [the Financial Industry Regulatory Authority ("FINRA")]."  (*See* ECF No. 43-4 ("Pls.' Ex. 2") at 16 (emphasis added).)  Because it was LPL and *not* the clients' advisors who "creat[ed] and operat[ed]" the Cash Sweep Programs, (*see* CCAC ¶ 109), the Court concludes that Exhibit 2 is not relevant to its analysis, even if it were a proper subject of judicial notice.  Accordingly, the Court **DENIES IN PART** Plaintiffs' Request for Judicial Notice as to Plaintiffs' Exhibit 2.

Plaintiffs' Exhibit 3 is "formal SEC guidance" that Plaintiffs offer "as authority that LPL's Cash Sweep Programs are subject to LPL's fiduciary duties and best interest obligations."  (*See* RJN Reply at 4–5.)  LPL concedes that "[t]he Court may consider the SEC's interpretation to the extent that it has persuasive value," (*see* RJN Opp'n at 6),[2] but

---

[2]    Plaintiffs are correct that, pursuant to Section III.B.4 of undersigned's Standing Order for Civil Cases, LPL's Opposition to Plaintiffs' Request for Judicial Notice is improper.  Although the Court could

contends that documents providing SEC guidance "are not subject to judicial notice because their interpretations are not binding, subject to reasonable dispute, and do not carry force of law." (*See id.* at 5–6 (citing *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 478 (5th Cir. 2008)).) The Court agrees and **DENIES IN PART** Plaintiffs' Request for Judicial Notice as to Plaintiffs' Exhibit 3.

Finally, Plaintiffs' Exhibits 5, 7, and 9 are various reports that LPL created for its investors, and Plaintiffs' Exhibits 6 and 8 are a FINRA BrokerCheck® Report and trademark record, respectively. (*See* RJN Reply at 6–9.) Plaintiffs seek judicial notice of these documents to bolster the allegations in their Consolidated Class Action Complaint regarding LPL Holdings' control over and benefit from LPL Financial's cash sweep programs, such that LPL Holdings may be found liable as LPL Financial's corporate parent. (*See id.* at 6–7 (Pls.' Exs. 6 and 8), 8–9 (Pls.' Exs. 5, 7, and 9).) Having compared the allegations appearing in paragraphs 13, 14, 89, 94, and 176 of the Consolidated Class Action Complaint against the facts Plaintiffs attempt to introduce through Plaintiffs' Exhibits 5 through 9, the Court concludes that it would be improper to these exhibits because "[a] plaintiff cannot utilize judicially noticed documents for the purpose of supplementing the allegations in a complaint." *See D & D Greek Rest., Inc. v. Great Greek Franchising, LLC*, No. CV 20-9770-MWF (KSX), 2021 WL 4459063, at *3 (C.D. Cal. May 19, 2021) (collecting cases). Accordingly, the Court **DENIES IN PART** Plaintiffs' Request for Judicial Notice as to Plaintiffs' remaining Exhibits 5 through 9.

Because the Court concludes that judicial notice of Plaintiffs' proffered exhibits would not be appropriate, the Court **DENIES** Plaintiffs' Request for Judicial Notice in its entirety.

/ / /

overrule LPL's objections on that basis, the Court would invite error if it did not undertake its own analysis of whether Plaintiffs' exhibits are proper subjects of judicial notice. *See, e.g.*, *Khoja*, 899 F.3d at 999–1001.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# BACKGROUND

## I.   Factual Allegations[3]

### A.   *LPL*

LPL Holdings is a Delaware corporation with its principal place of business in San Diego, California.  (*See* CCAC ¶ 13.)  LPL Holdings' "primary subsidiary" is LPL Financial, a Delaware limited liability company whose principal place of business is also in San Diego, California.  (*See id.* ¶ 14.)  LPL Financial is "a registered broker-dealer and investment advisor with the SEC and a FINRA member."  (*See id.*; *see also* ECF No. 40-6 ("Defs.' Ex. 1") at 2.)

"[T]ogether with its subsidiaries, [LPL Holdings] provides financial consulting, wealth management, brokerage, and investment advisory services."  (*See* CCAC ¶ 13; *see also* Defs.' Ex. 1 at 2.)  LPL's financial professionals "are primarily independent contractors."  (*See* Defs.' Ex. 1 at 5.)

LPL's "[b]rokerage services include taking [its clients'] orders and executing [their] securities transactions; making recommendations for [its clients] to buy, sell, or hold securities; and holding [its clients'] securities for safekeeping."  (*See id.* at 2.)  "In most cases, [LPL] provide[s] recommendations to [its clients] on specific investments, but [the client] make[s] the final investment decisions."  (*See id.*)  LPL "do[es]n't monitor brokerage account investments for [its clients], unless [it] state[s] otherwise in writing."  (*See id.*)  "For brokerage services, [LPL] charge[s] a transaction-based fee (sometimes referred to as a commission) every time [a client] buy[s] or sell[s] an investment."  (*See id.* at 3.)  The independent contractors LPL employees to provide brokerage services then "receive a portion of the commissions or markups/markdowns from [the client's] trades."  (*See id.* at 5.)

---

[3]   For purposes of the Motion, the facts alleged in Plaintiffs' Consolidated Class Action Complaint are accepted as true.  *See Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007) (holding that, in ruling on a motion to dismiss, the Court must "accept all material allegations of fact as true").

LPL also offers a number of investment advisory services.  (*See id.* at 2.) "[T]ypically[,]" a client will "grant [LPL] discretion to buy and sell investments in [the client's] account without asking [the client] in advance," although that discretion may be limited, "such as by imposing reasonable restrictions on investing in certain securities or groups of securities." (*See id.*)  The client also may "grant investment discretion to another financial institution[,]" or the client may have a nondiscretionary account, "which means [the client] [is] required to preapprove each investment transaction that [LPL] recommend[s]." (*See id.*)  LPL will "typically monitor accounts, and specific investments within accounts, on an ongoing basis to align with [the client's] investment goals." (*See id.*)  For these services, LPL "typically charge[s] an ongoing quarterly fee (sometimes referred to as an asset-based fee)" that "is a percentage of the value of [the client's] account." (*See id.* at 3.)  The independent contractors who provide investment advisory services through LPL in turn "receive a portion of the advisory fee [the client] pay[s]." (*See id.* at 5.)

According to Plaintiffs, LPL Holdings "substantially assisted, encouraged, directed, participated in, and received the benefits of the wrongful conduct . . . conducted primarily by LPL Financial." (*See* CCAC ¶ 13.)

### B.    *Plaintiffs*

"Peters is a resident of Michigan who held an advisory Individual Retirement Account[] ("IRA"), a non-advisory IRA account, . . . [and] a standard brokerage account with LPL," (CCAC ¶ 10); "Nevitt is a resident of Illinois who held an advisory IRA with LPL," (*id.* ¶ 11); and "White is a resident of Colorado who maintained an advisory IRA account with LPL." (*Id.* ¶ 12.)

Peters applied for an advisory retirement account on August 8, 2022. (*See generally* ECF No. 40-12 ("Defs.' Ex. 7").)  This resulted in a 58-page Account Agreement between LPL and Peters.  (*See generally* ECF No. 40-13 ("Defs.' Ex. 8").)

/ / /

/ / /

### C.    *LPL's Cash Sweep Program*

In a cash sweep program, "a brokerage firm automatically moves uninvested cash from a client's brokerage or advisory account into an interest-bearing bank account that generates returns for the client." (*See* CCAC ¶ 2; *see also id.* ¶ 39.) The cash balances in all three of Plaintiffs' LPL accounts were swept into LPL's cash sweep programs, for which they contend they received "unreasonably low interest." (*See id.* ¶¶ 10–12.)

#### 1.    *Underlying Contracts*

Based on the allegations in Plaintiffs' Consolidated Class Action Complaint, the relevant agreements between LPL and Plaintiffs include the Account Agreement, (*see* Defs.' Ex. 8); the Relationship Summary, (*see* ECF No. 40-6 ("Defs.' Ex. 1"); the Insured Cash Account ("ICA") and Deposit Cash Account ("DCA") Disclosure Booklets, (*see* ECF Nos. 40-7 ("Defs.' Ex. 2")), 40-8 ("Defs.' Ex. 3"), respectively; LPL's posted interest rates and fees for ICAs, (*see* ECF Nos. 40-9 ("Defs.' Ex. 4"), 40-10 ("Defs.' Ex. 5"), respectively; and LPL's posted interest rate and fee for DCAs, (*see* ECF No. 40-11 ("Defs.' Ex. 6")). (*See* CACC ¶¶ 4–6, 10–12, 21, 24–26, 28, 29, 31–33, 36, 42–51, 53, 54, 56–61, 64–70, 76, 78, 80, 82–84, 108, 111, 131, 132, 151–54; *see also* Defs.' RJN at 5–7.)

##### a.    Account Agreement

Under the terms of the Account Agreement, "[b]y signing the Application, Client is selecting and agreeing, with respect to assets held at LPL, to have cash balances in the Account transferred automatically into a sweep program, depending on the type of Account[,]" to "be implemented upon LPL's acceptance of the Account." (*See* Defs.' Ex. 8 at 65.) The Account Agreement then provides "a summary of the general terms and conditions of the sweep programs offered by LPL." (*See id.*)

LPL primarily offers two cash sweep programs: the "insured cash account" (or "ICA") or "deposit cash account" (or "DCA") (together, the "Cash Sweep Programs"). (*See id.* at 65–66.) "The ICA program is available for accounts of individuals, trusts, sole proprietorships and entities organized or operated to make a profit, such as corporations,

/ / /

partnerships, associations, business trusts, and other organizations." (*See id.* at 66.) "The DCA program is available only to IRAs." (*See id.*)

The Account Agreement provides:

> If the Account is eligible for the ICA or DCA program, [the client] hereby authorize[s] and direct[s] LPL to automatically deposit available cash balances (from securities transactions, dividend and interest payments, deposits and other activities) in the Account into interest-bearing Federal Deposit Insurance Corporation ("FDIC") insured deposit accounts ("Deposit Accounts") at one or more banks or other depository institutions (each, a "Bank"), as provided for in such programs.

(*See id.* at 65.) Further,

> [i]n selecting the DCA program for [the client's] Account, [the client] agrees that: [they] have independently chosen the DCA program for [their] Account, fees of LPL and the program administrator, as discussed below, are reasonable and appropriate for the services being provided under the program, [the client] ha[s] reviewed the DCA Disclosure Booklet and [the client] ha[s] not relied on the advice or recommendation of LPL or [Investment Advisor Representative ("IAR")] in making this selection.

(*See id.* at 65–66.)

As for interest, "[i]n both the ICA and DCA Program, Client will earn the same rate of interest for the respective program as stated on lpl.com/disclosures.html regardless of the Bank in which the Client deposits are held." (*See id.* at 66.) "The interest rates paid are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties for administering the program." (*Id.*) "The interest rates accruing on funds may change as frequently as daily without prior notice[,]" although "[t]he most up-to-date interest rates are found on lpl.com/disclosures.html." (*See id.*) As of November 14, 2024, the date this action was initiated, the ICA program's interest rate disclosure page displayed the following "interest rate tiers":

/ / /

/ / /

/ / /

/ / /

| Tier | Household Value * | Rate |
|:---:|:---:|:---:|
| 1 | Any Value < $25,000 | 0.20% |
| 2 | $25,000 to < $50,000 | 0.20% |
| 3 | $50,000 to < $150,000 | 0.20% |
| 4 | $150,000 to < $300,000 | 0.20% |
| 5 | $300,000 to < $500,000 | 0.25% |
| 6 | $500,000 to < $750,000 | 0.40% |
| 7 | $750,000 to < $1.5M | 0.70% |
| 8 | $1.5M to < $5M | 1.00% |
| 9 | $5M to < $10M | 1.10% |
| 10 | > $10M | 2.00% |

(*See* Defs.' Ex. 4 at 34; *see also* ECF No. 40-4 ("Severino Decl.") ¶ 6.)

As for fees, "[i]n the ICA program, LPL receives a fee equal to a percentage of the average daily deposit balance." (*See* Defs.' Ex. 8 at 66.) In 2017, the advisory account agreements provided that "[t]he fee paid to LPL may be at an annual rate of up to an average of 200 basis points as applied across all ICA Deposit Accounts taken in the aggregate." (*See* CCAC ¶ 62 (emphasis omitted).) At unspecified dates, this contractual maximum increased to 400 basis points, (*see* Defs.' Ex. 8 at 66; *see also* CCAC ¶ 63), and 600 basis points. (*See* CCAC ¶ 64.) Meanwhile, LPL's ICA fee disclosure page as of November 14, 2024, displays quarterly fees from the first quarter of 2019 through the third quarter of 2024, ranging from a low of 0.98% in the second quarter of 2021, to a high of 3.32% in the third quarter of 2024. (*See generally* Defs.' Ex. 5 at 37–38; *see also* Severino Decl. ¶ 7.) "In the DCA program, LPL receives a flat fee per account with the fee indexed to the Fed Funds Target (FFT) interest rate." (Defs.' Ex. 8 at 66.) As of November 14, 2024, LPL's

DCA interest rate and fee disclosure page displayed an interest rate of 0.35% for all accounts with a balance greater than $0 and a monthly account fee of $18.50. (*See* Defs.' Ex. 6 at 40; *see also* Severino Decl. ¶ 8.)  There is also mention of a "program administrator," (*see* Defs.' Ex. 8 at 65 ("fees of LPL and the program administrator"), 66 ("the fees paid to LPL and other parties for administering the program")), although the amount of fees paid to the unidentified third-party administrator is unknown.  (*See generally id.*; *see also* Defs.' Exs. 5 & 6.)

The Account Agreement also provides that the client "can terminate [their] Account's participation in the ICA or DCA program, as applicable, at any time without penalty, upon notice to LPL" and directs clients to the "ICA Disclosure Booklet or DCA Disclosure Booklet (as applicable) available from IAR or on lpl.com/disclosures.html" "[f]or more specific information about the terms and conditions of the ICA or DCA program." (*See* Defs.' Ex. 8 at 67.)

b.    Disclosure Booklets

The ICA and DCA Disclosure Booklets also each contain sections on the applicable interest rates and fees, (*see* Defs.' Ex. 2 at 8, 13–14; Defs.' Ex. 3 at 22, 25–27), and the ICA Disclosure Booklet includes an additional discussion of "conflicts of interest." (*See* Defs.' Ex. 2 at 8, 13–14.)

With regard to the interest rates, the Disclosure Booklets explain:

The interest rates paid are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties (described below).  The rate of interest accruing on your Deposit Account balances may change as frequently as daily without prior notice.  The most up-to-date interest rates may be found by visiting [link].

The interest rates paid by a Bank may be higher or lower than the interest rates available to depositors making deposits directly with the Bank or other depository institutions in comparable accounts and for investments in money market mutual funds and other cash equivalent investments available through LPL.  You should compare the terms, interest rates, required minimum amounts, and other features of the ICA[/DCA] program with other accounts and alternative investments.

(*See* Defs.' Ex. 2 at 13; *see also* Defs.' Ex. 3 at 25 (substantially identical text).)  The ICA Disclosure Booklet adds:

> The ICA program should not be viewed as a long-term investment option.  If you desire to maintain cash balances for other than a short-term period or are seeking higher yields currently available in the market, please contact your financial professional to discuss investment options to maximize your potential return.

(*See* Defs.' Ex. 2 at 13.)

As for "**FEES AND RELATED CONFLICTS OF INTEREST**," (*see id.* (emphasis in original)), the ICA Disclosure Booklet notes:

> The fee paid to LPL reduces the interest rate paid on your cash, and depending on the interest rate and other market factors, LPL generally receives as its fee the majority of the amount paid by the Banks with respect to such deposits. Depending on interest rates and other market factors, the yields on the ICA program have been, and may continue in the future to be, lower than the aggregate fees and expenses received by LPL for your participation in the ICA program.  This can result in you experiencing a negative overall investment return with respect to cash reserves in the ICA program.  For information about historical fees received by LPL from average daily balances in the ICA program, please visit https://www.lpl.com/content/dam/lplwww/documents/ disclosures/account-fees.pdf or speak with your financial professional.
>
> If you are investing through an advisory account, the fees that LPL receives from the Banks is in addition to the advisory fee that you pay LPL and your financial professional.  This means that LPL earns two layers of fees on the same cash balances in your LPL account.  We also receive different fees based on whether your Deposit Accounts are allocated to PBL1 or PBL2.  Therefore, we have an incentive for you to use (and invest your assets in) the sweep products that increase our compensation.  We also have an incentive to assign your accounts to the PBL that earns LPL higher fees.  As new deposit capacity becomes available, LPL assigns such additional capacity between PBL1 and PBL2 and its other sweep programs at its sole discretion.  LPL has a conflict of interest with respect to allocations of additional sweep capacity to programs and arrangements that will increase its compensation.  We set our advisory program fees with the expectation that we will receive fees and benefits from the ICA program.  Our advisory program fees would be higher if we did not receive fees and benefits from the ICA program. . . .

> The fees that LPL receives from the Banks are an important revenue stream and present a conflict of interest for LPL because LPL benefits financially if cash is swept into the ICA program. Because this compensation is retained by LPL and is not shared with your financial professional, it does not cause your financial professional to have a direct financial incentive to recommend that cash be held in a Deposit Account instead of holding securities. However, your financial professional does have a financial incentive to recommend that your cash *not* be swept to the ICA program, as they do not receive compensation for such sweeps. . . .
>
> In addition to LPL, other service providers of the ICA program will receive fees. Other than these stated fees, there will be no charges, fees, or commissions imposed on your account with respect to the ICA program.

(*See* Defs.' Ex. 2 at 13–14 (emphasis in original).) Again, the amount of any fees paid to the unidentified "other service providers" is unstated. (*See generally id.*)

c.    Relationship Summary

Finally, Plaintiffs rely heavily on the Relationship Summary, (*see, e.g.*, CCAC ¶¶ 24, 25, 31, 108), which explain at a high level "the various services [LPL] offer[s], how [LPL] charge[s] for those services, and conflicts of interest that exist when [LPL] provide[s] [its] services." (*See* Defs.' Ex. 1 at 2.) As is relevant to this action, the Relationship Summary provides:

> *When we provide you with a recommendation as your broker-dealer or act as your investment adviser*, we have to act in your best interest and not put our interest ahead of yours. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the recommendations and investment advice we provide you. Here are some examples to help you understand what this means. If you have questions about whether any of these situations could apply to your investments, ask your Professional.

(*See id.* at 3 (emphasis in original).) Under the sub-heading "Third-Party Payments," the Relationship Summary notes:

> In some accounts we offer, uninvested cash is automatically placed into interest-bearing federally insured bank accounts. We receive fees for your participation in these "cash sweep" programs from the banks sponsoring the programs. The fees we receive are typically higher than the interest you earn

on the cash held in the bank accounts and are in addition to any fees you pay to us.  This creates an incentive for LPL if you maintain a cash balance in your account. . . .  Detailed information regarding third-party payments can be found in the Third-Party Compensation and Related Conflicts of Interest document on lpl.com.

(*See id.*)  At the bottom of the last page, the document directs the reader where to go for "Additional Information":

Please visit the Disclosures page on lpl.com for more information, including a copy of the agreement for the account and/or program you are considering, the Form ADV Brochure for any advisory program you are considering, detailed information on our brokerage services under Brokerage Compensation and Related Conflicts of Interest, and more information regarding our brokerage and advisory programs under Third Party Compensation and Related Conflicts of Interest.

(*See id.* at 5.)

### 2.    *Plaintiffs' Experiences with LPLs' Cash Sweep Programs*

Plaintiffs contend that, "[i]n exercising complete control over the design and operation of its Cash Sweep Programs, LPL guaranteed tremendous profits for itself at the expense and against the best interest of its clients."  (*See* CCAC ¶ 72.)  Plaintiffs point to several market factors to illustrate how the interest rate LPL paid to participants in the Cash Sweep Programs were unjustifiably low.

First, "[e]xamining LPL's interest rates paid to client against the backdrop of the Federal Funds Rate illustrates the unjust windfall LPL captures through its Cash Sweep Programs."  (*Id.* ¶ 79.)  "For example, and without limitation, since 2022, the Federal Funds Rate—the interest rate at which banks lend to one another—increased significantly from a low of 0.08% to a high of 5.33% in 2024."  (*Id.*)  "However, LPL failed to pay proportional interest rates on its clients' swept cash."  (*Id.*)  "In fact, LPL maintained nearly flat Cash Sweep Program rates for years, at a fraction of a percent, continuing to collect high fees for itself on the cash but paying far less than a fair and reasonable rate to clients—thereby retaining the sharply increase spread for itself."  (*Id.* ¶ 80.)  "This is reflected in the graph

/ / /

below comparing the Federal Funds Rate to LPL's ICA Program interest rate on deposits up to $149,999, its lowest three tiers:"



(*Id.*; *see also id.* ¶ 143.)  Meanwhile, LPL paid interest to its clients at the following rates:

| Deposit Balance | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024[3] |
|---|---|---|---|---|---|---|---|
| **ICA Program** | | | | | | | |
| $0 - $24,999 | 0.09% | 0.03% | 0.01% | 0.01% | 0.34% | 0.34% | 0.20% |
| $25,000 – $49,999 | 0.09% | 0.03% | 0.01% | 0.01% | 0.34% | 0.34% | 0.20% |
| $50,000 – $149,999 | 0.18% | 0.09% | 0.01% | 0.01% | 0.34% | 0.34% | 0.20% |
| $150,000 – $299,999 | 0.21% | 0.09% | 0.01% | 0.01% | 0.34% | 0.39% | 0.20% |
| $300,000 – $499,999 | 0.23% | 0.09% | 0.01% | 0.01% | 0.39% | 0.44% | 0.25% |
| $500,000 – $749,999 | 0.28% | 0.14% | 0.01% | 0.01% | 0.39% | 0.49% | 0.40% |
| $750,000 – $1.49 M | 0.30% | 0.14% | 0.01% | 0.01% | 0.49% | 0.79% | 0.70% |
| $1.5 M – $4.9 M | 0.35% | 0.14% | 0.01% | 0.01% | 0.74% | 1.14% | 1.00% |
| $5 M – $9.9 M | 0.45% | 0.14% | 0.01% | 0.01% | 0.89% | 1.24% | 1.10% |
| > $10 Million | 0.65% | 0.29% | 0.01% | 0.01% | 1.19% | 2.17% | 2.00% |
| **ICA Fees** | -- | 2.22% | 1.08% | 1.01% | 2.91% | 3.17% | 3.32% |
| **DCA Program** | | | | | | | |
| >$0 | 0.59% | 0.05% | 0.01% | 0.01% | 0.49% | 0.34% | 0.35% |

(*Id.* ¶ 84.)

"The yield on short-term U.S. Treasury Bills also demonstrates that the interest rate paid on client Deposit Accounts was not reasonable." (*Id.* ¶ 145.) "The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage." (*Id.* ¶ 146.)

As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased through mid-2019; (ii) dropped to close to zero throughout the COVID pandemic; and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



(*Id.*) "During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, LPL's client rates remained a tiny fraction of that benchmark." (*Id.* ¶ 147.)

"The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present were also significantly higher than LPL's client rates[,] . . . further demonstrat[ing] that LPL's client rates were not reasonable and did not properly account for relevant market factors." (*Id.* ¶ 148.) "A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities." (*Id.* ¶ 149.) "The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period." (*Id.*) "The

overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs." (*Id.* ¶ 150.) "From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023[,]" which is "significantly higher than LPL's client rates." (*See id.*)

Finally, "the interest rates paid by other brokerages that, like LPL, sweep cash into unaffiliated banks . . . demonstrate that the client rates LPL pays were not reasonable." (*See id.* ¶ 131.) "As shown in the graph below, an index of interest rates paid by five brokerages that, like LPL, did not sweep client cash balances into banks affiliated with the brokerage generally tracks the movement of the Federal Funds Rate (set forth above)." (*Id.* ¶ 132.) "By contrast, the *de minimis* interest rates that LPL paid its clients were much lower during much of the relevant time period:"



(*Id.*) "As shown in the above graph, from mid-2018 to 2024, LPL's sweep rates had minimal movement, even as the sweep rates paid by other brokerages using unaffiliated banks increased during 2018 and 2019 and remained much higher than LPL in the beginning of 2020." (*Id.* ¶ 133.) "In addition, starting in mid-2022, LPL's sweep rates stayed consistently low with miniscule increases[,] while the rates paid by comparable brokerages increased consistently with the market." (*Id.*)

24-CV-1228 TWR (AHG)

1   Meanwhile, over the same period that Plaintiffs were paid interest at artificially low
2   rates, "LPL has reaped billions of dollars using its clients' uninvested cash."  (*See id.* ¶ 23.)
3   "Even though the average client balance in LPL's Cash Sweep Programs is approximately
4   $5,000, the aggregate total of LPL cash sweep balances through the Cash Sweep Programs
5   is staggering."  (*Id.* ¶ 77.)  "As of September 30, 2024, LPL client cash sweep balances
6   were **$45.8 billion**[,] which generated ***over $1 billion*** in revenue for LPL during the
7   previous nine months."  (*Id.* (emphasis in original).)  "In 2023, revenues generated from
8   client cash sweep balances were **$1.5 billion**, up from **$954 million** in 2022 and **$361**
9   **million** in 2021."  (*Id.* (emphasis in original).)

10  ## II.    Procedural History

11  Peters filed a putative class action against LPL Financial on July 17, 2024, alleging
12  four causes of action for (1) breach of fiduciary duty; (2) unjust enrichment (in the
13  alternative); (3) unfair or fraudulent business practices in violation of California's Unfair
14  Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200–17210; and (4) breach of
15  contract (in the alternative).  (*See generally* ECF No. 1.)  Nevitt filed a separate putative
16  class action against LPL on July 31, 2024, alleging two causes of action for (1) breach of
17  fiduciary duty, and (2) unjust enrichment.  (*See generally* Case No. 24-CV-1358 ("*Nevitt*")
18  ECF No. 1.)    Finally, White filed a separate putative class action against LPL on
19  September 26, 2024, alleging five causes of action for (1) breach of fiduciary duty,
20  (2) unjust enrichment, (3) breach of contract, (4) breach of the implied covenant of good
21  faith and fair dealing, and (5) gross negligence.  (*See generally* Case No. 24-CV-1724
22  ("*White*") ECF No. 1.)

23  After *Nevitt* and *White* were transferred to the undersigned as related to Peters'
24  case pursuant to this District's Civil Local Rule 40.1, (*see Nevitt* ECF No. 17; *White* ECF No.
25  4), the Court consolidated these cases under the caption *In re LPL Financial Cash Sweep*
26  *Litigation* in Peter's low-numbered case, (*see* ECF No. 30), and appointed interim co-lead
27  counsel pursuant to Federal Rule of Civil Procedure 23(g)(3).  (*See* ECF No. 37.)
28  / / /

1    Plaintiffs filed the operative Consolidated Class Action Complaint against LPL on

2    December 12, 2024, alleging four causes of action for (1) breach of fiduciary duty,

3    (2) unjust enrichment, (3) breach of contract, and (4) breach of the implied covenant of

4    good faith and fair dealing.  (*See generally* ECF No. 38.)  They seek to represent "Clients

5    of LPL who had cash deposits or balances in LPL's Cash Sweep Programs from July 18,

6    2018, until the unlawful conduct alleged herein ceases."  (*See id.* ¶ 155 (emphasis

7    omitted).)

8    The instant Motion followed on January 13, 2025.  (*See generally* ECF No. 40.)

9    ### MOTION TO DISMISS

10   ## I.    Legal Standard

11   "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to

12   state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"

13   *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro*

14   *v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  "A district court's dismissal for failure to

15   state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of

16   a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

17   theory.'"  *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th

18   Cir. 1988)).

19   "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

20   accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at

21   677–78 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the

22   plaintiff pleads factual content that allows the court to draw the reasonable inference that

23   the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

24   "[W]here the well-pleaded facts do not permit the court to infer more than the mere

25   possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

26   pleader is entitled to relief.'"  *Id.* at 679 (second alteration in original) (quoting Fed. R.

27   Civ. P. 8(a)(2)).

28   / / /

1    "If a complaint is dismissed for failure to state a claim, leave to amend should be

2    granted 'unless the court determines that the allegation of other facts consistent with the

3    challenged pleading could not possibly cure the deficiency.'"  *DeSoto v. Yellow Freight*

4    *Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well*

5    *Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).  "A district court does not err in

6    denying leave to amend where the amendment would be futile." *Id.* (citing *Reddy v. Litton*

7    *Indus.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991)).

8    **II.    Analysis**

9    Through the instant Motion, LPL seeks dismissal of each of Plaintiffs' causes of

10    action with prejudice.  (*See* Mot. at 1; *see also generally* ECF No. 40-1 ("Mem."); *see also*

11    *id.* at 25.)  The Court examines each in the order addressed in LPL's Motion.

12    **A.    Third Cause of Action: Breach of Contract**

13    Plaintiffs' third cause of action alleges that LPL "breached the terms of its

14    agreements with Plaintiffs and the Class when it failed to pay or secure fair and reasonable

15    interest rate on their cash sweep account balances by putting LPL's interests ahead of its

16    clients['']." (*See* CCAC ¶ 186; *see also generally id.* ¶¶ 183–87.)  The Parties agree that

17    Massachusetts law governs Plaintiffs' claims.  (*See* CCAC ¶¶ 161, 168; Mem. at 10; *see*

18    *also* Defs.' Ex. 8 at 64.)  "[T]o state a viable breach of contract claim under Massachusetts

19    law, plaintiffs must prove that a valid, binding contract existed, the defendant breached the

20    terms of the contract, and the plaintiffs sustained damages as a result of the breach." *Brooks*

21    *v. AIG SunAm. Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (citing *Michelson v.*

22    *Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999)).  LPL challenges the sufficiency of

23    Plaintiffs' allegations as to both breach and damages.  (*See* Mem. at 10–15.)

24    As for breach, LPL argues that "[t]he Complaint neither identifies which contract

25    term(s) were allegedly breached, nor plausibly alleges that LPL departed from the

26    requirements of its account agreements and disclosures." (*See id.* at 11.)  Plaintiffs counter:

27    / / /

28    / / /

1
2
3
4

> LPL breached its contractual obligations when it: (i) failed to act in its clients' best interests and to put its clients' interests ahead of its own; (ii) failed to take adequate steps to mitigate its conflicts of interest; and (iii) failed to secure and pay a reasonable rate on clients' cash sweep deposits, and obtained for itself unreasonably high fees in connection with the Cash Sweep Programs.

5

(*See* Opp'n at 18 (citing CCAC ¶¶ 31–32, 121, 173).)  According to Plaintiffs, "LPL also

6

has a contractual obligation to make reasonable arrangements regarding its clients' cash

7

balances in advisory retirement accounts" under Section 4975 of Chapter 26 of the United

8

States Code (the "Internal Revenue Code" or "IRC").  (*See* Opp'n at 19 (citing CCAC

9

¶¶ 112–17).)

10

    *1.    Best Interests*

11

    Plaintiffs' claim that LPL failed to act in their best interests is premised on the

12

Relationship Summary, (*see, e.g.*, CCAC ¶¶ 24–26), which provides that "*[w]hen [LPL]*

13

*provide[s] [a client] with recommendations as [the client's] broker-dealer or act[s] as [a*

14

*client's] investment adviser*, [LPL] ha[s] to act in [the client's] best interest and not put

15

[its] interest ahead of [the client's]," (*see* Defs.' Ex. 1 at 4 (emphasis in original)), and "[a

16

client's] Professional is legally required to act in [that client's] best interest and not put his

17

or her interests ahead of [the client's] own."  (*See id.* at 5.)

18

    As LPL notes, (*see* Reply at 2–3), the latter of these two provisions expressly applies

19

only to the client's "Professional."  (*See* Defs.' Ex. 1 at 5.)  From the very beginning, the

20

Relationship Summary takes care to distinguish between "LPL (referred to as "we" or

21

"us")" and its "network of financial professionals ("Professionals")."  (*See id.* at 2.)

22

Consequently, under the plain language of the Relationship Summary, it is only the client's

23

*Professional* who is contractually obligated to "not put his or her interests ahead of [the

24

client's]."  (*See id.*)

25

    As for the former, the provision expressly limits the conditions under which LPL is

26

required to act in its clients' best interest to only those situations in which "*[LPL]*

27

*provide[s] [a client] with recommendations as [the client's] broker-dealer or act[s] as [a*

28

*client's] investment adviser*."  (*See id.* at 4 (emphasis in original).)  Consequently, LPL has

breached this provision only if it recommended the Cash Sweep Programs to Plaintiffs as their broker-dealer or placed Plaintiffs' uninvested cash in the Cash Sweep Programs as their investment adviser.  Plaintiffs make four arguments in this respect:

First, Plaintiffs contend, "Massachusetts law imposes a duty for recommending 'the opening of or transferring of assets to any type of account.'"  (*See* Opp'n at 16 (quoting 950 Code Mass. Regs. § 12.207(1)(a)).)  This duty, however, is a statutorily defined fiduciary duty, not a contractual one.  *See* 950 Code Mass. Regs. § 12.207 (entitled "Fiduciary Duty of Broker-dealers and Agents").

"Second, LPL tells its clients that the Cash Sweep Programs are an example of LPL making a recommendation to its clients or acting as an advisor."  (*See* Opp'n at 16 (emphasis omitted) (citing Mem. at 7).)  The portion of LPL's Memorandum to which Plaintiffs cite is quoting the Relationship Summary, where LPL addresses the questions "[w]hat are [LPL's] legal obligations to [the client] when providing recommendations as [the client's] broker-dealer or when acting as [the client's] investment adviser?" and "[h]ow else does [LPL's] firm make money and what conflicts of interest do[es] [LPL] have?"  (*See* Mem. at 7 (quoting Defs.' Ex. 1 at 4).)  But rather than informing its clients that the Cash Sweep Programs are an example of LPL "*provid[ing] [its clients] with a recommendation as [its clients'] broker-dealer or act[ing] as [its clients] investment adviser*," LPL provides examples of "the ways [LPL] makes money [that] create[] some conflicts with [its clients'] interests," cautioning its clients to "understand and ask [LPL] about these conflicts because they can affect the recommendations and investment advice [LPL] provide[s] [its clients]" and advising them to "ask [their] Professional" "[i]f [the clients] have questions about whether any of these situations could apply to [their] investments."  (*See* Defs.' Ex. 1 at 4 (emphasis in original).)

"Third, LPL did not simply recommend or advise clients to invest in the Cash Sweep Programs, but as its clients' agent automatically enrolled them."  (*See* Opp'n at 16–17 (emphasis omitted) (citing CCAC ¶ 40; Defs.' Ex. 2 at 17; Defs.' Ex. 3 at 28)).)  LPL responds that this "argument is defeated by (i) the lack of supporting facts in the Complaint;

(ii) Plaintiffs' contractual attestation that they 'independently chose' the program without 'reliance on the advice or recommendation of LPL'; and (iii) their admission that they could have 'turned off' the cash sweep feature at will." (*See* Reply at 3 n.1 (citing CCAC ¶¶ 34–36, 42).) There is inherent tension in Plaintiffs' argument that LPL "recommend[ed] or advis[ed]" the cash sweep programs given the disclaimers in the Account Agreement that, "[b]y signing the Application, Client is selecting and agreeing, with respect to assets held at LPL, to have cash balances in the Account transferred automatically into a sweep program," (*see* Defs.' Ex. 8 at 65), and, "[i]n selecting the DCA program for [the client's] eligible Account, [the client] agree[s] that: [the client] ha[s] independently chosen the DCA program for [their] Account . . . and [the client] ha[s] not relied on the advice or recommendation of LPL or IAR in making this selection." (*See id.* at 65–66.) Further, clients had the right to "terminate [their] Account's participation in the ICA or DCA program, as applicable, at any time without penalty, upon notice to LPL." (*See id.* at 67.) Ultimately, the language of the Account Agreement does not support Plaintiffs' interpretation that automatic enrollment in a cash sweeps program was at the recommendation of LPL such that LPL was contractually obligated act in their "best interest" in enrolling them in the Cash Sweep Programs.

Fourth and finally, "LPL's Relationship Summary admits that its 'best interest' obligation is not limited to discrete recommendations or advice but extends to '*managing*' each client's account." (*See* Opp'n at 17 (emphasis in original) (quoting Defs.' Ex. 1 at 5).) But as before, *see supra* page 23, this language from the Relationship Summary expressly applies to the client's "Professional," not LPL. (*See* Defs.' Ex. 1 at 5.)

Ultimately, Plaintiffs fail to identify a contractual term that required LPL to act in their "best interest" when enrolling clients in its Cash Sweep Programs.

### 2. *Mitigation of Conflicts of Interest*

Plaintiffs' claim that LPL failed to mitigate conflicts of interest also appears to rely on the Relationship Summary, (*see, e.g.*, CCAC ¶¶ 25, 30–31), which provides that "[LPL] ha[s] systems in place to mitigate the conflicts of interest that arise from the way [a client's

Professional] makes money, including systems to review whether a recommendation is in [the client's] best interest." (*See* Defs.' Ex. 1 at 5.) But, as LPL notes, (*see* Reply at 3 (citing CCAC ¶¶ 25–27; Defs.' Ex. 1 at 5)), "[t]he supposed 'promise' to mitigate conflicts that Plaintiffs cite, on its face, concerns only each Plaintiff's 'professional' and 'the way he or she makes money.'" In any event, as LPL explains in the ICA Disclosure Booklet, LPL eliminates any conflicts of interest its "Professionals" may have as a result of the Cash Sweep Programs by declining to share the fees LPL receives through those programs with its Professionals. (*See* Defs.' Ex. 2 at 14; *see also* Reply at 3.) Plaintiffs therefore fail to identify any contractual term in which LPL promised to mitigate its conflicts of interest with respect to the Cash Sweep Programs or to allege any facts that LPL breached its promises with regard to the controls in place regarding its Professionals by paying them any share of the fees LPL collected from the Cash Sweep Programs.

### 3. Reasonableness of Interest and Fees

Plaintiffs allege that "[a]dditional provisions in LPL's advisory account agreements, and modifications to those provisions over time, further provide that LPL had a duty to charge and collect only reasonable fees through its Cash Sweep Programs." (*See* CCAC ¶ 34.) Specifically, Plaintiffs rely on the following language:

> In selecting the DCA program for your eligible Account, you agree that: you have independently chosen the DCA program for your Account, fees of LPL and the program administrator, as discussed below, are ***reasonable and appropriate*** for the services being provided under the program, you have reviewed the DCA Disclosure Booklet (as applicable) and you have not relied on the advice or recommendation of LPL in making this selection.

(*See id.* (emphasis in original);[4] *see also* Defs.' Ex. 8 at 65–66.) But Plaintiffs' agreement that the fees charged by LPL and the program administrator were "reasonable and appropriate" is not the same as LPL promising to pay Plaintiffs a "reasonable and

---

[4]    As Plaintiffs note, LPL apparently omitted the ICA Program from this clause initially, later adding it to a March 2024 version of the account agreement. (*See* CCAC ¶ 36.)

appropriate" rate or interest for their participation in the Cash Sweep Programs.  That other brokerages paid higher rates of interest has no relevance where, as here, LPL did not undertake to pay a "reasonable rate," but rather the rates disclosed in the underlying contracts.  *Cf. Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 19-CV-7998 (VEC), 2021 WL 240737, at *1 (S.D.N.Y. Jan. 25, 2021) (permitting the plaintiff to file an amended complaint where there was a "'reasonable rate' provision" in the agreement regarding the defendant's cash sweep program).  Because Plaintiffs fail to identify any contractual provision requiring LPL to pay a "reasonable" amount of interest to the clients participating in the cash sweep programs, their breach of contract claim fails as to that theory.

### 4.    IRC Section 4975

Finally, Plaintiffs argue that "LPL also has a contractual obligation to make reasonable arrangements regarding its clients' cash balances in advisory retirement accounts." (*See* Opp'n at 19 (citing CCAC ¶¶ 112–17).)  Specifically, Plaintiffs rely on IRC Section 4975(d)(4),[5] (*see* CCAC ¶ 116; Opp'n at 20), which is an exemption to enumerated prohibited transactions pertaining to certain Employee Retirement Income

---

[5]    IRC Section 4975(d)(4) provides:

(d)    Except as provided in subsection (f)(6), the prohibitions provided in subsection (c) shall not apply to—

(4)    the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution supervised by the United States or a State, if such bank or other institution is a fiduciary of such plan and if—

(A)    the plan covers only employees of such bank or other institution and employees of affiliates of such bank or other institution, or

(B)    such investment is expressly authorized by a provision of the plan or by a fiduciary (other than such bank or institution or affiliates thereof) who is expressly empowered by the plan to so instruct the trustee with respect to such investment.

Security Act of 1974 ("ERISA") retirement plans and IRAs that would be subject to an excise tax.  *See generally* 29 U.S.C. § 4975.  Section 4975(d)(4) applies—in certain situations—to "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."

LPL identifies several issues with Plaintiffs' reliance on Section 4975.  (*See* Mem. at 13–14 & n. 11; Reply at 4.)  At the pleading level, LPL contends that Plaintiffs fail to allege that LPL relies on the Section 4975(d)(4) exemption.  (*See* Mem. at 14.)  This is true—while the DCA Disclosure Booklet does indicate that "[t]he DCA program is available only to individual retirement accounts (IRAs) subject to Section 4975," (*see* Defs.' Ex. 3 at 23), the Consolidated Class Action Complaint contains no allegations regarding LPL's use of the Section 4975(d)(4) exemption, much less any contractual obligation with respect to Plaintiffs to abide by Section 4975(d)(4).  (*See* CCAC ¶¶ 112–17; *see also generally id.*)  LPL also identifies more fundamental issues, including that Section 4975(d)(4) applies where an IRA fiduciary causes the IRA to make deposits with an affiliated bank, whereas Plaintiffs concede that LPL's Cash Sweep Programs involve unaffiliated banks, (*see* Mem. at 14 n.11 (citing CCAC ¶ 17); Reply at 4), and that there is no private right of action under Section 4975(d)(4).  (*See* Mem. at 14 (citing *Chamber of Com. of U.S. of Am. v. U.S. Dep't of Lab.*, 885 F.3d 360, 384 (5th Cir. 2018)); Reply at 4.)  For all these reasons, Plaintiffs cannot allege that LPL had a contractual obligation to abide by the Section 4975(d)(4) exemption.

### 5. Conclusion

Because Plaintiffs fail to identify any plausible breach by LPL of the underlying contracts, the Court **GRANTS IN PART** LPL's Motion and **DISMISSES** Plaintiffs' third cause of action for breach of contract without reaching the Parties' arguments concerning the sufficiency of Plaintiffs' allegations concerning their contractual damages.

/ / /

/ / /

/ / /

### B.      First Cause of Action: Breach of Fiduciary Duty

Plaintiffs' first cause of action is for breach of fiduciary duty based on LPL's

> (i) fail[ure] to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest on their cash sweep account balances; (ii) fail[ure] to act in the best interests of Plaintiff and the Class with respect to the Cash Sweep Programs; and (iii) recommend[ation] to Plaintiffs and the Class that they utilize and continue to utilize the Cash Sweep Programs.

(*See* CCAC ¶ 173; *see also generally id.* ¶¶ 170–176.)  Under Massachusetts law, "[a] claim for breach of fiduciary duty has four elements: 1) existence of a fiduciary duty arising from a relationship between the parties, 2) breach of that duty, 3) damages and 4) a causal relationship between the breach and the damages." *Qestec, Inc. v. Krummenacker*, 367 F. Supp. 2d 89, 97 (D. Mass. 2005) (citing *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 164 (1999)).

LPL contends that Plaintiffs fail to allege the existence of a fiduciary duty with respect to the Cash Sweep Programs.[6]  (*See generally* Mem. at 15–21.)  Plaintiffs counter that they plausibly allege the existence of a fiduciary duty under Massachusetts law, (*see* Opp'n at 7–9); agency law, (*see id.* at 9–10); and federal law, including the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. §§ 80b-1–80b-21, and the SEC's Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33364 (July 12, 2019) ("Reg BI").  (*See* Opp'n at 11.)

####      1.      Massachusetts Law

Under Massachusetts common law,

> Fiduciary duties may arise in two ways: (a) as a matter of law, where parties to the subject relationship are cast in archetypal roles, "such as trustee and [beneficiary], guardian and ward, attorney and client[]" . . . ; or (b) as "determined by the facts established," . . . upon "evidence indicating that one

---

[6]      LPL also argues that Plaintiffs' claims for breach of fiduciary duty before July 17, 2021, are barred by Massachusetts's three-year statute of limitations.  (*See* Mem. at 21 (citing Mass. Gen. Laws ch. 260, § 2A; *Lattuca v. Robsham*, 442 Mass. 205, 213 (2004)).)  Because the Court concludes that Plaintiffs fail adequately to plead the existence of a fiduciary duty, the Court need not address this argument.

person is in fact dependent on another's judgment in business affairs or property matters."

*UBS Fin. Servs., Inc. v. Aliberti*, 483 Mass. 396, 406 (2019) (first alteration in original) (citations omitted).  "[I]n Massachusetts[,] a relationship between a stockbroker and a customer may be either a fiduciary or an ordinary business relationship, depending on whether the customer provides sufficient evidence to prove 'a full relation of principal and broker.'"[7]  *Patsos v. First Albany Corp.*, 433 Mass. 323, 331–32 (2001).  The Supreme Judicial Court of Massachusetts has "suggest[ed] considerations relevant to that determination," *see id.* at 332, including whether the account is "'non-discretionary,' meaning that the customer makes the investment decisions and the stockbroker merely receives and executes a customer's orders," *see id.* at 333, or "'discretionary,' meaning that the customer entrusts the broker to select and execute most if not all of the transactions without necessarily obtaining prior approval for each transaction," *see id.* at 333–34; "[a] customer's lack of investment acumen," *see id.* at 334–35; and "[s]ocial or personal ties between a stockbroker and customer."  *See id.* at 335.

LPL argues that Plaintiffs identify no accounts over which LPL had discretion, meaning that Plaintiffs fail to allege facts giving rise to a fiduciary relationship under *Patsos*.  (*See* Mem. at 16.)  Plaintiffs counter that there is no "need to distinguish between discretionary and non-discretionary LPL accounts" here because "[f]or LPL advisory accounts, their advisory nature is an independent basis for LPL's fiduciary relationship." (*See* Opp'n at 7 & n.3.)  LPL responds that "LPL could not owe fiduciary duties *as to the disputed rates and fees* where the cash sweep programs were governed by a comprehensive set of contractual terms that fully disclosed LPL's conflicts of interest, such that Plaintiffs could not reasonably have reposed trust in LPL with respect to that aspect of their relationship."  (*See* Reply at 5 n.4.)

---

[7]     As LPL notes, (*see* Mem. at 16), the same is true of "[t]he relationship between the custodian of a nondiscretionary IRA and a named beneficiary of the IRA."  *See UBS Fin. Servs.*, 483 Mass. at 406.

For the reasons discussed above, *see supra* Section II.A.1, the Court agrees with LPL—there is no language in the Account Agreement and other governing documents that LPL "possess[ed] the *sine qua non* of a fiduciary relationship in the financial advisor context—discretion"—with respect to the Cash Sweep Programs. *See Kriegel v. Bank of Am., N.A.*, No. 07CV12246-NG, 2010 WL 3169579, at *14 (D. Mass. Aug. 10, 2010). "By definition, free credit balances existed in Plaintiffs' brokerage accounts because Plaintiffs chose *not* to invest these funds and instead left them idle in their accounts," *see DeBlasio v. Merrill Lynch & Co.*, No. 07CIV318RJS, 2009 WL 2242605, at *31 (S.D.N.Y. July 27, 2009) (emphasis added) (citing 17 C.F.R. §§ 240.15c3–3(a)(8); Amendments to Financial Responsibility Rules for Broker-Dealers, 72 Fed. Reg. 12,862, 12,866 (proposed Mar. 19, 2007)), and "the specific Cash Sweep Programs at issue were governed by the terms of their account agreements and the amendments thereto." *See id.*[8] Because "there is neither 'any common-law fiduciary obligation, nor any special relationship of trust, confidence, or reliance,' the [Consolidated Class Action Complaint] fails to state a claim for breach of fiduciary duty under Massachusetts" common law. *See UBS Fin. Servs.*, 483 Mass. at 409 (quoting *Locator Servs. Group, Ltd. v. Treasurer & Receiver Gen.*, 443 Mass. 837, 855 (2005)); *see also Doelger v. JPMorgan Chase Bank, N.A.*, No. CV 21-11042-AK, 2024 WL 4727989, at *19 (D. Mass. Mar. 25) (dismissing breach of fiduciary claim as duplicative of breach of contract claim because "[t]here is no actionable tort for breach of a fiduciary duty where there is a written agreement covering the specific subject matter of the alleged fiduciary duty"), *report and recommendation adopted*, 2024 WL 4406990 (D. Mass. Sept. 27, 2024); *Kriegel*, 2010 WL 3169579, at *14 (dismissing breach of fiduciary claim premised on automatic renewal of the investor plaintiffs' expiring certificates of deposit at the defendant bank at "the then prevailing interest rate, which was lower than

---

[8]    In *UBS Financial Services*, the Supreme Judicial Court of Massachusetts could "discern no relevant difference between the fiduciary duty law of New York and Massachusetts," concluding that "application of either State's law would yield the same result here." *See* 483 Mass. at 406 n.12.

the rates the[ plaintiffs] . . . could have received from the company's other offers, or from other companies," where "[the defendant's] relationship with plaintiffs was purely contractual" and "the contractual language suggest[ed] that plaintiffs' position that a fiduciary relationship existed [wa]s unreasonable").

> Nonetheless, Plaintiffs also invoke "Massachusetts statutory law," which they claim
>
> imposes on broker-dealers and agents the "duties of utmost care and loyalty to the customer," and deems a broker-dealer's or agent's "failure to act in accordance with a fiduciary duty to a customer when providing investment advice or recommending an investment strategy, the opening of or transferring of assets to any type of account, or the purchase, sale, or exchange of any security" "unethical or dishonest conduct or practices" under G.L.C. 110A, § 204 (a)(2)(G).

(*See* Opp'n at 7 (quoting 950 Code Mass. Regs. §§ 12.207(1)(a), 12.207(2)).  LPL counters that this is not a statute, but rather "a recent Rule of the Secretary of Massachusetts," and that "Plaintiffs' arguments about that Rule have at least three fatal flaws[.]"  (*See* Reply at 6.)  "*First*, as a matter of law, that Rule neither creates nor enlarges any private right of action."  (*See id.* (emphasis in original).)  "*Second*, the Rule's plain language shows that it does not even apply to Plaintiffs' allegations," (*see id.* (emphasis in original)), because "LPL is not an 'agent' under the Rule, did not make a 'recommendation,' and cash sweep is an account feature or service, not a 'type' of account."  (*See id.* at 7 n.6.)  "*Third*, Plaintiffs misread both the Rule and the parties' agreements in arguing that LPL's disclosure of its conflicts of interest were inadequate."  (*See id.* at 7.)  Further, "if the Rule meant what Plaintiffs claim, it would be preempted under the National Securities Markets Improvement Act of 1996, 15 U.S.C. § 78*o*(i)."  (*See id.* at 7 n.7.)

The Court agrees with LPL that the Rule Plaintiffs invoke as "Massachusetts statutory law" is inapplicable and, in any rate, that it does not provide an alternative basis for a claim for breach of fiduciary duty.  Accordingly, the Court concludes that Plaintiffs fail adequately to allege a claim for breach of fiduciary duty under Massachusetts law.

/ / /

/ / /

24-CV-1228 TWR (AHG)

### 2. *Agency Law*

Plaintiffs next argue that LPL contracted to "act[] as [clients'] agent" when sweeping available cash balances under the ICA and DCA Programs, (*see* Defs.' Ex. 2 at 9; Defs.' Ex. 3 at 23; *see also* CCAC ¶ 109), and that "[i]t is black letter law that principal-agent relationships give rise to fiduciary duties." (*See* Opp'n at 9 (citing *Berenson v. Nirenstein*, 326 Mass. 285, 289 (1950)).  LPL responds that "[i]t is black letter law that the principal-agent relationship only gives rise to fiduciary duties for matters within the scope of the agency," (*see* Reply at 8 (citing Restatement (Second) of Agency § 390 (1958), cmt. d)), and that, "[u]nder the contracts, the agency duties that LPL undertook were limited to opening bank accounts for Plaintiffs and depositing their uninvested free credit balances into those accounts." (*See id.* (citing Mem. at 20).)  "Crucially, the applicable contracts never suggested that LPL would act as Plaintiffs' agent regarding setting the interest rate that Plaintiffs would be paid or the fees that participating banks paid to LPL." (*Id.*)

Again, the Court agrees with LPL—the scope of the agency LPL undertook with respect to the Cash Sweep Programs was exceedingly narrow and limited by the ICA and DCA Disclosure Booklets to LPL "making 'deposits to and withdrawals from deposit accounts' at program banks, making sure balances remained under FDIC maxima, keeping records of the bank accounts, and moving funds between banks as required." (*See* Mem. at 20 (citing Defs.' Ex. 2 at 9, 10, 16, 19–20; Defs.' Ex. 3 at 23, 24, 27, 29).)  Because Plaintiffs fail to allege that LPL breached any of the limited duties it expressly undertook as their agent, the Court concludes that Plaintiff's fail plausibly to allege a breach of fiduciary duty under that theory.

### 3. *Federal Law*

Finally, Plaintiffs contend that "LPL Financial is . . . a registered investment adviser . . . , who is bound by the duties of care and loyalty imposed by the [IAA] . . . and [b]roker-dealer rules and regulations[,]" such as Reg BI.  (*See* Opp'n at 11.)  LPL responds that "Plaintiffs' reliance on the [IAA] . . . is misplaced for at least three insurmountable reasons." (*See* Mem. at 19.)  "First, the IAA provides only a limited private right of action

24-CV-1228 TWR (AHG)

that Plaintiffs do not invoke here."  (*Id.* (citing *Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979); *DeBlasio*, 2009 WL 2242605, at *16–18).)  "Second, Plaintiffs never plausibly allege that LPL undertook duties as their investment adviser concerning the use of the cash sweep programs . . . both because their agreements provide otherwise . . . and because investment advice under the IAA pertains to 'securities[.]'"  (*See id.* (citing 15 U.S.C. §§ 80b-2(a)(11), (a)(18); *Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982)).)  "Third, even if a federal fiduciary duty applied here, such duty requires an adviser to 'eliminate or make full and fair disclosure of all conflicts of interest'—and LPL did the latter."  (*See id.* (quoting *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, SEC Release No. IA-5248, 84 Fed. Reg. 33669, 33671 (July 12, 2019)).)  As for Reg BI, "the SEC expressly stated that it did not create fiduciary duties or a private cause of action," (*see id.* at 19–20 (first citing Reg BI at 33462; then citing *id.* at 33327; then citing *SEC v. W. Int'l Secs., Inc.*, No 2:22-cv-04119-ODW (AFMx), 2023 WL 2480732, *1 (C.D. Cal. Mar. 13, 2023); then citing *Allen v. Fid. Brokerage Servs. LLC*, 711 F. Supp. 3d 219, 224 & n.5 (S.D.N.Y. 2024))), and "Reg BI's obligations are triggered only when a broker-dealer 'mak[es] a recommendation of any securities transaction or investment strategy involving securities[.]'"  (*See id.* at 20 (first alteration in original) (quoting 17 C.F.R. § 15*l*-1(a)(1)).)

The Court concludes that neither the IAA nor Reg BI apply here because neither provides Plaintiffs with a private right of action, *see Transam. Mortg. Advisors*, 444 U.S. at 24 ("[W]e hold that there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable."); Reg BI at 33327 ("[W]e do not believe Regulation Best Interest creates any new private right of action or right of rescission, nor do we intend such a result."), or even applies to the Cash Sweep Programs.  *See* 15 U.S.C. §§ 78c(a)(10) (definition of securities applicable to Reg BI), 80b-2(a)(18) (definition of securities applicable under the IAA).  Accordingly, the Court concludes that Plaintiffs fail to allege a viable claim for breach of fiduciary duty under "federal law."

### 4.    Conclusion

Because Plaintiffs fail to establish that LPL owed them a fiduciary duty with respect to the cash sweep programs under Massachusetts law, the law of agency, or federal law, the Court **GRANTS IN PART** LPL's Motion and **DISMISSES** Plaintiffs' first cause of action for breach of fiduciary duty.

### C.    Fourth Cause of Action: Breach of Implied Covenant

Plaintiffs allege that LPL breached the implied covenant of good faith and fair dealing by failing "to pay or secure for Plaintiffs and Class members a fair and reasonable rate of interest on their cash balances." (*See* CCAC ¶ 191; *see also generally id.* ¶¶ 188–92.) "Under Massachusetts law, [e]very contract implies good faith and fair dealing between the parties to it." *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 237 (1st Cir. 2013) (alteration in original and internal quotation marks omitted) (quoting *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 569–70 (2010)). "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." *Id.* at 237–38 (quoting *T.W. Nickerson*, 456 Mass. at 570). "[T]o prevail, the plaintiff must 'present [ ] evidence of bad faith or an absence of good faith.'" *Id.* at 238 (second alteration in original) (quoting *T.W. Nickerson*, 456 Mass. at 570). "There is a presumption that all parties act in good faith, and the plaintiff bears the burden of presenting evidence of bad faith or an absence of good faith." *T.W. Nickerson*, 456 Mass. at 574 (quoting 23 S. Williston, Contracts § 63.22, at 507 (R. Lord 4th ed. 2002)).

"The concept of good faith 'is shaped by the nature of the contractual relationship from which the implied covenant derives,' and the 'scope of the covenant is only as broad as the contract that governs the particular relationship.'" *Young*, 717 F.3d at 238 (quoting *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005)). "As a consequence, the implied covenant cannot 'create rights and duties not otherwise provided for in the existing contractual relationship,' and instead focuses on 'the manner of performance.'" *Id.* (quoting *Ayash*, 443 Mass. at 385). "The essential inquiry is whether the challenged

1  conduct conformed to the parties' reasonable understanding of performance obligations, as

2  reflected in the overall spirit of the bargain, not whether the defendant abided by the letter

3  of the contract in the course of performance." *Id.* (quoting *Speakman v. Allmerica Fin. Life*

4  *Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005)).

5      LPL contends that Plaintiffs' implied covenant claim must fail because it is merely

6  a "repackag[ing of their] defective breach of contract claim." (*See* Mem. at 23 (citing

7  *Brand Grp. Int'l, LLC v. Established Brands Int'l, Inc.*, Civil No. 10-11783-JLT, 2011 WL

8  3236078, at *3 (D. Mass. July 26, 2011)).)  According to LPL, "***[n]othing*** in the parties'

9  contracts implies that Plaintiffs could have expected to receive anything more than the

10 posted rates (which they did), and LPL encouraged Plaintiffs to act if they sought 'higher

11 yields' (which they did not)." (*See* Reply at 9 (citing Defs.' Ex. 2 at 13; Defs.' Ex. 3 at

12 25).)  It is true that Plaintiffs received the benefit of their bargain—including the posted

13 interest rate on the Cash Sweep Programs—when they entered into their agreements with

14 LPL.  At the time Peters opened his account in August of 2022, for example, LPL's interest

15 rate for the ICA program was 0.34% for all deposit balances of less than $300,000,[9] while

16 LPL received a fee of 2.91%.  (*See* CCAC ¶ 84.)  Defendants are correct that Plaintiffs

17 could not reasonably have expected a higher yield on the Cash Sweep Programs *at that*

18 *time*.

19      Plaintiffs' implied covenant claim instead focuses on Plaintiffs' reasonable

20 expectations moving forward. (*See, e.g.*, *id.* ¶¶ 118–19.)  Plaintiffs essentially allege that—

21 regardless of what interest rates they initially agreed to under the terms of their contract—

22 they had a reasonable understanding that LPL would increase the interest rates paid to its

23 clients participating in the Cash Sweep Programs as the market improved and interest rates

24 rose generally, but that, "by improperly keeping the interest rates paid on cash sweep

25 accounts artificially low, LPL usurped that opportunity for itself, leveraging its clients'

---

[9]     According to Plaintiffs, "the average client balance in LPL's Cash Sweep Programs is approximately $5,000." (*See* CCAC ¶ 77.)

cash for its own benefit and securing massive profits for itself." (*See* CCAC ¶ 5; *see also id.* ¶¶ 6–9, 59–60, 70–71, 79–81, 119, 128–50.)  At oral argument, (*see* Tr. at 8:20–9:1), Plaintiffs leaned heavily into the Account Agreement's explanation that "[t]he interest rates paid are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties for administering the program." (*See* Defs.' Ex. 8 at 66.)  As alleged in Plaintiffs' Consolidated Class Action Complaint, "by stating that rates are influenced by what 'Banks are willing to pay,' LPL provides that interest rates paid on client cash deposits will be determined by a reasonable arm's-length negotiation between LPL and the participating Banks based on the prevailing interest rate environment and competitive market factors." (*See also* CCAC ¶ 59.)  Instead, "LPL developed, implemented, and maintains its Cash Sweep Programs to maximize its profits by capturing increased net interest income by setting and paying unreasonably low client rates, appropriating nearly all of the interest that 'Banks are willing to pay' to LPL through fees at significantly higher rates than LPL pays its clients on Deposit Accounts." (*See id.* ¶ 127.)

The critical question, therefore, is whether Plaintiffs plausibly allege that LPL's conduct in setting interest rates on its Cash Sweep Programs going forward failed to conform with Plaintiffs' reasonable expectations.  LPL contends that Plaintiffs could not have had a reasonable expectation to anything because they are entitled to zero interest on cash in a brokerage account, (*see* Defs.' Ex. 8 at 68 ("Interest will not be paid to the Account on free credit balances."); *see also* Tr. at 12:2–12), and LPL clearly disclosed that "[t]he ICA program should not be viewed as a long-term investment option." (Defs.' Ex. 2 at 13.)  LPL also warned Plaintiffs that "LPL generally receives as its fee the majority of the amount paid by the Banks with respect to such deposits," (*see id.*), and that "[LPL's] advisory program fees would be higher if [LPL] did not receive fees and benefits from the ICA program." (*See id.* at 14.)

At the very least, however, a reasonable individual entering into an Account Agreement at the same time as Peters could have expected either that LPL would continue to collect fees of roughly 2.91% on "the amount Banks are willing to pay" or that LPL

would continue to pay them between approximately 10% percent of the "the amount the Banks are willing to pay" on cash swept under the ICA Program, while retaining the remainder as its fees.  Instead, when these proceedings were initiated in 2024, LPL's interest rate *dropped* to 0.20% for all deposit balances of less than $300,000, while LPL *increased* its fee to 3.32%.  (*See id.*)

Compounding LPL's reduction of the amount of interest that it passed along to its clients over that period was a corresponding increase in the federal funds rate from 0.08% in the beginning of 2022 to a high of 5.33% in 2024, (*see id.* ¶¶ 79–80); an increase in interest rate on short-term U.S. Treasury Bills from close to zero in early 2022 to approximately 5.5% in mid-2023, (*see id.* ¶¶ 146); and an increase in the overnight repo rate to approximately 4.83% in April 2023 to as high as 5.5% in December 2023, (*see id.* ¶ 150).  In other words—although Plaintiffs face an uphill battle[10]—it may have been reasonable for Plaintiffs to believe that, as "the amount Banks are willing to pay" increased, the interest that LPL passed along to them would increase in turn.  But the opposite occurred, even though the interest rates paid by *other* brokerages who swept client cash balances into unaffiliated banks generally rose to track the movement of the market.  (*See id.* ¶¶ 132–39.)  Because the Court concludes that Plaintiffs plausibly allege that LPL breached the implied covenant of good faith and fair dealing, the Court **DENIES IN PART** Defendants' Motion as to Plaintiffs' first cause of action.  *See, e.g.*, *Robert & Ardis James Found. v. Meyers*, 474 Mass. 181, 188–92 (2016) (affirming trial court's ruling in bench

---

[10]    For example, while Peters, who opened an account in August 2022, could reasonably have expected to share in increasing interest rates, it seems unlikely that customers entering into Account Agreements closer when this action was filed—when LPL was disclosing an interest rate of 0.20% on cash swept funds while the Federal Funds Rate was approximately 5%, (*see* CCAC ¶¶ 79, 84)—could reasonably have expected a greater share of interest.  Indeed, it is unclear from the Consolidated Class Action Complaint when Nevitt and White opened their accounts with LPL.  Nonetheless, the Court concludes that at least one of the named Plaintiffs has stated a plausible claim for breach of the implied covenant of good faith and fair dealing under Massachusetts law.  Ultimately, however, when Nevitt, White, and putative class members signed their Account Agreements may prove significant in evaluating their reasonable expectations for purposes of class certification and summary judgment.

trial that the defendant had breached the implied covenant when it failed to sell stock purchased with capital from the plaintiff within a reasonable time after the plaintiff requested despite the fact that the profit-sharing agreement contained no provision regarding the timing of the sale because the plaintiff "foundation had a reasonable expectation that it would share in the eventual profits from sale before the proverbial Twelfth of Never"); *Dey v. Robinhood Markets, Inc.*, No. 24-CV-07442-RFL, ___ F. Supp. 3d. ___, 2025 WL 1322716, at *9–11 (N.D. Cal. Apr. 28, 2025) (concluding that the plaintiffs stated plausible breach of implied covenant claim where the defendant's deposit sweep program promised to pay participants interest based on "'amount the Program Banks are willing to pay' and the 'prevailing economic and business conditions'").

### D.    Second Cause of Action: Unjust Enrichment

Plaintiffs' second cause of action is for unjust enrichment based on LPL's retention of the "fees" it charged on Plaintiffs' (and the putative Class's) cash sweep deposits. (*See* CCAC ¶¶ 177–82.)  "To succeed with an unjust enrichment claim under Massachusetts law, a plaintiff must show that the defendant received, was aware of, and accepted or retained a benefit conferred by the plaintiff 'under circumstances which make such acceptance or retention inequitable.'"  *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140 (1st Cir. 2012) (quoting *Vieira v. First Am. Title Ins. Co.*, 668 F. Supp. 2d 282, 294 (D. Mass. 2009)).

LPL contends that Plaintiffs cannot plead a plausible unjust enrichment claim because there was an explicit contract defining the obligations of the Parties.  (*See* Mem. at 23–24.)  But as Plaintiffs note, (*see* Opp'n at 23), even though "*damages* for breach of contract and unjust enrichment are mutually exclusive," *see Lass*, 695 F.3d at 140 (citing *see Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006)), "it is accepted practice to pursue both theories at the pleading stage[.]"  *Id.* (citing *Vieira*, 668 F. Supp. 2d at 294–95).  LPL replies that "unjust enrichment may be pled in the alternative with breach of contract only where an *ambiguity* in the contract creates doubt that a breach of contract claim was available[,]" and that such ambiguity is missing here.  (*See* Reply at

9–10 (emphasis in original) (citing *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 83–84 (1st Cir. 2020); *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017)).)

For the reasons discussed above, *see supra* Section II.C, the Court concludes that there existed some ambiguity in the Account Agreement and related documents concerning how interest and LPL's fees on cash swept under the ICA Program would be calculated going forward.  Further, despite the fact that LPL paid no interest on free credit balances that were not invested in the Cash Sweep Programs, (*see* Defs.' Ex. 8 at 68), LPL certainly retained a benefit at the expense of its clients by using their uninvested cash in the Cash Sweep Programs, particularly in those situations in which clients realized *negative* returns. (*See* Defs.' Ex. 2 at 13; *see also* CCAC ¶¶ 70, 152.)  Accordingly, at least at this juncture, the Court **DENIES IN PART** LPL's Motion as to Plaintiffs' second cause of action for unjust enrichment.  *See, e.g.*, *Lass*, 695 F.3d at 140–41 (reversing district court's dismissal of unjust enrichment claim where mortgage required the plaintiff mortgagor to obtain flood insurance and allowed the defendant mortgagee to prescribe the amount of flood insurance given ambiguity regarding the defendant's authority to increase the required coverage and, thereafter, obtain "force-placed" policies from its affiliates).

### E.    *LPL Holdings*

Finally, LPL contends that LPL Holdings, LPL Financial's corporate parent, should be dismissed because "the Complaint is devoid of any allegations that LPL Holdings itself engages in any of the challenged activities, or that Plaintiffs had any relationship with LPL Holdings." (*See* Mem. at 25.)  Plaintiffs respond that they have pleaded sufficient facts to establish LPL Holdings' liability under an agency theory.[11]  (*See* Opp'n at 24–25.)  LPL responds that this theory of liability not only is not alleged in the Consolidated Class Action

---

[11]    Plaintiffs also contend that they have pleaded sufficient facts to establish LPL Holdings' liability for breach of contract as an intended third-party beneficiary.  (*See* Opp'n at 24.)  Because the Court dismisses Plaintiffs' cause of action for breach of contract, *see supra* Section II.A, the Court need not address this argument.

1  Complaint,[12] but also that Plaintiffs fail to allege any "facts indicating that LPL Holdings

2  directed 'specific actions' concerning the cash sweep programs" to establish an agency

3  relationship.  (*See* Reply at 10.)

4  As an initial matter, the Parties dispute which state's law governs the issue of

5  whether derivative claims can be brought against LPL Holdings based on its ownership of

6  LPL Financial.  (*Compare* Mem. at 24–25, *with* Opp'n at 24 n.22.)  LPL contends that

7  Delaware law applies because both LPL Holdings and LPL Financial were organized in

8  Delaware, (*see* Mem. at 24–25 (citing *Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp.

9  2d 1122, 1128 (N.D. Cal. 2011))), while Plaintiffs claim that Massachusetts law controls.

10  (*See* Opp'n at 24.)  Nonetheless, Plaintiffs appear to take the stance that the result is the

11  same under the laws of either state.  (*See id.*)  The Court agrees with Plaintiffs that this

12  dispute need not be resolved at this time because the result is the same in either instance.

13  Under the laws of both Delaware and Massachusetts, "the court may attribute the

14  actions of a subsidiary company to its parent where the subsidiary acts on the parent's

15  behalf or at the parent's direction."  *See C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp.

16  556, 560 (D. Del. 1998) (citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260,

17  271 (D. Del. 1989)); *see also, e.g.*, *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353

18  Mass. 614, 618 (1968) ("A corporation or other person controlling a corporation and

19  directing, or participating actively in . . . , its operations may become subject to civil or

20  criminal liability on principles of agency or of causation." (internal citation omitted)).

21  Common ownership and management are not sufficient, *see My Bread Baking Co.*, 353

22  Mass. at 618; *accord Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*, 456 F. Supp.

23

24  _____

25  [12]  In Plaintiffs' first cause of action for breach of fiduciary duty, they allege that "LPL Financial
   Holdings Inc. is also liable for such breaches, including under the doctrine of respondeat superior, because

26  LPL Financial LLC is a wholly owned subsidiary and agent of LPL Financial Holdings Inc. and committed
   breaches of fiduciary duties within the scope of its corporate relationship and employment."  (*See* CCAC

27  ¶ 176.)  Plaintiffs do not specifically mention LPL Holdings in any of their other causes of action, although
   all causes of action are brought "[a]gainst [a]ll Defendants."  (*See generally id.* ¶¶ 170–92 (emphasis

28  omitted).)

831, 841 (D. Del. 1978), nor is "simply alleging that the parent company 'benefitted' from an arrangement." *See Barsoum v. Kinderhook Indus., LLC*, 701 F. Supp. 3d 160, 162 (D. Mass. 2023).  Critically, "*the arrangement must be relevant to the plaintiff's claim of wrongdoing*." *See Otto Candies, LLC v. KPMG, LLP*, No. CV 2018-0435-MTZ, 2020 WL 4917596, at *9 (Del. Ch. Aug. 21, 2020) (emphasis in original) (quoting *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988)); *see also, e.g.*, *My Bread Baking Co.*, 353 Mass. at 619 (requiring "some fraudulent or injurious consequence of the intercorporate relationship").

Here, Plaintiffs point to the fact that LPL Financial is a wholly owned subsidiary of LPL Holdings, (*see* Reply at 25 (citing CCAC ¶¶ 13–14)); that the ICA and DCA Disclosure Booklets "do not distinguish between LPL Holdings and LPL Financial," (*see id.* (citing Defs.' Exs. 2, 3); their allegations that LPL Financial is "an agent of LPL Holdings," (*see id.* (citing CCAC ¶ 176)); and to statements from LPL Holdings' then-CEO and President Dan Arnold, (*see* CCAC ¶ 94), and CFO Matthew Jon Audette, (*see id.* ¶ 89), as evidence of "LPL Holdings' control over, and benefits from, LPL's Cash Sweep Programs."[13]  (*See* Opp'n at 24–25.)  Under the laws of both Delaware and Massachusetts, none of this suffices to establish the degree of control that LPL Holdings would need to exert over LPL Financial's administration of the cash sweep programs to hold LPL Holdings liable under an agency theory.  Plaintiffs' first two contentions—that LPL Financial is a wholly owned subsidiary and that the ICA and DCA Disclosure Booklets do not distinguish between the LPL entities—are insufficient, without more, and the general allegation that LPL Financial is an agent of LPL Holdings is conclusory and, therefore, "not entitled to be assumed true." *See Iqbal*, 556 U.S. at 681 (citing *Twombly*, 550 U.S. at

---

[13]     Plaintiffs also attempt to introduce other facts from the exhibits they proffer for judicial notice. (*See* Opp'n at 25.)  As discussed above, *see supra* page 7, because those facts are not alleged in the Consolidated Class Action Complaint, the Court concludes that it would be improper to consider them because "[a] plaintiff cannot utilize judicially noticed documents for the purpose of supplementing the allegations in a complaint." *See D & D Greek Rest.*, 2021 WL 4459063, at *3.

554–55).  The key question, therefore, is whether the statements by Arnold and Audette give rise to a plausible inference that LPL Holdings exerted substantial control of LPL Financial's administration of its cash sweep programs.

According to Plaintiffs, "[i]n a Q2 2021 earnings call, LPL [CFO] . . . Audette stated, 'Using our current sweep balances, a 100 basis point increase in the Fed Funds rate would translate to approximately $340 million of annual gross profit.'"  (*See* CCAC ¶ 89.)  As Plaintiffs themselves admit, this demonstrates only that "LPL makes an enormous amount of revenue from its clients' swept cash."  (*See id.*)  As for Arnold's statement, "on July 26, 2024, *Barrons* reported on LPL's refusal to increase cash sweep interest rates paid to clients, quoting former LPL CEO and President Dan Arnold as saying during LPL's earnings call that, '***We do not have plans to change our pricing***.'"  (*See id.* ¶ 94 (emphasis in original) (footnote omitted).)  It is unclear from Plaintiffs' Consolidated Class Action Complaint, however, whether this statement was made on behalf of LPL Holdings or LPL Financial or both, what degree of control LPL Holdings exercised over those plans and LPL Financial's pricing, etc.

In short, Plaintiffs' allegations—even considered as a whole—fail to evidence the degree of control required by courts applying both Delaware and Massachusetts law.  The Court therefore **GRANTS IN PART** LPL's Motion and **DISMISSES** Plaintiffs' surviving claims as to LPL Holdings.

### F.    *Leave to Amend*

LPL seeks dismissal of Plaintiffs' claims with prejudice, (*see* Mem. at 25), while Plaintiffs request leave to amend.  (*See* Opp'n at 25 n.24.)  "[A] trial court shall grant leave to amend freely . . . ['] even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).  For example, "[a] denial of leave to amend is proper on a breach of contract claim where amendment would be futile because the terms of the contract, which are not subject to change, preclude plaintiff's claim." *See Zamora v. Solar*,

No. 2:16-CV-01260-ODW-KS, 2016 WL 3512439, at *5 (C.D. Cal. June 27, 2016) (citing *Ratcliff Architects v. Vanit Constr. Mgmt., Inc.*, 88 Cal. App. 4th 595, 604 (2001)).

Although the Court harbors doubts that Plaintiffs can allege additional facts to state viable claims for breach of contract and breach of fiduciary duty, out of an abundance of caution, the Court **GRANTS** Plaintiffs the opportunity to amend their complaint to address the above-identified deficiencies.

**CONCLUSION**

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss (ECF No. 40).  Specifically, the Court **GRANTS IN PART** LPL's Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiff's first cause of action for breach of fiduciary duty, Plaintiff's third cause of action for breach of contract, and Plaintiffs' causes of action as to LPL Holdings.  Defendants' Motion is otherwise **DENIED**.  Within <u>thirty (30) days</u> of the electronic docketing of this Order, Plaintiffs **SHALL FILE** either (a) a notice of intent to proceed as to their surviving claims, or (b) an amended complaint addressing the above-identified deficiencies.  Defendants **SHALL RESPOND** to Plaintiffs' operative pleading within <u>sixty (60) days</u> of the electronic docketing of this Order.

**IT IS SO ORDERED.**

Dated:  June 30, 2025

_____
Honorable Todd W. Robinson
United States District Judge

24-CV-1228 TWR (AHG)