Jonathan D. Uslaner (Bar No. 256898)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470
jonathanu@blbglaw.com

*Counsel for Plaintiffs Daniel Peters, Douglas Nevitt, and Carol White and Interim Co-Lead Counsel*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re LPL Financial Cash Sweep Litigation* | Case No. 3:24-cv-1228-TWR-BJW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT**<br><br>Date: September 10, 2026<br>Time: 1:30 p.m. PT<br>Courtroom: 14A<br>Judge: Hon. Todd W. Robinson |

**REDACTED VERSION**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 4

A. The Court's Order On Defendant's Motion To Dismiss ..... 4

B. After Plaintiffs' Diligent Efforts, The Court Amended The Schedule ..... 5

III. THE PROPOSED AMENDED COMPLAINT ..... 5

A. The PAC Alleges Facts Showing That LPL Owed Fiduciary Duties To Its Corporate Advisory Clients ..... 6

1. LPL's Agreements With Its Corporate Advisory Clients Confirm That It Owes Them Fiduciary Duties ..... 7

2. LPL Internally Acknowledges That It Owes Fiduciary Duties To Its Corporate Advisory Clients ..... 7

B. The PAC Details How LPL Promised To Pay Its Clients Yields Based On What "Banks Are Willing To Pay" ..... 9

C. The PAC Demonstrates How LPL Breached Its Duties And The Implied Covenant Of Good Faith And Fair Dealing, And Unjustly Enriched Itself, Through The Cash Sweep Programs ..... 10

1. LPL Sets Its Client Yields And Its Own Fees To Capture All Or Almost All Of The Interest Income Earned On Swept Cash ..... 10

2. LPL Disregarded Concerns Regarding Its High Fees And Low Client Yields ..... 12

3. LPL Eliminated The Option For Clients To Sweep Their Cash Into Higher-Yielding Money Market Funds In Order To "Maximize Monetization" ..... 13

4. The OCC Began To Investigate And LPL Acknowledged It Was Breaching Its Duties ..... 15

5. LPL Continues To Acknowledge Its Breaches But Persists In Misconduct ..... 16

IV. LEGAL STANDARD ........ 18
V. ARGUMENT ........ 19
VI. CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Art Attacks Ink, LLC v. MGA Entm't, Inc.*,
2005 WL 8160181 (S.D. Cal. May 11, 2005) ....................3, 4, 20

*Bortz v. JPMorgan Chase Bank, N.A.*,
2021 WL 4819575 (S.D. Cal. Oct. 15, 2021) ....................23

*Chan v. ArcSoft, Inc.*,
2022 WL 22863221 (N.D. Cal. Nov. 23, 2022) ....................19, 20, 21

*Chudacoff v. Univ. Med. Ctr. of S. Nevada*,
649 F.3d 1143 (9th Cir. 2011) ....................2

*Cress v. Nexo Cap. Inc.*,
2025 WL 3034067 (N.D. Cal. Oct. 30, 2025) ....................3

*Dauth* v. *Convenience Retailers, LLC*,
2013 WL 12440997 (N.D. Cal. July 31, 2013) ....................3

*DCD Programs, Ltd. v. Leighton*,
833 F.2d 183 (9th Cir. 1987) ....................2, 20, 25

*Doe v. Harbor Schools, Inc.*,
843 N.E.2d 1058 (Mass. 2006) ....................23

*dpiX LLC v. Yieldboost Tech, Inc.*,
2015 WL 5158534 (N.D. Cal. Sept. 2, 2015) ....................3

*Duell v. First Nat'l Bank of Omaha*,
2016 WL 3033856 (S.D. Cal. May 27, 2016) ....................18, 19

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ....................18

*Foman v. Davis*,
371 U.S. 178 (1962) ....................18

*Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.*,
2006 WL 3733815 (E.D. Cal. Dec. 15, 2006) ....................20

*Golchin v. Liberty Mut. Ins. Co.*,
993 N.E.2d 684 (Mass. 2013)....24

*Goldsmith v. UBS Fin. Servs., Inc.*,
2026 WL 819461 (S.D.N.Y. Mar. 25, 2026)....23, 24

*Hayes v. Wright Med. Tech., Inc.*,
2016 WL 7451662 (S.D. Cal. Dec. 28, 2016)....18

*Henderson v. United Student Aid Funds, Inc.*,
2014 WL 4658744 (S.D. Cal. Sept. 17, 2014)....20

*Holm v. Acima Credit Dig., LLC*,
2025 WL 951273 (S.D. Cal. Mar. 27, 2025)....20

*James B. Nutter & Co. v. Est. of Murphy*,
88 N.E.3d 1133 (Mass. 2018)....24

*In re JPMorgan Chase Cash Sweep Program*,
2026 WL 396055 (S.D.N.Y. Feb. 12, 2026)....24

*Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*,
802 F. Supp. 3d 701 (S.D.N.Y. 2025)....24, 25

*McGhee v. N. Am. Bancard, LLC*,
2021 WL 5763834 (S.D. Cal. Sept. 17, 2021)....18, 21

*Mehlman v. Ameriprise Fin., Inc.*,
2025 WL 2403252 (D. Minn. Aug. 19, 2025)....24, 25

*Patsos v. First Albany Corp.*,
741 N.E.2d 841 (Mass. 2001)....22

*Pizana v. SanMedica Int'l LLC*,
345 F.R.D. 469 (E.D. Cal. 2022)....19

*Robinhood Fin. LLC v. Sec'y of Commonwealth*,
214 N.E.3d 1058 (Mass. 2023)....3, 21

*Smith Interface Techs., LLC v. Apple Inc.*,
2026 WL 222245 (S.D. Cal. Jan. 28, 2026)....18

*U.S. EEOC v. Bay Club Fairbanks Ranch, LLC*,
475 F. Supp. 3d 1099 (S.D. Cal. 2020)....................................................19

*UBS Financial Services, Inc. v. Aliberti*,
133 N.E.3d 277 (Mass. 2019)..................................................................22

*In re Wells Fargo Cash Sweep Litig.*,
2025 WL 1785315 (N.D. Cal. June 27, 2025)...........................................23

*Zeng v. Calidi Biotherapeutics, Inc.*,
2026 WL 578817 (S.D. Cal. Mar. 2, 2026)...........................................18, 19

**RULES**

Fed. R. Civ. P. 15(a)(2)..........................................................................18

Fed. R. Civ. P. 16................................................................................18, 19

# I. INTRODUCTION

In its motion to dismiss decision, the Court found Plaintiffs' original complaint did not sufficiently allege that LPL owed a fiduciary duty to its advisory and brokerage clients in relation to its Cash Sweep Programs.[1] Recently-produced documents, however, show that LPL knew it owed a fiduciary duty to advisory clients with assets in the Cash Sweep Programs like Plaintiffs Nevitt and White, i.e., clients whose accounts were overseen by investment advisers employed by LPL (referred to internally by LPL as the "Corporate Advisory" clients).

In internal talking points, for example, LPL bluntly admitted that, "[f]or corporate advisory [clients], ***LPL is the investment advisor with the fiduciary obligation***." In a 2019 presentation on using the DCA Cash Sweep Programs for advisory clients, LPL explained that the "[DCA] Program is ***subject to the fiduciary standard of conduct***[.]"[2] And a later presentation reiterated that charging "advisory fees on cash balances in advisory accounts" meant LPL was subject to "***the fiduciary standard***." Other LPL documents show [redacted]

Discovery has also confirmed that LPL repeatedly breached its contractual and fiduciary obligations by operating the Cash Sweep Programs precisely in the

[1] LPL's "Cash Sweep Programs" comprise its Insured Cash Account ("ICA") and Deposit Cash Account ("DCA").

[2] Unless otherwise noted, all emphases are added, and all internal citations are omitted. References to: (i) "Blatchley Decl." are to the Declaration of Michael D. Blatchley, filed herewith; and (ii) "¶" are to the Proposed Amended Consolidated Class Action Complaint ("PAC"), attached as Exhibit A to the Blatchley Declaration.

manner the Court suggested in its earlier opinion sustaining Plaintiffs' breach of implied covenant and unjust enrichment claims. Dkt. No. 58 at 37-38. Specifically, contrary to the contract's promises that LPL's client cash sweep yields would be based on what the participating program banks were "willing to pay" (*id.*), discovery confirms the opposite: LPL, through its CFO and CEO—not the program banks or the programs' third-party administrator—unilaterally set the interest rates paid to clients, and designed the ICA and DCA so that LPL captured nearly the entire interest spread—even when it meant that advisory clients lost money on their swept cash. And despite Board member concerns about the Cash Sweep Programs being run "very strongly and obviously in favor of the company" and contrary to "serving only the investors' interests," LPL repeatedly rejected proposals to ameliorate its breaches by eliminating advisory fees on Cash Sweep Program cash or giving investors ***any*** reasonable portion based on what the program banks were "willing to pay."

These facts contradict LPL's claims in its motion to dismiss briefing. Together with LPL's inculpatory admissions, these facts also establish both LPL's fiduciary duty to Corporate Advisory clients vis-a-vis the Cash Sweep Programs and its breach of that duty. Further, based on the new evidence establishing that LPL executives unilaterally determined to extract the greatest revenue from the interest earned on its clients' swept cash—in a manner that bore no resemblance to what the program banks were "willing to pay"—Plaintiffs seek leave to replead a claim for breach of contract based on LPL's broken promise.

Motions to amend are treated with "extreme liberality" in the Ninth Circuit, and they may be "denied ***only*** upon [a] showing of bad faith, undue delay, futility, or undue prejudice to the opposing party." *Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649 F.3d 1143 (9th Cir. 2011). As the party opposing the motion to amend, LPL bears the burden to make this showing. *See DCD Programs, Ltd. v. Leighton*,

833 F.2d 183, 187 (9th Cir. 1987). It cannot do so.

***First***, Plaintiffs have sought leave to amend without delay and in good faith. This motion follows promptly from LPL's production of critical evidence, which resulted from months of diligent discovery efforts by Plaintiffs. Allowing the amendment also would not prolong litigation because discovery is ongoing and addition of the fiduciary duty and contract claims would not alter the scope or timing of discovery. LPL, therefore, cannot show either undue delay, which "cannot exist where discovery has not ended," *Dauth* v. *Convenience Retailers, LLC*, 2013 WL 12440997, at *3 (N.D. Cal. July 31, 2013), or bad faith, which requires "evidence [of] wrongful motive." *dpiX LLC v. Yieldboost Tech, Inc.*, 2015 WL 5158534, at *4 (N.D. Cal. Sept. 2, 2015).

***Second***, LPL will not face undue prejudice. When "there is no undue delay, as is the case here, courts are less likely to find prejudice to the nonmoving party." *Cress v. Nexo Cap. Inc.*, 2025 WL 3034067, at *7 (N.D. Cal. Oct. 30, 2025). Further, "to justify denial of leave to amend, prejudice must be substantial." *Art Attacks Ink, LLC v. MGA Entm't, Inc.*, 2005 WL 8160181, at *1 (S.D. Cal. May 11, 2005). Thus, where, as here, "the proposed amendment is requested in good faith and based on the same operative facts alleged in the [original] complaint," defendant cannot show prejudice sufficient to justify denying the amendment. *Id*. at *2.

***Third***, the proposed amendment is not futile. Facts uncovered in discovery directly address the pleading issues the Court identified. Specifically, LPL's setting of interest rates on Corporate Advisory clients' Cash Sweeps funds and collection of advisory fees on those funds established a fiduciary duty under Massachusetts law. *See Robinhood Fin. LLC v. Sec'y of Commonwealth*, 214 N.E.3d 1058, 1062 (Mass. 2023). Discovery shows that LPL breached that duty, as well as its promise to pay interest rates based on what other banks were "willing to pay." These facts go well beyond the threshold for futility—where "no set of facts can be proved that

would render the new claim valid." *Art Attacks*, 2005 WL 8160181, at *2.

## II. BACKGROUND

### A. The Court's Order On Defendant's Motion To Dismiss

On June 30, 2025, the Court denied Defendant's motion to dismiss as to Plaintiffs' breach of good faith and fair dealing and for unjust enrichment claims. Dkt. No. 58. The Court granted Defendants' motion in part and dismissed without prejudice Plaintiffs' claims for breach of fiduciary duty and breach of contract as well as all claims against LPL Financial Holdings Inc. *See id*. at 44.

With respect to the breach of fiduciary duty claim, the Court held that Plaintiffs failed to allege that LPL owed a fiduciary duty to any of its clients, whether advisory or non-advisory.[3] Specifically, the Court found that the original complaint did not sufficiently allege "any common-law fiduciary obligation, *[]or any special relationship* of trust, confidence, or reliance" under Massachusetts law. *Id.* at 31.

With respect to the breach of contract claim, the Court found that Plaintiffs did not plausibly allege a breach of contract claim as to four provisions: (1) LPL's promise to act in its clients' best interests; (2) that LPL has "systems in place to mitigate the conflicts of interest"; (3) that LPL's fees "are reasonable and appropriate for the services being provided under the program"; and (4) any contractual promise to abide by 29 U.S.C. § 4975.

In accordance with the Court's Order, on July 12, 2025, Plaintiffs filed their intent to proceed on their surviving claims, while reserving "all rights, including with respect to any subsequent amendment of the Consolidated Class Action Complaint [] following a reasonable opportunity for discovery, including in accordance with any case schedule . . . ordered by the Court." Dkt. No. 62 at 2.

[3] The Consolidated Class Action Complaint that the Court analyzed did not allege an Advisory Subclass or otherwise distinguish between non-advisory and advisory clients, including with respect to the fiduciary duty claim.

### B. After Plaintiffs' Diligent Efforts, The Court Amended The Schedule

On July 23, 2025, the parties conducted their initial Rule 26(f) conference. Blatchley Decl. ¶3. Just one week later, Plaintiffs served their first set of document requests. *Id.* ¶4. After LPL served boilerplate objections on September 24, 2025, Plaintiffs pushed for discovery, including through multiple meet-and-confers with LPL over the next two and a half months. *Id.* ¶¶5-6. Finally, on December 18, Plaintiffs moved to compel before Magistrate Judge White to seek, *inter alia*, the names of the members of LPL's Rate Setting Committee, LPL's cash sweep program alternatives, and structured data. *Id.* ¶7.

Over the next two months, the parties filed four more discovery briefs and appeared before Judge White nine times to resolve discovery disputes and provide status updates. *Id.* ¶8. In early February 2026, Judge White ordered LPL's document production, but LPL did not make a material production until mid-April 2026—over eight months after Plaintiffs served their initial discovery requests. *Id.* ¶9.

LPL's production included documents in which LPL acknowledged its fiduciary duty to Corporate Advisory clients and that illustrate LPL's breach of that duty and a key contractual promise. *Id.* ¶10. After Plaintiffs discovered significant gaps in LPL's production, they promptly moved to modify the scheduling order based on good cause and Plaintiffs' diligence. *Id.* ¶¶11-12. The Court granted Plaintiffs' motion, over LPL's objection, to extend the schedule and ordered that "Plaintiffs shall file a motion seeking leave from the U.S. District Judge to amend the complaint on or before July 17, 2026." Dkt. No. 98.

## III. THE PROPOSED AMENDED COMPLAINT

The Proposed Amended Complaint ("PAC") marshals key, recently produced evidence to reassert (i) breach of fiduciary duty claims on behalf of LPL clients for

whom LPL or its representatives served as an investment advisor (the "Corporate Advisory" clients, as LPL refers to them), and (ii) breach of contract claims based on LPL's failure to abide by its promise that "[t]he interest rates paid" to clients in the Cash Sweep Programs "are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties for administering the program." Dkt. No. 58 at 37-38.

### A. The PAC Alleges Facts Showing That LPL Owed Fiduciary Duties To Its Corporate Advisory Clients

The breach of fiduciary duty claim the Court previously dismissed was brought on behalf of both advisory and brokerage clients. The PAC reasserts fiduciary duty claims, but on behalf of only LPL's Corporate Advisory clients. Discovery confirms that LPL owes its Corporate Advisory clients fiduciary duties, a point LPL management and employees repeatedly admitted.

LPL's Corporate Advisory clients have a different relationship to LPL than its brokerage clients. For brokerage accounts, LPL charges a transaction-based commission each time a client buys or sells an investment. *See* Dkt. No. 58 at 8. For advisory accounts, LPL charges an ongoing, asset-based advisory fee calculated as a percentage of the value of the client's account—a fee that LPL ***applies to cash sweep balances***, confirming that its fiduciary duties apply to those balances. *See id.* at 9. LPL thus "earns two layers of fees on the same cash balances" in an advisory account: the advisory fee it charges the client on the swept cash, plus the sweep fee it collects from the third-party program banks. *Id.* at 14 (quoting ICA Disclosure Booklet).

As detailed below, LPL's newly produced documents show LPL itself has long understood the legal consequence of that arrangement and its other promises to advisory clients: it owes them fiduciary duties, including a duty of loyalty.

**1. LPL's Agreements With Its Corporate Advisory Clients Confirm That It Owes Them Fiduciary Duties**

As quoted in the PAC, LPL's agreements with its Corporate Advisory clients confirm LPL's fiduciary duties, including a duty of loyalty. For example, the "Relationship Summary" document LPL provides to clients states explicitly: "When we [LPL] . . . act as your investment adviser, we have to act in your best interest and not put our interest ahead of yours" and that "[y]our professional." For Corporate Advisory clients, an LPL employee or representative "is legally required to act in your best interest and not put his or her interests ahead of your own." ¶¶45-46. The PAC also cites provisions from account materials in which LPL admits that it has conflicts of interest and that underscore LPL's fees must be "reasonable and appropriate." ¶¶48-54.

The PAC also cites language in LPL's agreements confirming that they incorporate and are informed by the fiduciary duties imposed by the Investment Advisers Act of 1940 (the "Advisers Act"). Specifically, LPL's advisory account client agreements state that they should be construed "in a manner consistent with the Advisers Act and the rules and regulations of the Securities and Exchange Commission thereunder (and ERISA, where applicable)." ¶57. LPL's agreements thus adopt the Advisers Act's requirements that LPL: "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own"; "cannot place its own interests ahead of the interests of its client"; and "eliminate . . . or adequately mitigate" any conflicts of interest it "cannot fully and fairly disclose." ¶¶58-59.

**2. LPL Internally Acknowledges That It Owes Fiduciary Duties To Its Corporate Advisory Clients**

As detailed in the PAC, throughout the class period, LPL repeatedly acknowledged its fiduciary duty to its Corporate Advisory clients. For example, in a presentation titled "Cash Q&A," which provided a template for potential questions

that LPL executives might receive about the company's Cash Sweep Programs during an earnings call, LPL stated that "[f]or corporate advisory, ***LPL is the investment advisor with the fiduciary obligation***" and further: "***Our fiduciary duty is the same for employee advisors and independent advisors if they are on our corporate advisory platform. In that case, those advisors are investment advisor representatives of LPL***." ¶¶120-21. Similarly, in a 2019 presentation regarding the DCA program, LPL confirmed several facts about the duties it owed its DCA clients: that the "Program is subject to the fiduciary standards of conduct and prohibited transaction restrictions of ERISA and the Internal Revenue Code"; that "disclosure alone does not resolve conflicts"; and that the "LPL Fee & Client Yield must be considered 'Reasonable.'" ¶73.[4]

LPL further admitted its fiduciary duties to all advisory clients, including because ***it collected advisory fees on those clients' cash sweep balances***, in several other internal presentations and communications:

- In a draft presentation for the Board of Directors circulated to LPL executives, including then-CEO Dan Arnold, LPL stated that, "[i]n Corporate, ***we have a fiduciary responsibility***," and that "[o]ur fiduciary responsibility on this portion of cash is the focus of regulators across the industry, including our SEC investigation." ¶112. LPL also was considering "[e]liminat[ing] advisory fees on cash balances held in advisory accounts ***thus eliminating the fiduciary standard***," observing that, while LPL "would have to consider larger, fundamental changes to our business model" to "replenish" its earnings, "***we would instead not charge advisory fees on any cash so that we may eliminate risk related to our fiduciary responsibility***." *Id.* at ¶¶113-14.

- Another internal presentation, titled "Cash Sweep Analysis and Scenarios," which was sent to Audette for his review with Arnold, stated that "advisory balances governed by SEC fiduciary standard"

[4] The DCA is only for advisory retirement plan accounts. Complaint, Dkt. No. 38 at ¶¶31, 43. LPL's ICA is the default option for the remainder of LPL's accounts. *Id.* at ¶¶29, 31, 43.

comprised of roughly 60% of LPL's cash balance in the Cash Sweep Programs and that "***[c]ash held in advisory accounts governed by fiduciary standard are potentially in scope due to the imposition of an advisory fee on the cash***." ¶116.

- In a memo to LPL's Audit Committee, Audette reported that "***Cash balances where we have a fiduciary responsibility are $17[billion]***[.]" ¶122.

Thus, the PAC details how, consistent with the language from its agreements, LPL and its senior-most executives have repeatedly admitted that LPL has a fiduciary duty to its advisory clients, and that duty arises at least in part from the company's decision to charge an advisory fee on swept cash assets.

### B. The PAC Details How LPL Promised To Pay Its Clients Yields Based On What "Banks Are Willing To Pay"

The PAC details how LPL promised clients that the interest rates they would be paid were "determined by the amounts the Banks are willing to pay minus the fees paid to LPL and other parties." ¶29. It further alleges how LPL's agreements provide that the referenced "fees" must be "reasonable and appropriate," and how clients would receive interest rates that "may be higher" than those paid by Program Banks, money market funds, or "other cash equivalent investments." ¶¶29-31.

The PAC traces the implications of these terms and other language in LPL's account materials. LPL's promises and the agreement terms imply—and an objectively reasonable client would expect—that client cash sweep yields would meaningfully track market-based interest rates and that LPL would not appropriate for itself all or virtually all of the interest Banks were willing to pay for itself. ¶¶27-38. In reality, the very opposite occurred: LPL barely increased client yields as short-term interest rates skyrocketed, and, as LPL acknowledged internally, only its own "economics" for the Cash Sweep Programs, based on the fees it paid itself, were "market based and aligned with the level of prevailing interest rates." ¶92.

### C. The PAC Demonstrates How LPL Breached Its Duties And The Implied Covenant Of Good Faith And Fair Dealing, And Unjustly Enriched Itself, Through The Cash Sweep Programs

The PAC includes numerous detailed allegations—drawn from LPL's own documents—showing how LPL breached its duties, frustrated clients' reasonable expectations, and unjustly enriched itself by setting *de minimis* client yields and capturing for itself all or almost all of the interest earned on its clients' swept cash—even when doing so could cause advisory clients to ***lose*** money. Among other things, LPL set yields and eliminated higher-yielding options from the Cash Sweep Programs to maximize its own revenues, and "double-dipped" on advisory clients by charging them both advisory fees and Cash Sweep Program fees on swept cash. When regulators raised concerns about the ICA program's failure to meet LPL's fiduciary duties to the clients of an LPL subsidiary, LPL replaced the ICA with a money market fund for that subsidiary—but left the ICA in place for its Corporate Advisory clients. And when other regulators continued to question whether LPL was meeting its fiduciary duties to Corporate Advisory clients through its sweep programs, LPL admitted that it owed those clients fiduciary duties and considered eliminating its advisory fees to eliminate those duties, but ultimately refused to act.

#### 1. LPL Sets Its Client Yields And Its Own Fees To Capture All Or Almost All Of The Interest Income Earned On Swept Cash

LPL's internal records have shown that the client yields in LPL's Cash Sweep Programs were not based on what "Banks are willing to pay," but instead were set by LPL's top executives, in their sole discretion, to maximize LPL's profits. LPL's internal emails make this clear. For example, in a January 2022 email, LPL's CFO Audette responded to the recommendation to keep the client interest rates at .01% for the DCA program even as anticipated rate hikes were on the horizon. He told Rich Steinmeier, who now serves as LPL's CEO, that he and Burt White, LPL's CIO, set the rates:

**From:** Matt Audette <matt.audette@lplfinancial.com>
**Sent:** Thursday, January 27, 2022 7:40 AM
**To:** Rich Steinmeier <Rich.Steinmeier@lplfinancial.com>
**Subject:** FW: Approval Needed: DCA Update - February Client Yield

Burt and I.....really me....set pricing on deposits. And margin.

The team is working on a new process for that....but I think it should be CFO and Strategy....meaning you and I. We can discuss/align....but as rate hikes are likely coming in about 2 months.....we'll need to make sure we have our process in order by then.

Nothing for you to do now.....other than to let me know if you think it should be someone other than you replacing Burt.

Note years ago it was me, Burt and Dan.....and we dropped Dan at his request. And I just keep him informed of our approach via 1:1s.

¶80. Thus, Audette confirmed: (1) at the time, he maintained exclusive authority to set the DCA rates, and (2) he and a small group of LPL executives, including its former CEO Arnold, had been setting the rates for years.

Internal LPL documents further show that, when LPL set its client yields, it did so to achieve particular corporate income targets. LPL set up the DCA Program in order to earn cash sweep fees on advisory IRA accounts, and purported to structure the Program to meet the legal requirements for such accounts. ¶¶69-70. However, LPL actually operated the DCA Program in a manner inconsistent with those requirements, demonstrating its bad faith. ¶76. For example, LPL's graphic below shows how, for the DCA program, the interest income received from the banks flowed into the per-account fee LPL set to capture that income:




¶78. As LPL's graphic demonstrates, the DCA Program is designed so that the "Net Program Revenue," i.e., "net interest income" is equal to "LPL Revenue," i.e., the "Per Account Fee Revenue." ¶¶77-78. Thus, LPL's "fee" is just a label that LPL uses to obscure the fact that it is keeping nearly the entirety of the aggregate net interest spread. *Id.*

### 2. LPL Disregarded Concerns Regarding Its High Fees And Low Client Yields

LPL's internal documents confirm that its senior executives disregarded the conflict of interests inherent in its cash sweep practices, even in the face of serious concerns, and instead operated the Cash Sweep Programs to maximize LPL's profits at its clients' expense.

For example, in January 2018, LPL's Head of Financial Planning persuaded CFO Audette to cut the DCA program's rate in half, even though the Federal Reserve had increased the Federal Funds Rate and it "feels counterintuitive to reduce the client rate following a rate hike." ¶83. Similarly, in a February 2018 presentation to LPL's Board of Directors, senior management discussed how LPL had been able to convert approximately $5 billion in money market fund balances into its DCA and ICA sweep accounts, which "provide greater yields to LPL"—not to its clients. ¶84.

In May 2018, LPL emailed R&T, the third-party administrator for the DCA program, a proposed DCA fee schedule, seeking input. ¶81. R&T raised concerns "about the impact the fees may have on DCA's ability to meet the objective of providing a reasonable rate." *Id*. R&T's analysis indicated that LPL's proposed DCA fee schedule could result in clients losing money or receiving negative interest on their accounts, a result obviously not "reasonable."

This conflict of interest also drew attention at LPL's highest levels. In August 2018, an LPL Board member emailed LPL's CFO, Audette, in response to a *Wall Street Journal* article titled, "How Brokers Make More on Your Cash Than You Do" and wrote that he continued to "worry about growing exposure of this apparent conflict of interest in the context of our positioning as being independent and serving only the investors' interests," observing that "the weight of our interest income allocation remains very strongly and obviously in favor of the company." ¶85. Rather than heed this warning, Audette forwarded the message to LPL's then-CEO

Arnold, stating that the Board member's suggestion "is not consistent with our strategy." ¶86.

### 3. LPL Eliminated The Option For Clients To Sweep Their Cash Into Higher-Yielding Money Market Funds In Order To "Maximize Monetization"

LPL's documents reflect LPL's then-growing incentive to push clients into low-yielding DCA and ICA accounts. In November 2018, LPL circulated an internal presentation titled "LPL Cash Management Strategy" stating that "revenue earned on cash balances is becoming a larger driver of our corporate earnings." ¶89. It further stated that, while LPL at the time still "grant[ed] advisors and their clients flexibility to opt out of the default bank deposit sweep program (ICA/DCA) into (higher yield, non-FDIC insured) money market sweeps," the "reduced monetization of money market assets"—*i.e.*, LPL's lower fees on money market rather than cash sweep balances—"presents an immediate risk to gross profit as advisors / investors increase their use of money market sweeps." *Id.*

In its sole discretion, LPL soon initiated a plan to eliminate the money market fund sweep option, allowing LPL to greatly increase profits at its clients' expense. Specifically, LPL recognized that, compared to the small amount it earned on money market fund sweeps, bank sweeps would allow LPL to appropriate all or virtually all of the returns based on "prevailing interest rates." According to an LPL internal presentation, "bank sweeps are priced by LPL, but money market funds are priced by the fund companies, which leads to different interest rates paid on the same effective cash product." And, while LPL's own "economics on money market funds are capped at ~45 basis points," in "bank cash," LPL's returns would be "market based and aligned with the level of prevailing interest rates." ¶92.

LPL confirmed this math in another internal presentation, effectively describing how eliminating the money market fund sweep option essentially swapped the yields LPL and the client were receiving:




¶95.

In 2019, based on this analysis, and ignoring its fiduciary and other legal obligations to its advisory clients, LPL exercised its sole discretion to pursue a strategy of "eliminating the money market sweeps option" for clients so that LPL could "[m]aximize monetization" for itself:




¶90. According to LPL's own calculations, removing the option to sweep to money market funds would generate $45 million in additional profit to LPL per year. ¶92.

LPL's own documents reflect that this change was expected to raise concerns and show how LPL anticipated addressing them. For example, in February 2019, LPL circulated a presentation in which it recommended "Eliminating MM Sweeps" so that "[a]ccounts eligible for Bank Sweep no longer have the option to use MM

Sweeps," identifying a need to "[a]lign with CEO on Advisor communication strategy" to manage the fallout from this change that would reduce client yields. ¶93. LPL also described how it was implementing a "strategic approach" to prevent clients from withdrawing their assets in response to the low rates they would receive, by excluding money market options from the Cash Sweep Programs while also instituting "***investment minimums to minimize erosion of ICA/DCA sweep AUM*** via yield seeking behavior with smaller clients." ¶94. In other words, LPL would impose minimums to prevent its lowest net worth clients from moving their money out of Cash Sweep and into money market funds in response to the change. *Id.*

As a result of this change, LPL at times caused its advisory clients to receive what was effectively a negative interest rate on their cash sweep balances. In 2019, for example, cash sweep rates averaged only 30 basis points, but LPL charged an average advisory fee of 100 basis points on those balances. ¶96.

**4. The OCC Began To Investigate And LPL Acknowledged It Was Breaching Its Duties**

[redacted] *Id.*

[redacted] ¶100. [redacted]

[redacted] ¶99. [redacted] ¶100.

[redacted] ¶¶90, 102 [redacted] ¶102.

### 5. LPL Continues To Acknowledge Its Breaches But Persists In Misconduct

Internally, LPL continued to recognize both that it owed its advisory clients fiduciary duties as to their swept cash and that it was breaching them. For example, one LPL advisor emailed CEO Arnold in March 2023, stating that he did "not understand why the ICA rate (currently at .35%) does not more closely track the rise in short term interest rates" and could not "see the logic where an independent broker dealer service company like LPL Financial keeps this hefty spread for their own benefit, rather than adjust the rate on the ICA paid out to our clients." ¶106. Similarly, in September 2023, another advisor observed that, because LPL was "charging an asset management fee that is higher than" the Cash Sweep Program yield, "it's an automatic 'loss' right out of the gate" for LPL clients, and further that, "[a]t other firms, cash is held in a money market and yielding around 5%[.]" *Id.*

These concerns mirrored others being raised at LPL's highest levels at the time. For example, a December 2023 presentation for the CEO and CFO admitted that "[k]eeping large sums of money in low yielding sweep programs is a red flag

for regulators as it is usually not in the best interest of the end-client." ¶107. [redacted] ¶108. By January 2024, LPL was considering implementing that ability to provide "advisors flexibility on how to manage non-operational cash inside of advisory while maintaining fiduciary responsibility," thus implicitly conceding that its status quo practice failed to do so. ¶109.

These concerns continued to be raised throughout 2024. As described above, in September 2024, LPL circulated three separate internal presentations in which it acknowledged its fiduciary duties to its advisory clients, confirmed that those duties arose from its practice of charging advisory fees on cash sweep balances, and calculated the precise financial cost of bringing its Cash Sweep Programs into compliance.

Despite those concerns, LPL chose to maintain the status quo and continued to seek out ways to maximize its own sweep profits at its clients' expense into 2025. In two January 2025 presentations, LPL discussed the most profitable ways to convert accounts gained through acquisitions—which had swept cash into money market funds—into its ICA and DCA programs. ¶123. In a March 2025 presentation, LPL described its use of financial modeling to identify the clients least likely to leave if LPL reduced their yields—ultimately determining to disproportionately apply rate decreases to its least wealthy clients because they were least likely to leave in response. ¶124.

## IV. LEGAL STANDARD

Under Rule 15, courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).[5] Courts evaluate leave to amend under the five "*Foman* factors": (1) undue prejudice to the non-moving party; (2) futility of amendment; (3) undue delay; (4) repeated failure to cure deficiencies by prior amendments; and (5) bad faith on the part of the movant. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178 (1962)). In weighing the *Foman* factors, "all inferences should be made in favor of granting the motion to amend." *Hayes v. Wright Med. Tech., Inc.*, 2016 WL 7451662, at *1 (S.D. Cal. Dec. 28, 2016).

Of the *Foman* factors, "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Cap.*, 316 F.3d at 1052. "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.* (emphasis in original). "[T]his policy is to be applied with extreme liberality." *Smith Interface Techs., LLC v. Apple Inc.*, 2026 WL 222245, at *10 (S.D. Cal. Jan. 28, 2026) (Robinson, J.).

---

[5] Rule 15, rather than Rule 16, applies to Plaintiffs' motion because Plaintiffs are seeking leave to amend within the deadline set by the Court—July 17, 2026. *See* Dkt. No. 98. *See McGhee v. N. Am. Bancard, LLC*, 2021 WL 5763834, at *2 (S.D. Cal. Sept. 17, 2021) (court applying Rule 15(a) rather than Rule 16 where the plaintiff moved to amend within the scheduling order's deadline). That said, even if the Rule 16 "good cause" standard were to apply, Plaintiffs satisfy that standard, as shown below. Rule 16 "primarily considers the diligence of the party seeking the amendment." *Zeng v. Calidi Biotherapeutics, Inc.*, 2026 WL 578817, at *3 (S.D. Cal. Mar. 2, 2026). Here, Plaintiffs have exercised utmost diligence in pursuing discovery and obtaining evidence for the proposed amendment. *See infra* §II.B. Once good cause is shown (as it is here), the inquiry shifts back to the standard Rule 15 analysis. *See Duell v. First Nat'l Bank of Omaha*, 2016 WL 3033856, at *2-3 (S.D. Cal. May 27, 2016).

## V. ARGUMENT

### A. Plaintiffs Seek Leave To Amend Without Delay And In Good Faith

Plaintiffs have been highly diligent in the prosecution of this action. LPL's new evidence supporting the PAC resulted from months of Plaintiffs' active discovery efforts, during which they engaged in multiple meet-and-confer sessions with LPL, briefed multiple discovery motions, and appeared at nine conferences before Magistrate Judge White. *See* Dkt. Nos. 77, 82, 88-89, 91-92, 96-97, 99.

Those efforts culminated in Judge White ordering LPL to produce additional documents and setting July 17 as the deadline for Plaintiffs to seek leave to amend. *See* Dkt. No. 98. After obtaining new and critical evidence relating to LPL's breach of fiduciary duty it owed to its Corporate Advisory clients and LPL's violation of its promise to pay clients interest based on rates offered by other banks, Plaintiffs promptly moved to amend. Plaintiffs' diligence rebuts any suggestion of delay, and this factor weighs in favor of granting leave to amend. *See Chan v. ArcSoft, Inc.*, 2022 WL 22863221, at *5 (N.D. Cal. Nov. 23, 2022).

Further, even if the Court were to consider the "good cause" requirement under Rule 16, Plaintiffs' diligence in moving to amend soon after obtaining the discovery that supports the amendment weighs strongly in favor of granting Plaintiffs' motion. *See U.S. EEOC v. Bay Club Fairbanks Ranch, LLC*, 475 F. Supp. 3d 1099, 1102-03 (S.D. Cal. 2020) (granting leave to amend eight months after original deadline to amend where plaintiff obtained new evidence to support allegations through "consistent[]" discovery efforts); *accord Duell*, 2016 WL 3033856, at *2-3. Indeed, "courts routinely find good cause [under Rule 16] when a movant shows that facts supporting new amendments were revealed for the first time in discovery." *Pizana v. SanMedica Int'l LLC*, 345 F.R.D. 469, 481 (E.D. Cal. 2022); *see also Zeng*, 2026 WL 578817, at *3 (granting leave to amend based on evidence obtained in discovery because "waiting to amend a complaint until a strong

evidentiary basis has been developed is preferable to prematurely asserting those claims based on a limited record that may or may not support them" and the court has a "strong preference for resolving cases on the merits"); *Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.*, 2006 WL 3733815, at *5 (E.D. Cal. Dec. 15, 2006) ("Allowing parties to amend based on information obtained through discovery is common and well established."); *Henderson v. United Student Aid Funds, Inc.*, 2014 WL 4658744, at *6 (S.D. Cal. Sept. 17, 2014) ("discovery produced after the deadline to amend the pleadings made compliance with the deadline a temporal impossibility" (cleaned up)).

**B. LPL Will Not Be Prejudiced**

"[T]he party opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). To establish prejudice, LPL must show that Plaintiffs' "new allegations greatly alter the nature of the litigation and would require defendants to undertake, at a late hour, an entirely new course of defense." *Holm v. Acima Credit Dig., LLC*, 2025 WL 951273, at *3 (S.D. Cal. Mar. 27, 2025). Further, to "justify denial of leave to amend, prejudice must be substantial." *Art Attacks*, 2005 WL 8160181, at *1.

Here, Plaintiffs do not seek to assert new claims, but instead to replead their original fiduciary duty and contract claims with additional facts that address pleading deficiencies identified by the Court. Under similar circumstances, *i.e.*, where plaintiffs sought leave "to amend to reallege a [previously dismissed] claim" based on "facts obtained in discovery," the district court granted leave and rejected the defendants' claim of prejudice. *See Chan*, 2022 WL 22863221, at *2.

*Chan*'s prejudice analysis is instructive. First, the court declined to find prejudice in *Chan* because, as is the case here, the defendants "have been on notice of these theories since the inception of the litigation." *Id.* at *5. Second, like here, the different claims in *Chan* arose from the same set of facts, which meant that the

"proposed amendments [would] not significantly alter the scope of the litigation or require Defendants to undertake an entirely new course of defense." *Id.*; *accord McGhee*, 2021 WL 5763834, at *3 (rejecting prejudice argument where the added claims "share a common core of operative facts" with the pending claims).

Third, in *Chan*, the court found a lack of prejudice because "at least some of the discovery already taken is relevant to the amendments." 2022 WL 22863221, at *5. This rationale applies with even greater force here as the proposed amendment would not require a significant expansion of the scope of discovery. Further, in *Chan* as well as here, the facts supporting the amendments "are in large part based on documents produced by Defendants, which weighs against prejudice." *Id*.

Finally, the Court recently extended not only the deadline to file a motion for leave to amend, but also the deadline for fact discovery, by four months, based solely on the claims in the current operative complaint. *See* Dkt. No. 98. LPL has not taken a deposition or filed any dispositive motion, and will therefore not duplicate any discovery efforts. LPL cannot show prejudice from the proposed amendment.

**C. The Proposed Amendment Is Not Futile**

Plaintiffs' proposed amendment alleges, based on LPL's internal admissions and other evidence, that LPL owed a fiduciary duty to its Corporate Advisory clients vis-à-vis their swept cash, charged advisory fees for managing that cash, and breached their fiduciary duties by setting client interest rates and fees in the Cash Sweep Programs based solely on how much money LPL would make. These facts address the pleading deficiency the Court previously identified—that Plaintiffs failed to allege "any common-law fiduciary obligation, [or] any special relationship of trust, confidence, or reliance" under Massachusetts law. *See* Dkt. No. 58 at 31.

Specifically, as the Massachusetts Supreme Judicial Court has recognized, "traditional[]" facets of an investment adviser's relationship with its clients include "responsibility of continuous [] management" over their clients' funds and

"charg[ing] a periodic fee calculated as a percentage of [the] asset under management." *Robinhood*, 214 N.E.3d at 1063-64. Both features, as alleged in the PAC, existed in LPL's management of Corporate Advisory clients' swept cash. By assuming the "trusted advisory role," LPL in turn "must comply with the full complement of fiduciary duties of utmost good faith, and full and fair disclosure of all material facts, and shoulder an affirmative obligation to employ reasonable care to avoid misleading clients" as a matter of Massachusetts law. *Id.* at 1064.

Further, it is well-settled that "Federal and State law historically have held broker-dealers and investment advisers to different standards of care." *Id*. Here, because LPL served as the adviser for its Corporate Advisory clients, not merely their broker, the standard for discerning a ***broker's*** fiduciary duty based on its level of discretion from *Patsos v. First Albany Corp.*, 741 N.E.2d 841, 850 (Mass. 2001) and *UBS Financial Services, Inc. v. Aliberti*, 133 N.E.3d 277 (Mass. 2019) does not apply. *See* Dkt. No. 58 at 30. Even if it did apply, in *Patsos*, the Massachusetts Supreme Court held that "where the account is 'discretionary,' . . . the broker assumes broad fiduciary obligations that extend beyond individual transactions." 741 N.E.2d at 850. Thus, the reasoning from *Patsos* fully supports the application of a fiduciary duty to LPL's advisory clients. By narrowing their fiduciary duty claim to a subclass of Corporate Advisory clients who received investment advisory services from LPL, and alleging detailed admissions from LPL that it owed those very clients a fiduciary duty and exercised complete discretion with respect to client yields, Plaintiffs satisfactorily address the pleading deficiency that the Court previously identified.

Plaintiffs' proposed amendment highlights LPL's repeated and unqualified admissions of its fiduciary duty in internal documents. *See, e.g.*, ¶112 ("***In Corporate, we have a fiduciary responsibility***" and "Our fiduciary responsibility on this portion of cash is the focus of regulators across the industry, including our SEC

investigation."); ¶120 ("For corporate advisory, ***LPL is the investment advisor with the fiduciary obligation***."). Under Massachusetts law, where, as here, a party "acknowledged . . . that [it] was required to act in [another party's] best interests," that is clear evidence of "the existence of a fiduciary relationship." *Doe v. Harbor Schools, Inc.*, 843 N.E.2d 1058, 1064-65 (Mass. 2006) (holding that fiduciary duty existed based on defendant's acknowledgment in its answer to the complaint).[6]

Finally, Plaintiffs are proffering newly-uncovered admissions by LPL that the use of the Cash Sweep Programs for its Corporate Advisory clients breached the fiduciary obligation LPL owed to those clients. *See* ¶100 ("The analysis for this program ***does not demonstrate how this program is in the fiduciary interest of the client***."); ¶81 ("concern about the impact the fees may have on DCA's ability to meet the objective of providing a reasonable rate"). LPL cannot evade liability by hiding behind its boilerplate disclaimers—as LPL itself acknowledged in a 2019 internal presentation on its DCA Cash Sweep Programs, "***disclosure alone does not resolve conflicts***." ¶73.

The proposed amendment sufficiently alleges both the existence of LPL's fiduciary duty under Massachusetts law and LPL's breach of that duty. These allegations far exceed Plaintiffs' limited burden to rebut a claim of futility on a motion for leave to amend. *See Bortz v. JPMorgan Chase Bank, N.A.*, 2021 WL 4819575, at *5 (S.D. Cal. Oct. 15, 2021) (Robinson, J.) (recognizing that denying "leave to amend on grounds of futility is rare" and that "courts generally defer consideration of challenges to the merits of a proposed amended pleading until after

---

[6] *See also Goldsmith v. UBS Fin. Servs., Inc.*, 2026 WL 819461, at *20 (S.D.N.Y. Mar. 25, 2026) (when a defendant "acknowledged it was acting as a fiduciary," that alone "plausibly plead[s]" the existence of a fiduciary relationship under New York law); *In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315, at *3 (N.D. Cal. June 27, 2025) (defendant's statement that "we owe [] a fiduciary duty" shows the existence of fiduciary relationship under New York law).

leave to amend is granted and the amended pleading is filed.”).[7]

Plaintiffs also have alleged a valid claim that LPL breached its express agreement to pay interest rates on its clients’ swept funds based on “the amount the [external] Banks are willing to pay.” ¶¶2, 29, 41. In its motion to dismiss decision, the Court found that Plaintiffs did not identify a specific agreement or promise by LPL regarding the interest rate. *See* Dkt. No. 58 at 26-27.

The proposed amendment addresses this deficiency by identifying a specific promise that LPL made to clients in a form contract to pay interest rates based on what the external banks “[were] willing to pay." Dkt. No. 58 at 37-38; ¶¶92, 225. As courts have repeatedly held, similar promises about the payment of interest rates for cash sweep accounts are enforceable. *See, e.g.*, *Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701, 713 (S.D.N.Y. 2025) (sustaining breach of contract claim based on a promise to pay interest rates “based upon prevailing economic and business conditions”); *Mehlman v. Ameriprise Fin., Inc.*, 2025 WL 2403252, at *7 (D. Minn. Aug. 19, 2025) (“Ameriprise was contractually obligated to secure for and pay clients interest rates that took prevailing economic and business conditions into consideration”).[8]

The amendment further details how LPL breached this promise, by proffering internal LPL documents showing that the rates banks “[were] willing to pay” climbed as a result of rising market rates and highlighting how, instead of raising the interest rates for its Cash Sweeps clients, LPL capitalized on rising rates to increase

---

[7] This promise was made in a form contract prepared by LPL and given to its clients on a take-it-or-leave-it basis. It is therefore subject to the interpretation that “an objectively reasonable person in the nondrafting party’s position would give to its terms.” *James B. Nutter & Co. v. Est. of Murphy*, 88 N.E.3d 1133, 1139 (Mass. 2018); *see also Golchin v. Liberty Mut. Ins. Co.*, 993 N.E.2d 684, 689 (Mass. 2013) (form contract interpreted under “objectively reasonable” standard).

[8] *See also Goldsmith*, 2026 WL 819461, at *13 (same); *In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055, at *7 (S.D.N.Y. Feb. 12, 2026) (same).

its own profits through increased fees and remitting unreasonably low client yields. ¶¶2, 29, 41. These facts establish a breach of LPL's contractual promise to its clients. *See, e.g.*, *Oppenheimer*, 802 F. Supp. 3d at 713; *Mehlman*, 2025 WL 2403252, at *7. Plaintiffs' request to replead a contract claim, therefore, is not futile.

### D. Plaintiffs Seek Their First Amendment

The final *Foman* factor also favors granting Plaintiffs leave to amend. Plaintiffs have not previously sought leave to amend and, instead, "waited until they had sufficient evidence of conduct upon which they could base claims of wrongful conduct." *DCD Programs*, 833 F.2d at 187.

## VI. CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs leave to amend and adopt the attached First Amended Consolidated Class Action Complaint as the operative pleading in this action.

Dated: July 17, 2026

Respectfully submitted,

By: _/s/ Michael D. Blatchley_
Jonathan D. Uslaner (Bar No. 256898)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470
jonathanu@blbglaw.com

-and-

Salvatore J. Graziano (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Adam H. Wierzbowski (*pro hac vice*)
Michael D. Blatchley (*pro hac vice*)
Emily A. Tu (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 245-1000
salvatore@blbglaw.com
johnr@blbglaw.com
adam@blbglaw.com
michaelb@blbglaw.com
emily.tu@blbglaw.com

Sophia M. Rios (Bar No. 305801)
**BERGER MONTAGUE PC**
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Telephone: (619) 489-0300
srios@bergermontague.com

-and-

Michael Dell'Angelo (*pro hac vice*)
Alex B. Heller (*pro hac vice*)
Joseph E. Samuel, Jr. (Bar No. 344732)
1818 Market Street, Suite 3600

Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bergermontague.com
aheller@bergermontague.com
jsamuel@bergermontague.com

Matthew L. Dameron (*pro hac vice*)
Clinton J. Mann (*pro hac vice*)
Claire M. Terrebonne (*pro hac vice*)
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, MO 64105
Telephone: (816) 945-7110
matt@williamsdirks.com
cmann@williamsdirks.com
cterrebonne@williamsdirks.com

*Counsel for Plaintiffs Daniel Peters, Douglas Nevitt, and Carol White and Interim Co-Lead Counsel*